IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOLTERRA SEMICONDUCTOR LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-2240 (CFC) |
| | ) | |
| MONOLITHIC POWER SYSTEMS, INC., | ) | REDACTED - PUBLIC VERSION |
| | ) | |
| Defendant. | ) | |

**FISH & RICHARDSON P.C.'S
ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO DISQUALIFY COUNSEL**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Megan E. Dellinger (#5739)
Andrew M. Moshos (#6685)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mdellinger@mnat.com
amoshos@mnat.com

*Attorneys for Fish & Richardson P.C.*

Originally Filed:  May 28, 2020
Redacted Version Filed:  June 4, 2020

TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................1

II.     SUMMARY OF ARGUMENT ..............................................................2

III.    STATEMENT OF FACTS .....................................................................2

        A.      "DC-to-DC Converters" .............................................................2

        B.      Fish's 2007-2012 Work for MPS ...............................................4

                1.      MPS Retained Fish in 2007 ............................................4

                2.      Fish Was Not MPS's "IP General Counsel" ...................5

                3.      Fish's Litigation Work for MPS ......................................6

                4.      Fish's Prosecution Work for MPS ...................................7

                5.      General Advice ................................................................7

                6.      The Powertech Litigation ...............................................8

        C.      Fish Terminated Its Relationship with MPS in 2012 ..............8

        D.      Fish Reiterated in 2014 that It Had No Attorney-Client
                Relationship with MPS ...............................................................9

        E.      This Litigation ..........................................................................10

                1.      MPS Describes the Patents-in-Suit Narrowly in Its Motion
                        to Dismiss ......................................................................11

                2.      The Statute of Limitations Cuts Off Damages in 2013 ............13

        F.      Fish Set Up Ethical Walls .........................................................13

IV.     ARGUMENT .......................................................................................15

        A.      MPS Has Not Shown a Substantial Relationship Between Fish's
                2007-2012 Work for MPS and This Litigation. ......................15

B.      MPS's Other Arguments About Fish's Work Do Not Create a Substantial Relationship. ...................................................................17

C.      Even If There Had Been a Violation of the Rules, Disqualification Would Not Be Appropriate. ...............................................................20

V.      CONCLUSION ..............................................................................21

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Biax Corp. v. Fujitsu Computer Sys. Corp.*,
   2007 WL 1466638 (E.D. Tex. May 16, 2007) ...................................................16

*Bos. Sci. Corp. v. Johnson & Johnson, Inc.*,
   647 F. Supp. 2d 369 (D. Del. 2009).............................................................20, 21

*Conley v. Chaffinch*,
   431 F. Supp. 2d 494 (D. Del. 2006)..................................................................15

*EON Corp. IP Holdings LLC v. Flo-TV Inc.*,
   2012 WL 4364244 (D. Del. Sept. 24, 2012)......................................................21

*Evolutionary Intelligence, Inc. v. Facebook, Inc.*,
   2013 WL 12140485 (E.D. Tex. July 3, 2013) ...................................................16

*Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*,
   2011 WL 2692968 (D. Del. June 22, 2011) ...........................................15, 19, 20

*Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*,
   632 F. Supp. 418 (D. Del. 1986)........................................................................21

*Regalo Int'l, LLC v. Munchkin, Inc.*,
   211 F. Supp. 3d 682 (D. Del. 2016)..........................................................*passim*

*Sonos, Inc. v. D&M Holdings Inc.*,
   2015 WL 5277194 (D. Del. Sep. 9, 2015)..................................................*passim*

*Soverain Software LLC v. CDW Corp.*,
   2010 WL 1038731 (E.D. Tex. Mar. 18, 2010) ...................................................15

*Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*,
   491 F. Supp. 2d 510 (D. Del. 2007)...................................................................15

*Walker Digital LLC v. Axis Commc'ns*,
   2012 WL 5878668 (D. Del. Nov. 21, 2012).......................................................16

**Statutes and Rules**

35 U.S.C. § 286 ........................................................................................13

MRPC Rule 1.9 ..................................................................................14, 21

MRPC Rule 1.10 .....................................................................................21

MRPC Rule 1.16 .......................................................................................9

## I.      INTRODUCTION

It is undisputed that Fish has done no work for MPS since early 2012.  It is undisputed that Fish never provided any legal services to MPS relating to Volterra or to the Volterra patents at issue here.  It is undisputed that Fish never provided any legal services to MPS related to the accused product that was announced in 2019, more than seven years after Fish parted ways with MPS.  And it is undisputed that none of the Fish lawyers who have worked on this case ever did any work for MPS.

In order to disqualify Fish, MPS must show that work Fish did from 2007-2012 is substantially related to this litigation.  It is not.  In its opening brief (D.I. 18), MPS does not even try to show a substantial relationship between anything Fish did for MPS and this litigation.  There is not a single example in MPS's brief providing any facts or argument that there was a substantial relationship between any matter Fish handled for MPS and this litigation.

Instead, MPS simply repeats over and over that the work Fish did for MPS involved DC-to-DC converters, and that this case involves DC-to-DC converters.  But DC-to-DC converters includes thousands of products and tens of thousands of patents.  MPS's "DC-to-DC converter" refrain does not establish a substantial relationship between the work Fish did a decade ago and this case.  Nor does MPS's argument that Fish interviewed MPS personnel and reviewed its technology in 2007 establish a substantial relationship.

The "substantial relationship" test requires far more.  A general allegation that technology is in the same broad field does not show a substantial relationship.  The party seeking to disqualify its adversary's chosen counsel has to provide a real and meaningful analysis.  MPS has not done that.

## II.    SUMMARY OF ARGUMENT

1.    Fish's past representation of MPS from 2007-2012 is not "substantially related" to this litigation.    Vague generalizations that both representations involved the broad field of "DC-to-DC converters" are insufficient to carry MPS's burden.

2.    Fish was never MPS's "IP general counsel"; regardless, unfocused concerns about former counsel knowing a party's general litigation strategy does not warrant disqualification.

3.    If a remedy were needed, Fish erected an ethics wall promptly after MPS raised its concern.  No lawyer who previously worked for MPS has worked on this matter and no confidential information was disclosed before the institution of the wall.

## III.   STATEMENT OF FACTS

### A.    "DC-to-DC Converters"

MPS's entire argument for disqualification is that work Fish did for MPS from 2007-2012 is substantially related to this litigation, because it all involves "DC-to-DC converters."  D.I. 18 at 16; *see also id.* at 2-6, 8-10, 17-18.  But MPS provides

2

virtually no discussion or analysis of DC-to-DC converters, or what they are, relegating that to two short footnotes. *See id.* at 3 n.2, 4 n.3. MPS also provides no analysis whatsoever of any alleged relationship between any matter Fish handled for MPS and its current work for Volterra. And for good reason. The term "DC-to-DC converters" does not refer to any specific device, but to a broad, general category of devices encompassing any circuit that converts voltages. As described in a 2013 textbook:

> Numerous dc-to-dc converters are currently being employed in various electronic equipment and systems. These converters outwardly look *so varied in their topologies and operations that the diversity of dc-to-dc converters is seemingly amazing, even mysterious.*

Ex. A at 123 (emphasis added); *see also* Ex. B at 4 ("A large number of dc-dc converter circuits are known that can increase or decrease the magnitude of the dc voltage and/or invert its polarity."). There are many topologies for DC-to-DC converters including buck (step-down), true buck-boost, boost (step-up), SEPIC, buck-boost (inverting), and Ćuk for non-isolated converters (Ex. C at 218, 223) and flyback, forward, push-pull, half-bridge, and full-bridge for isolated converters (Ex. D at 1). These topologies have thousands of specific circuitry implementations.

MPS sells hundreds of different DC-to-DC converters – the category "DC-DC Power Converters" on MPS's website lists 746 products (Ex. E), including 517 "switching regulators" and 101 "power modules" (Ex. F). And the first 15 pages

of MPS's product catalog (Ex. G) are devoted to "DC/DC Power Conversion" with over 300 products.

The diversity of "DC-to-DC converters" is also highlighted by the vast number of patents in this field.  A search of the USPTO's patent database returned approximately 36,000 patents using the term "dc-to-dc converter," "dc/dc converter," "dc to dc converter," "dc-dc converter," or "dc dc converter" in the written description, and over 8,000 patents using those terms in the claims.  Exs. H & I (last accessed May 23, 2020).

**B.    Fish's 2007-2012 Work for MPS**

**1.    MPS Retained Fish in 2007**

MPS engaged Fish in July 2007. ███████████████████

██████████████████████████  ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████

### 2.    Fish Was Not MPS's "IP General Counsel"

MPS argues that Fish was MPS's "IP general counsel." D.I. 18 at 1, 5, 7,

15.   But MPS provides no contemporaneous evidence to support that.   █████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Moreover, MPS has an in-house legal department, including General Counsel (D.I. 20,

¶1 ("I, Saria Tseng, … have been employed by MPS as General Counsel since late

2004.")), and a Director of Patents, in addition to other patent attorneys and

paralegals.  Ex. K. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

Fish was not the only law firm MPS engaged to do patent work in the

2007-2012 time frame.  In two of the cases MPS cites, it replaced Fish with Latham &

Watkins and Finnegan Henderson.  Ex. L (D.I. 24 & 33 from *Monolithic Power*

*Systems, Inc. v. O2 Micro Int'l Ltd.* (substituting Latham for Fish and adding Finnegan

in February 2009)), Ex. M (docket entries from *Certain Cold Cathode Fluorescent*

*Lamp Inverter Circuits and Products Containing Same* (same)); ███████

████████████████████████████████████████

███████████████████  And nearly all of MPS's patent prosecution work was

being done by another firm.  According to the USPTO's database, from 2007-2012,

Fish is listed on just two (abandoned) MPS patent applications, while Perkins Coie is

listed on sixty-eight.  Ex. N.

### 3.    Fish's Litigation Work for MPS

MPS identifies the *O2 Micro* and *Cold Cathode* cases mentioned above

(where it replaced Fish in early 2009), stating that those cases involved "technologies

similar to those at issue here."  But MPS provides no explanation.  D.I. 18 at 9 &

9 n.8.  Those cases did not involve any Volterra patents or the MPS product at issue.

They hardly involved Fish either.

MPS also identifies lawsuits Fish handled for it against Chip Advanced

Technology in 2007 involving MPS's 6,897,643 patent and against Silergy in 2010

involving that patent and the 7,714,558 patent, and a pre-litigation analysis against

another party on those patents.  *Id.* at 8-9.  There is not a word in MPS's brief about

what those cases related to – except "DC-to-DC converters."  Those cases did not

relate to any Volterra patent or the MPS product at issue.

Finally, MPS refers to "[other planned actions] against significant

competitors."  *Id.* at 9.  MPS cites three more patents, but again provides no

description of what they relate to.  They did not relate to any Volterra patents or the accused MPS product.

### 4.    Fish's Prosecution Work for MPS

MPS spends a single paragraph on Fish's patent prosecution work for it, saying nothing about that work (just more references to "DC-to-DC converters"). Those two patent applications (of 73 MPS was prosecuting (Ex. N)) did not relate to Volterra patents or the MPS product at issue.  ███ Fish attorneys billed a total of ██ hours to those matters in 2008-2010.  D.I. 19, ¶¶42-47.  All ██ left Fish in 2010. Ex. O, ¶¶3-5.[1]

### 5.    General Advice

████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████

---

[1]    MPS devotes a sentence of its brief to a reexamination proceeding that Fish worked on for two months in 2011, saying only "related to DC-to-DC converters." D.I. 18 at 10.  That did not relate to Volterra patents or the accused MPS product.

[2] ████████████████████████████████████████████
██████████████████████████████.

### 6.     The Powertech Litigation

MPS also references work Fish did for an entity called "Powertech" in 2009-2010.  D.I. 18 at 5, 7, 9, & 15; D.I. 19, ¶¶39-41; D.I. 20, ¶¶9-11, 13, 25, 48-49, 78 & Ex. 12.  But Powertech was not MPS.  ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████  That representation has no relevance to this motion.[3]

### C.     Fish Terminated Its Relationship with MPS in 2012

█████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

───────────────────

[3] ██████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Formally terminating the relationship and returning files to the former client when the matters concluded was the appropriate and ethical thing to do. *See* MRPC 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, [and] surrendering papers and property to which the client is entitled...."). [4] Fish was entitled to terminate the relationship in 2012 when it had not done work for MPS for several months.

### D. Fish Reiterated in 2014 that It Had No Attorney-Client Relationship with MPS

█████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████ MPS does not even try to explain what that has to do with this motion. More importantly, there is no basis for MPS's allegation.

---

[4] There is no requirement that the client acquiesce to the termination, as long as any "withdrawal can be accomplished without material adverse effect on the interests of the client." MRPC 1.16(b).



### E.    This Litigation

Three Volterra patents are asserted here – not any MPS patents Fish worked on a decade ago – and this case involves only a narrow subset of "DC-to-DC converters," as MPS argues in its concurrently-filed motion to dismiss.

### 1. MPS Describes the Patents-in-Suit Narrowly in Its Motion to Dismiss

In its disqualification motion, MPS argues that the term "DC-to-DC converters" creates a substantial relationship between work Fish did a decade ago and unrelated Volterra patents. In its motion to dismiss, however, MPS argues that the complaint does not describe the "detailed structural and operational limitations" required by the Volterra patents.  D.I. 16 at 4.  There, MPS describes the asserted Volterra patents not as DC-to-DC converter patents, but as patents "relate[d] to coupled inductors for voltage converters."[5]  D.I. 16 at 6.  Similarly, Volterra says that "[t]he patents-in-suit relate to DC-to-DC power converters based upon a coupled inductor architecture."  D.I. 31 at 3. Thus, the parties agree that the Volterra patents are based on coupled inductor architecture.

On its motion to dismiss, MPS also repeatedly lists "detailed structural and operational limitations of [the Volterra] patents."  D.I. 16 at 4 ("[a]ll of the asserted claims of all three Asserted Patents include detailed structural and operational limitations"), 7-11 (detailing the many, specific limitations required of the claims of the Asserted Patents); *see also id.* at 5 (arguing that phrases such as "'Modular Dual-

---

[5]     MPS uses the term "DC-to-DC converters" 35 times in its disqualification brief (D.I. 18), but only twice in its motion to dismiss opening brief, and neither time as the invention: the first time as "a method for 'reducing ripple in a DC-to-DC converter'" requiring certain steps and the second time as a DC-to-DC converter with a "coupled inductor" having a long list of features. *See* D.I. 16 at 6 & 9.  There is no mention of "DC-to-DC converters" in its reply brief.  D.I. 32.

phase Buck[6] with Coupled Inductor' and '10 Phases for 600A,' [] offer only general descriptions of the technology"); D.I. 32 at 3-13 (MPS's reply brief referencing narrow details of claims without reference to "DC-to-DC converters").

The characterization of the scope of the technology in this case as "DC-to-DC converters" comes from MPS, not from Volterra.  The scope of this case will of course be determined by the claims of the asserted patents, all of which (as their titles indicate (Exs. A-C to D.I. 11)) relate to coupled inductors, and any accused products will have to embody those specific applications of coupled inductors.  Furthermore, even as MPS seeks to impute the overly-broad "DC-to-DC converter" definition to Volterra (and then argues that the current and prior representations must necessarily be "substantially related," due to that broad scope), MPS simultaneously argues that there is no definition of the scope of this case that would not be substantially related (D.I. 18 at 17, 19 ("[E]ven if Volterra expressly limits its infringement claims to products developed after Fish's relationship with MPS ended, Fish's knowledge would unfairly materially advance Volterra's position.")).  In short, according to MPS, any of the thousands of products and patents in the DC-to-DC converter space is inherently substantially related to any other product or patent in that broad field, no matter how different they may be.

---

6       A "buck" is a subset of "DC-to-DC converters."  D.I. 18 at 4 n.3.

## 2.    The Statute of Limitations Cuts Off Damages in 2013

Damages cannot go back before December 2013 (35 U.S.C. §286) and

Fish's representation of MPS ended in 2012.  Yet MPS states that discovery in this

case "would necessarily include MPS's products that were available when Fish

represented MPS."  D.I. 18 at 4; *see also id.* at 18.  But MPS does not explain why.

The only Fish investigation into MPS's products mentioned in MPS's brief was in

2007, more than twelve years before this lawsuit was filed.  ████████████████

████████████████████████████████████████████████████████

███████████████████████    And even if MPS were correct, the mere availability of

MPS products while Fish was representing MPS is not sufficient for disqualification.

The product accused in the complaint was not announced until 2019.  As set forth in

the Tseng declaration (D.I. 20, ¶5), that product "is an example of a DC-to-DC

converter and its development was announced last year."  She does not suggest (nor

could she) that Fish had any role in the development of that new MPS product.

### F.    Fish Set Up Ethical Walls

Immediately after receiving MPS's first letter regarding its concerns

about Fish's representation of Volterra on January 21, 2020, Fish set up two ethical

walls, one preventing individuals working on this matter from accessing any files or

---

[7]    Even as MPS describes its products as being "on the cutting-edge of developing power systems" (D.I. 18 at 4-5), it argues that products from 2007 may be relevant to a case filed in 2019.

discussing the firm's prior matters for MPS with anyone, and the other preventing individuals who worked on the firm's prior matters for MPS from accessing any files from this matter or discussing this matter with anyone.  D.I. 21, Exs. 30 at 3 & 33 at 1-2.  MPS acknowledges that it was so informed.  D.I. 18 at 11.

MPS's concern that "[t]he Fish attorneys and staff, and their knowledge about MPS, were not walled off during the critical period in which Fish was investigating Volterra's claims against MPS" (D.I. 18 at 19; *see also id.* at 2, 11) has no basis, given that nobody working on the Volterra matter ever did any work for MPS (D.I. 21, Ex. 33 at 1-2).  Moreover, on its motion to dismiss, MPS argues that Volterra's complaint "relies entirely on two YouTube videos that do not provide factual support for its allegations" (D.I. 16 at 16; *id.* at 11-12) and the "imagin[ation]" of its counsel (D.I. 32 at 12 & 13).

Thus, while MPS argues on this motion that there is "a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance [Volterra's] position in the subsequent matter" (Cmt. 3 to MRPC Rule 1.9(a)), it argues on its other motion that Fish has only publicly available information from YouTube videos about MPS's products.

## IV.   ARGUMENT

### A.   MPS Has Not Shown a Substantial Relationship Between Fish's 2007-2012 Work for MPS and This Litigation.

The only issue in dispute is whether MPS has proved that Fish's representation of MPS from 2007-2012 was substantially related to this litigation. The determination of whether a matter is "substantially related" is fact specific. *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, 2011 WL 2692968, at *6 (D. Del. June 22, 2011).   Courts consider three questions in making that determination:

> (1) What is the nature and scope of the prior representation at issue? (2) What is the nature of the present lawsuit against the former client? [and] (3) In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?

*Regalo Int'l, LLC v. Munchkin, Inc.*, 211 F. Supp. 3d 682, 688 (D. Del. 2016).

MPS has the burden to demonstrate that "continued representation would be impermissible." *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.,* 491 F. Supp. 2d 510, 513 (D. Del. 2007).   "[V]ague and unsupported allegations are not sufficient to meet this standard." *Conley v. Chaffinch*, 431 F. Supp. 2d 494, 496 (D. Del. 2006); *see also Soverain Software LLC v. CDW Corp.*, 2010 WL 1038731, at *4 (E.D. Tex. Mar. 18, 2010) ("[D]isqualification cannot be granted on generalities…. [Movant] has the burden to delineate with specificity what confidential information was shared.").

15

MPS has made no such showing here.  Instead it argues that work Fish did for MPS and this litigation both relate to DC-to-DC converters. That is exactly the type of argument that courts have repeatedly rejected.

Courts "require a party who is moving to disqualify counsel in a patent matter to demonstrate a fairly close legal and factual nexus between the present and prior representations." *Regalo*, 211 F. Supp. 3d at 689.  "[D]ifferent patents and different products" generally are not regarded as substantially related.  *Sonos, Inc. v. D&M Holdings Inc.*, 2015 WL 5277194, at *4 (D. Del. Sep. 9, 2015); *see Walker Digital LLC v. Axis Commc'ns*, 2012 WL 5878668 (D. Del. Nov. 21, 2012) (denying disqualification because general confidences were not relevant when the suit "involve[d] different patents and a different subject matter, and [when] the patents' scope is to be drawn from intrinsic and extrinsic evidence").

A general allegation that the technology is in the same broad field is not sufficient to establish a substantial relationship. As one court has said:

> Sun has not offered any evidence, other than an affidavit by its chief patent counsel …. In addition, Sun's argument that both representations involve server architecture is too broad for purposes of establishing a substantial relationship.

*Biax Corp. v. Fujitsu Computer Sys. Corp.*, 2007 WL 1466638, at *2 (E.D. Tex. May 16, 2007); *see also Evolutionary Intelligence, Inc. v. Facebook, Inc.*, 2013 WL 12140485, at *16 (E.D. Tex. July 3, 2013) ("The fact the '102 specification may

briefly discuss technical concepts in the same field as the patents-in-suit does not make them substantially related.").

Courts in this district have reached similar conclusions.  In *Sonos*, the plaintiff's attorneys had represented the defendant in patent litigation matters ending five years earlier. 2015 WL 5277194 at *4.  Judge Andrews denied disqualification, finding that the litigations involved "different patents and different products," and that the defendant was not involved in the wireless audio technology field during the prior representation.  *Id.*  Thus, the representations were not substantially related and no confidential information was at risk of misuse.  *Id.*; *see also Regalo*, 211 F. Supp. 3d at 694.

Here, MPS has shown only that Fish represented MPS in a number of matters over a five-year period ending eight years ago.  MPS made no showing of a substantial relationship between any of those matters and this litigation.  Nor could it. None of those matters involved Volterra patents, the 2019 accused product, or any other issue in this case.  Saying DC-to-DC converter thirty-five times does not demonstrate a substantial relationship.

**B.    MPS's Other Arguments About Fish's Work Do Not Create a
        Substantial Relationship.**

Unable to meet the substantial relationship test, MPS argues instead that a decade ago, "Fish was MPS's IP general counsel, Fish interviewed MPS's

17

employees regarding *all* of MPS's technology and reviewed MPS's entire IP portfolio." D.I. 18 at 15.

As discussed above, Fish was not MPS's IP general counsel. But no matter what that relationship is called, that Fish learned information about MPS's patent portfolio and interviewed MPS employees does not establish the substantial relationship required to disqualify Fish from representing Volterra in this matter.

In *Regalo*, although the prior work involved trademarks and not the accused products in the patent litigation, Plaintiff's counsel had been exposed to defendant's confidential information, including "licensing positions and strategies, product development and placement strategies, and overall market position strategies" and had "frequent contact" with defendant's officers and managers, including its General Counsel and CEO. 211 F. Supp. 3d at 684-85. Judge Burke rejected the argument that there was a substantial relationship because both matters involved intellectual property and plaintiff's counsel had learned a great deal of intellectual property-related information from the defendant (*id*. at 688), summarizing the law:

> [J]udges in this District have tended not to give great weight … to unfocused concerns that a party's former counsel knows the party's "playbook." Instead, in the main, they tend to require a party who is moving to disqualify counsel in a patent matter to demonstrate a fairly close legal and factual nexus between the present and prior representations.

18

*Id.* at 689.   The defendants' general description of the representation did not demonstrate the danger of sharing relevant confidential information.  *Id.* at 693-94. Similarly, in *Sonos*, Judge Andrews concluded:

> At most, Defendants disclosed their general strategy for handling patent litigation, which is not enough to warrant disqualification.

2015 WL 5277194 at *4.

MPS's unfocused concerns about its general strategy and meetings and interviews with MPS personnel a decade ago are insufficient to meet the substantial relationship requirement:

> [I]f the generalized citation to counsel's knowledge of a prior client's "litigation philosophies," "strategies" and "risk tolerances" necessarily demonstrated that the past representations were "substantially related" to any new matter where an attorney is adverse to the prior client, the floodgates for disqualification would open wide.

*Regalo*, 211 F. Supp. 3d at 692.  The only case MPS cites for its contrary position (D.I. 18 at 15-16) is an acknowledged outlier that involved "unique factual and legal circumstances."  *Regalo*, 211 F. Supp. 3d at 692 (referring to *Intellectual Ventures*, 2011 WL 2692968).  The disqualification motion in *Intellectual Ventures* involved the unusual situation where the challenged firm had not only performed a significant amount of work for the client but was also "tied to the company's very existence as a patent assertion entity, as the firm had literally helped create the plaintiff and had

19

shepherded the company through its early years of existence." *Id.* No such circumstances are present here.

### C. Even If There Had Been a Violation of the Rules, Disqualification Would Not Be Appropriate.

Even if the Court were to find a substantial relationship between Fish's prior representation of MPS and this litigation, "whether disqualification is appropriate depends on the facts of the case and is never automatic." *Bos. Sci. Corp. v. Johnson & Johnson, Inc.*, 647 F. Supp. 2d 369, 374 n.7 (D. Del. 2009). Disqualification is disfavored. *Regalo*, 211 F. Supp. 3d at 687; *Sonos*, 2015 WL 5277194 at *1. Courts approach motions to disqualify with "cautious scrutiny." *Intellectual Ventures*, 2011 WL 2692968 at *6. The application of such scrutiny requires denial of MPS's motion to disqualify.

The Court has discretion to fashion an appropriate remedy, including use of ethical walls to cure a conflict of interest. *Id.* at *12. Fish erected an ethical wall as soon as MPS raised the issue. Moreover, none of the lawyers who have worked for Volterra on this matter ever did any work for MPS. D.I. 21, Ex. 33 at 1-2. Thus, there is no risk of misuse of confidential information. That no confidential information has been disclosed is evidenced by MPS's motion to dismiss, where it argues that the complaint is deficient because it is based solely on publicly available YouTube videos.

In *Boston Scientific,* Judge Robinson found a violation of the rules of professional conduct, but denied disqualification because the suits were unrelated, being handled by attorneys from different offices, and an ethical wall was in place. 647 F. Supp. 2d at 374-75.  Similarly, in *Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F. Supp. 418, 429 (D. Del. 1986)*,* Judge Farnan held that isolating the conflicted attorneys under Rule 1.9 was sufficient to cure a violation imputed by Rule 1.10 to the rest of the firm.  Here, an ethical wall is already in place, and there is no reason for disqualification.[8]

## V.    CONCLUSION

MPS's motion to disqualify Fish from representing Volterra should be denied.

---

[8]   MPS cites *EON Corp. IP Holdings LLC v. Flo-TV Inc.*, 2012 WL 4364244 (D. Del. Sept. 24, 2012), to argue that Fish should be disqualified even though none of the Fish attorneys working on this case ever worked for MPS and there is an ethical wall in place.  In *EON*, however, Judge Andrews found that relevant factual information could have been shared with the law firm at issue as a result of certain invalidity defenses that had been raised. *Id.* at *4-5.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Megan E. Dellinger (#5739)
Andrew M. Moshos (#6685)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mdellinger@mnat.com
amoshos@mnat.com

*Attorneys for Fish & Richardson P.C.*

May 28, 2020

## <u>WORD COUNT CERTIFICATION</u>

The undersigned counsel hereby certifies that the foregoing document contains 4,989 words, which were counted by using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count includes only the body of the brief. The word count does not include the cover page, tables of contents and authorities, or the counsel blocks.

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 4, 2020, upon the following in the manner indicated:

Karen E. Keller, Esquire                                    *VIA ELECTRONIC MAIL*
Andrew Russell, Esquire
Nathan R. Hoeschen, Esquire
SHAW KELLER LLP
1105 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant Monolithic Power Systems, Inc.*

Bob Steinberg, Esquire                                      *VIA ELECTRONIC MAIL*
Matthew J. Moore, Esquire
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
*Attorneys for Defendant Monolithic Power Systems, Inc.*

Lionel M. Lavenue, Esquire                                 *VIA ELECTRONIC MAIL*
FINNEGAN, HENDERSON, FARABOW, GARRETT
  & DUNNER, LLP
Two Freedom Square
Reston, VA  20190-5675
*Attorneys for Defendant Monolithic Power Systems, Inc.*

Surendra K. Ravula, Esquire                                *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Defendant Monolithic Power Systems, Inc.*

R. Benjamin Cassady, Esquire
FINNEGAN, HENDERSON, FARABOW, GARRETT
   & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001-4413
*Attorneys for Defendant Monolithic Power Systems,*
*Inc.*

                                                  *VIA ELECTRONIC MAIL*

*/s/ Andrew M. Moshos*

_____
Andrew M. Moshos (#6685)