IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VOLTERRA SEMICONDUCTOR LLC,

Plaintiff,

v.

MONOLITHIC POWER SYSTEMS, INC.,

Defendant.

**REDACTED- PUBLIC VERSION**

C.A. No. 19-2240-CFC

**REPLY BRIEF IN SUPPORT OF DEFENDANT MONOLITHIC POWER SYSTEMS, INC.'S MOTION TO DISQUALIFY FISH & RICHARDSON P.C. AS COUNSEL FOR PLAINTIFF VOLTERRA SEMICONDUCTOR LLC**

OF COUNSEL:
Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
Two Freedom Square
Reston, VA 20190-5675
(571) 203-2750

R. Benjamin Cassady
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

Dated: June 22, 2020

## TABLE OF CONTENTS

Page

I. Under Volterra's Defined Scope of the Case (DC-to-DC Converters), a Substantial Relationship Exists ....... 2

A. The Technology at Issue Determines Substantial Similarity ....... 2

B. *Volterra* Defined the Scope as "DC-to-DC Power Converters" ....... 3

C. Fish Represented MPS Regarding DC-to-DC Converters in a Dozen-Plus Matters, Including Advising, Litigation, and Prosecution ....... 4

II. Even if the Case Is Limited to the Single Named Product, the 48V-1V Power Solution, Fish's Prior Representation Is Still Substantially Related ....... 4

A. Confiding in Fish Caused Past Harm, and It Will Now ....... 4

B. Fish Fails to Show How MPS Is Immune from Harm Now ....... 5

III. MPS Never Agreed to Any Type of Waiver with "Informed Consent, Confirmed in Writing" ....... 7

IV. Disqualification of Fish Is the Only Effective Remedy ....... 8

V. Conclusion ....... 11

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bleacher v. Bose*,
No. CV N16C-10-178 CEB, 2017 WL 1854794 (Del. Super. Ct. May 3, 2017) ..... 10

*Bos. Sci. Corp. v. Johnson & Johnson, Inc.*,
647 F. Supp. 2d 369 (D. Del. 2009) ..... 10

*EON Corp. IP Holdings LLC v. Flo-TV Inc.*,
2012 WL 4364244 (D. Del. Sept. 24, 2012) ..... 10

*Hydrogen Master Rights, Ltd. v. Weston*,
2016 WL 7411523 (D. Del. Dec. 22, 2016) (*vacated on other grounds*, 2017 WL 8682121 (D. Del. Feb. 6, 2017)) ..... 7

*Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*,
632 F. Supp. 418 (D. Del. 1986) ..... 10

*Quantico Tactical Inc. v. United States*,
2020 WL 2763964 (Fed. Cl. May 8, 2020) ..... 3, 11

*Regalo Int'l, LLC v. Munchkin, Inc.*,
211 F. Supp. 3d 682 (D. Del. 2016) ..... 6

*Satellite Fin. Planning Corp, v. First Nat'l Bank of Wilmington*,
652 F.Supp. 1281 (D.Del.1987) ..... 4, 7

*Sonos, Inc. v. D&M Holdings Inc.*,
2015 WL 5277194 (D. Del. Sep. 9, 2015) ..... 2

**Rules**

DE RPC 1.10 cmt 2 ..... 9

FRCP 11(c) ..... 9

MRPC 1.10 ..... 4, 5, 9

[redacted]

MRPC 1.9........................................................................................................4, 7

Fish & Richardson, LLP ("Fish") must be disqualified here because Fish cannot sue MPS on a matter that is substantially related to its prior representation of MPS. For five years (from 2007-2012), Fish was MPS's primary IP counsel, representing MPS in [redacted] separate matters related to MPS's core technology, DC-to-DC converters, the same technology on which Fish, representing Volterra, now sues MPS. Over [redacted] Fish attorneys, including [redacted] current partners/principals, billed approximately [redacted] hours to MPS, including patent advising, litigation, and prosecution matters, building MPS's trust over the five-year attorney-client relationship. Now, after spending years developing MPS's trust and defending MPS's core DC-to-DC converter technology, Fish, representing Volterra, broadly accuses *all* MPS's DC-to-DC power converters in Volterra's First Amended Complaint ("FAC"). This sweeping legal accusation against its former client's core technology is a disqualifying conflict.

Fish, contradicting Volterra, now insists that this case only involves one product, a 48V-1V Power Solution; but, representing Volterra, Fish has repeatedly refused MPS's requests to limit this case to that single named product (the subject of a co-pending Motion to Strike). Further, despite Fish's overwhelming conflict of interest with MPS, Fish put no safeguards in place to protect MPS confidential information before filing this lawsuit, only now claiming (without details) an after-the-fact attorney wall exists. Fish must be disqualified.

## I. UNDER VOLTERRA'S DEFINED SCOPE OF THE CASE (DC-TO-DC CONVERTERS), A SUBSTANTIAL RELATIONSHIP EXISTS

### A. The Technology at Issue Determines Substantial Similarity

Fish does not contest its prior representations of MPS are substantially related to DC-to-DC converters. Instead, Fish repeatedly insists this case implicates nothing beyond one product—as if MPS's hundreds of other DC-to-DC converters are off-limits. This is not how discovery works, and Fish knows better. Fish cannot file a complaint accusing all MPS "DC-to-DC power converters" and then retroactively limit the case to a single product to avoid its disqualifying conflict. D.I. 11 at ¶18. No caselaw or common sense allows such transparently contradictory positions.

The measure of substantial similarity is the *technology* at issue, DC-to-DC converters, not solely the identity of products or patents. Fish's primary case, *Sonos*, found no substantial relationship between prior and current matters because the *technology* differed, not just the products and patents. 2015 WL 5277194 at *4. In fact, unlike here, where Fish had unfettered access to the MPS technology at issue—DC-to-DC converters—the firm in *Sonos* could not have seen relevant information of the former client, as the former client's business only changed to include the technology-at-issue *after* its relationship with the firm ended.

### B. *Volterra* Defined the Scope as "DC-to-DC Power Converters"

Desperate to reconcile its inconsistent positions, Fish claims that "[t]he characterization of the scope of the technology in this case as 'DC-to-DC converters' comes from MPS, not from Volterra." D.I. 35, 12. This jaw-dropping claim ignores that *Volterra's FAC* broadly defines the accused products as "DC-to-DC power converters." D.I. 11, ¶18. Further, Fish/Volterra has repeatedly refused to clarify the inconsistency, seemingly to gain commercial advantage by misrepresenting MPS's risk exposure to customers.[1] *See, e.g.,* D.I. 38, 14-17. Volterra's FAC controls the scope of the case, not Fish's improper, self-serving attempt to redefine the scope.[2] *See Quantico Tactical Inc. v. United States*, 2020 WL 2763964, at *10 (Fed. Cl. May 8, 2020) ("The amended complaint . . . constitute[s] [the plaintiff's] current position in this litigation," and amendment solely to address a conflict may "affect [the plaintiff's] interests.").

---

[1] During a meet-and-confer for the co-pending Motion to Strike (MTS), MPS explained the inconsistency between these definitions, but Fish refused to address it.

[2] Now in its Opposition to the MTS, Fish/Volterra advances yet *another* new scope position, leaving three competing positions:

1) Volterra's Complaint (FAC), all "MPS DC-to-DC Power Converters,"
2) Fish's disqualification position, one product, the 48V-1V Power Solution,
3) Volterra's MTS Opposition position, "voltage converters incorporating a coupled-inductor architecture." D.I. 46, 5.

Only the first, the FAC's plain language, controls. MPS will address the new, third position in its MTS Reply.

### C. Fish Represented MPS Regarding DC-to-DC Converters in a Dozen-Plus Matters, Including Advising, Litigation, and Prosecution

On at least one point, Fish and MPS agree—Fish represented MPS in matters related to DC-to-DC converters.[3] were litigation/prelitigation matters, and MPS identified how the information Fish obtained in these related matters can harm MPS. *See generally* D.I. 19, 20. Fish responds that this case involves a new product, but does not deny it is based on the same technology Fish spent years advising on as MPS's counsel. D.I. 35, 6-8. If the case is about what *Volterra* says it is—"DC-to-DC power converters"—Fish's representation of Volterra unquestionably violates MRPC 1.9 and 1.10.

## II. EVEN IF THE CASE IS LIMITED TO THE SINGLE NAMED PRODUCT, THE 48V-1V POWER SOLUTION, FISH'S PRIOR REPRESENTATION IS STILL SUBSTANTIALLY RELATED

### A. Confiding in Fish Caused Past Harm, and It Will Now

Fish's prior representation of MPS is substantially related. The critical question is not only if the patents or products *overlap*, but rather "might the client have disclosed to his attorney confidences which could be relevant to the present

[3] Fish claims Powertech's status as an MPS joint venture means it has "no relevance to this motion

action? **In particular, could any such confidences be detrimental to the former client in the current litigation?**" *Satellite*, 652 F.Supp. at 1283 (emphasis added).

Regardless of whose definition of the scope controls (Volterra's or Fish's), the confidence MPS placed in Fish could harm MPS.[4] The patents and products involved in Fish's representations of MPS all relate to DC-to-DC conversion, the same technology underlying the single product named in the FAC, the 48V-1V Power Solution. The harm from Fish's access to MPS's entire patent and product portfolio (and all levels of the company related to DC-to-DC conversion) is inescapable. *See* D.I. 20 *passim*. It is a disqualifying conflict.

**B. Fish Fails to Show How MPS Is Immune from Harm Now**

Instead of responding to MPS's conflict concerns, Fish (1) generically dismisses MPS's objections as "playbook" complaints, (2) downplays Fish's role as MPS's IP advisor, and (3) claims Fish's prior representations are too removed in time. D.I. 35, 5-6, 13, 18-9. These denials do not change the risk of harm to MPS, nor shift the burden to MPS to explicitly reveal further examples of information disclosed to Fish that may harm MPS. The comments to MRPC 1.10 are clear:

> A former client **is not required to reveal the confidential information** learned by the lawyer in order to establish a substantial risk that the lawyer has

[4] In the opening brief, MPS explained how The risk of Fish harming MPS is not theoretical, it has already occurred.

> confidential information to use in the subsequent matter. **A conclusion about the possession of such information may be based on the nature of the services** the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services. (Emphasis added).

As to the nature of the service, Fish represented MPS in [redacted] matters involving DC-to-DC converters—the same technology—confirming access to relevant information.

First, as to Fish's "playbook" argument, Fish exaggerates the significance of *Regalo* to conclude that a substantial relationship will not exist simply because "both matters involved intellectual property." D.I. 35, 18 (*citing* 211 F. Supp. 3d at 688). As Fish admits, "the prior work [in *Regalo*] involved trademarks and not … patent litigation." *Id.* Trademark and patent claims differ, and the "contacts" between the client and former attorney in *Regalo* did not involve substantially related technology, like here.

Second, Fish's claim that it was never MPS's IP advisor or general counsel, [redacted] Indeed, even in the two cases cited by Fish where it withdrew, Fish worked over [redacted] hours on each case.

[redacted]

D.I. 19, ¶¶34, 37. Fish even publicly claimed that it was MPS's "first choice" for representation; Fish only withdrew because of yet another conflict. *See* Ex. 36.[5] Fish participated in *every* MPS patent litigation from 2007-2012. *See* D.I. 20, ¶36.

Third, without caselaw support, Fish argues its five-year representation of MPS is irrelevant, because the statute of limitations limits damages to post-2013, after Fish's 2012 disengagement. Damages may be limited to post-2013, but pre-2013 confidences and confidential information will still "be detrimental to [MPS] in the current litigation." *Satellite*, 652 F.Supp. at 1283. Fish had access to *all* MPS's products, technology, and key personnel from 2007-2012. MPS's 2007-2012 DC-to-DC converter development did not cease, nor did the key MPS personnel Fish had contact with leave (many remain). Fish's knowledge of MPS's product development lifecycle, marketing, supplier relationships, engineers, and employees, for example, is still relevant. Allowing Fish to sue its former client with these confidences will harm MPS.

## III. MPS NEVER AGREED TO ANY TYPE OF WAIVER WITH "INFORMED CONSENT, CONFIRMED IN WRITING"

A conflict waiver under MRPC 1.9 requires "informed consent, confirmed in writing." Consent must be specific; "general and open-ended" consent is

---

[5] Alarmingly, Fish appears to have retained documents related to these and other cases. [redacted]

ineffective. *Hydrogen Master Rights, Ltd. v. Weston*, 2016 WL 7411523, at *7 (D. Del. Dec. 22, 2016) (*vacated on other grounds,* 2017 WL 8682121 (D. Del. Feb. 6, 2017)). Fish identifies no such waiver because none exists.[6]

Defying common sense, Fish believes it is free to sue MPS on Volterra's behalf now because Fish represented both companies in 2007 in matters *not* adverse to each other. D.I. 35, 4-5.

While MPS may have understood there was "room" for Fish to represent both parties on non-adverse matters in 2007, MPS never consented to Fish representing Volterra in direct opposition to MPS. Fish's allegation that this was or could be a wavier is nonsensical.

## IV. DISQUALIFICATION OF FISH IS THE ONLY EFFECTIVE REMEDY

Only disqualification protects MPS and the interests of justice—any purported after-the-fact wall, and certainly Fish's undefined wall, is insufficient.

Fish admits no wall was in place between Volterra's attorneys and MPS's confidences and confidential information until January 2020—well *after* Volterra conducted its pre-suit investigation and *after* it filed its Complaint (and even then,

6

only after MPS insisted).[7] D.I. 35,13-14. A wall implemented a month into the case is too late (D.I. 18, 19), especially where MPS's and Fish's relationship was so extensive.

Fish also, incredibly, argues no wall was necessary during its pre-suit investigation, because its pre-suit investigation was extremely limited.[8] Specifically, because the FAC relies on only "publicly available information from YouTube videos about MPS's products," Fish claims this shows it has not used MPS confidential information. D.I. 35, 14, 20-21; *see also* D.I. 36, 2. But, this proves nothing about whether Fish improperly relied upon MPS's confidences in communications with the ten Fish principals who worked for MPS or otherwise accessed/used MPS confidential information. In fact, it is not MPS's burden to prove actual use of such information, but rather only that prior matters afforded Fish *access to it.* Fish clearly had the latter.

Fish further claims its after-the-fact wall is sufficient because "nobody working on the Volterra matter ever did any work for MPS." D.I. 35, 14. But, MRPC 1.10 imputes conflicts to an entire firm, as the entire firm presumptively had access to information. By Fish's logic, no wall would *ever* be needed, if a firm

[7] Fish's opposition newly claims two walls were erected in January 2020, rather than one. D.I. 35, 13-14. Fish has not shared the specifics of these walls.

[8] If Fish's pre-suit investigation was truly this superficial, sanctions under FRCP 11(c) are the appropriate remedy. D.I. 39, Ex. C.

simply staffs new attorneys on the case. Per MRPC 1.10, a firm is "essentially one lawyer." DE RPC 1.10 cmt 2. "This 'imputed conflict' is firmly embedded in Delaware law." *Bleacher v. Bose*, No. CV N16C-10-178 CEB, 2017 WL 1854794 at *2 (Del. Super. Ct. May 3, 2017).

Moreover, Fish largely ignores *Eon Corp.*, which explains disqualification is the appropriate remedy, even for a less egregious conflict.[9] 2012 WL 4364244. Fish instead relies on two inapposite cases, where a wall was sufficient because conflicted firms took the ethical obligation to protect their former clients' interests more seriously than Fish here.

First, in *Boston Scientific*, the wall existed *from the commencement* of the conflicted firm's involvement, not only erected after filing. 647 F. Supp. 2d at 372. Further, the attorneys in *Boston Scientific* were on separate continents (North America and Europe), in a time of far more barriers for interoffice collaboration. *Id.* at 374.

Second, in *Nemours*, the conflict related to *one* attorney's representation of a former client in a single matter, *before* joining the conflicted firm. 632 F. Supp. at 429. That single attorney walled himself off "immediately" and his "deliberateness

[9] Fish claims *EON Corp.* is different from here, as "information could have been shared … as a result of certain invalidity defenses." D.I. 35, n. 8. At most, this argument is a consideration for the substantial relationship test, not if a wall is appropriate.

and speed in establishing a 'cone of silence'…support[ed] denial of the motion to disqualify." *Id.* at 429. Here, by contrast, dozens of *Fish* attorneys represented MPS for many years/matters. Further, unlike the attorney in *Nemours*, Fish's post-suit wall, constructed only at MPS's insistence, shows it was neither deliberate nor speedy (and there is no evidence it created a "cone of silence").

## V. CONCLUSION

Fish's disqualifying conflict applies to its entire firm. "[T]he same attorneys who once had unfettered access to [the client's] proprietary information should not be sitting across the table at deposition inquiring into the same issues." *Quantico Tactical*, 2020 WL 2763964 at *10. Given Fish's unfettered access to MPS confidential information on the same technology as in this case, Fish must be disqualified.

*/s/ Karen E. Keller*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

OF COUNSEL:
Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
Two Freedom Square
Reston, VA 20190-5675
(571) 203-2750

[redacted]

R. Benjamin Cassady
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: June 22, 2020

**CERTIFICATE OF COMPLIANCE WITH STANDING ORDER REGARDING BRIEFING**

Pursuant to the November 6, 2019 Standing Order Regarding Briefing in All Cases, I certify that the font of this brief is Times New Roman, the type is 14-point, and the total word count is 2,483 words as calculated by the word-processing system used to prepare the filing.

*/s/ Karen E. Keller*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I, Karen E. Keller, hereby certify that on June 22, 2020, this document was served on the persons listed below in the manner indicated:

**BY EMAIL**
Jack B. Blumenfeld
Megan E. Dellinger
Andrew M. Moshos
MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mdellinger@mnat.com
amoshos@mnat.com

*/s/ Karen E. Keller*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*