IN THE UNITED STATES DISTRICT COURT00
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VOLTERRA SEMICONDUCTOR LLC, <br><br> Plaintiff, <br><br> v. <br><br> MONOLITHIC POWER SYSTEMS, INC., <br><br> Defendant. | Civil Action No. 19-2240-CFC |

Robert Oakes, FISH & RICHARDSON, P.C., Wilmington, Delaware; David Barkan, FISH & RICHARDSON, P.C., Redwood City, California

*Counsel for Plaintiff*

Andrew Russell, Karen Keller, Nathan Hoeschen, SHAW KELLER LLP, Wilmington, Delaware; Robert Benjamin Cassady, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C.; Lionel Lavenue, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Reston, Virginia; Bob Steinberg, Matthew Moore, LATHAM & WATKINS LLP, Washington, D.C.; Surendra Ravula, LATHAM & WATKINS LLP, Chicago, Illinois

*Counsel for Defendant*

**MEMORANDUM OPINION**

August 26, 2020
Wilmington, Delaware

_[signature]_
COLM F. CONNOLLY
UNITED STATES DISTRICT JUDGE

Plaintiff Volterra Semiconductor LLC has sued Defendant Monolithic Power Systems, Inc. for infringement of U.S. Patent Nos. 6,362,986; 7,525,408; and 7,772,955. D.I. 1. Monolithic has moved under Model Rules of Professional Conduct 1.9(a) and 1.10(a) to disqualify Volterra's counsel from the firm of Fish & Richardson P.C. on the grounds that Fish previously represented Monolithic in matters that are substantially related to this case. D.I. 17.

## I. BACKGROUND

Monolithic and Volterra are semiconductor companies that specialize in high-performance power management solutions. D.I. 1 ¶ 13; D.I. 20 ¶ 2; D.I. 18 at 4. The asserted Volterra patents cover direct current to direct current (DC-to-DC) power converters that are based upon a coupled inductor architecture. D.I. 16 at 6; D.I. 31 at 3. Volterra accuses Monolithic's DC-to-DC converter technology of infringing the asserted patents. D.I. 1 ¶ 18. Volterra accuses by name only one Monolithic product, Monolithic's "48V-1V Power Solution for CPU, SoC or ASIC Controller" (Power Solution). D.I. 1 ¶ 18. Volterra has stated that it reserves "the right to add additional accused products and additional claims as warranted by discovery and the Court's schedule." D.I. 21, Ex. 19 at 1.

The law firm representing Volterra in this case, Fish, previously represented

Monolithic in legal matters. Fish's representation of Monolithic began in July 2007. D.I. 20 ¶ 7; D.I. 20, Ex. 2 at 2. At the time Monolithic engaged Fish, Volterra was a Fish client. D.I. 35, Ex. J at 2. Before Fish began work for Monolithic, Fish informed Monolithic that Volterra was Fish's client and that Fish could not do any work adverse to Volterra. D.I. 35, Ex. J at 2.

Fish's representation of Monolithic lasted five years. D.I. 18 at 5–6; D.I. 35 at 1. During those five years, over 30 Fish attorneys worked on 13 matters related to DC-to-DC converter technology for Monolithic. D.I. 48 at 1, 4.

In litigation matters, Fish asserted or prepared to assert on Monolithic's behalf patents related to DC-to-DC converter technology. D.I. 20 ¶¶ 39–44; D.I. 35 at 6. Fish also defended Monolithic from competitors in litigation matters involving "power inverters" that relate to "many of the same underlying technologies as DC-to-DC converters." D.I. 20 ¶¶ 45–47.

In prosecution matters, Fish prosecuted two Monolithic patent applications related to DC-to-DC converter technology and represented Monolithic in a reexamination proceeding for a patent related to DC-to-DC converter technology. D.I. 20 ¶¶ 54–55.

In 2007-2008, Fish conducted a "[t]echnology [r]eview" at Monolithic. D.I. 20 ¶¶ 15, 17; D.I. 35 at 7. As part of the review, Fish interviewed Monolithic personnel and reviewed Monolithic's intellectual property, products, and financial

2

data for Monolithic products. D.I. 20 ¶ 19; D.I. 20, Ex. 5 at 11–12.

Finally, during the five years that Fish represented Monolithic, Fish advised Monolithic "on the steps for setting up and establishing a joint venture with Microsemi Corporation called Powertech Association LLS." D.I. 18 at 7; D.I. 20 ¶ 25. That representation resulted in Fish asserting Powertech's patents related to DC-to-DC converter technology against competitors. D.I. 18 at 7; D.I. 20 ¶ 25. Before asserting the Powertech patents, Fish required Monolithic to agree that Fish was representing Powertech and not Monolithic in those matters. D.I. 20, Ex 3 at 14 ("MPS hereby understands and agrees that [Fish] only represents Powertech in the [lawsuits in which Fish asserted Powertech's patents], and does not represent MPS with respect to the Lawsuits.").

None of these 13 matters that Monolithic cites involved Volterra, Volterra patents, or the accused Power Solution product.

Ten of the 30 attorneys that completed work for Monolithic still work for Fish; all ten are partners/principals at Fish. D.I. 19 ¶ 6.

During the five years that Fish provided legal services to Monolithic, Monolithic had its own in-house legal department that included a General Counsel and a Director of Patents. D.I. 20 ¶ 1; D.I. 35, Ex. K. Also, during those five years, firms other than Fish completed patent work for Monolithic. For example, in 2009, Monolithic replaced Fish with other law firms as counsel on two litigation

3

matters that related to DC-to-DC converter technology, D.I. 35, Ex. L; D.I. 35, Ex. M, and the majority of Monolithic's patent prosecution work in 2007-2012 was completed by another law firm, D.I. 35, Ex. N.

In July of 2012, Fish informed Monolithic that it intended to terminate its attorney-client relationship with Monolithic. D.I. 20, Ex. 13 at 1. The termination was formalized in September 2012 and Fish returned its remaining Monolithic files to Monolithic. D.I. 20, Ex. 4 at 1. In 2014, Monolithic's attorneys from another law firm asked Fish for documents and information related to a matter that Fish had handled for Monolithic. D.I. 20 ¶ 65; D.I. 20, Ex. 15. Before Fish provided the requested items to Monolithic's counsel, Fish required Monolithic to agree that Fish no longer had and was not forming an attorney-client relationship with Monolithic. D.I. 20, Ex. 15 at 1–3.

## II. LEGAL STANDARDS

District Courts have the "inherent authority to supervise the professional conduct of attorneys appearing before it," including the power to disqualify an attorney from a representation. *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980) (citations omitted). "[M]otions to disqualify are generally disfavored" and, therefore, require the moving party to "clearly demonstrate that continued representation would be impermissible." *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007) (internal quotation marks and

4

citations omitted).

"An attorney's conduct is measured by the ethical standards of the court before which the attorney appears." *Id.* The District of Delaware has adopted the Model Rules of Professional Conduct (MRPC). *See* D. Del. LR 83.6(d). MRPC Rule 1.9(a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

For a representation to violate Rule 1.9, therefore, the representation must meet four elements:

> (1) the lawyer must have had an attorney-client relationship with the former client; (2) the present client's matter must either be the same as the matter the lawyer worked on for the first client, or a substantially related matter; (3) the interests of the second client must be materially adverse to the interests of the former client; and (4) the former client must not have consented to the representation after consultation.

*Apeldyn Corp. v. Samsung Elecs. Co., Ltd.*, 660 F. Supp. 2d 557, 561 (D. Del. 2009) (internal quotation marks and citation omitted).

"To the extent that a motion to disqualify involves imputing an individual lawyer's representation to an entire firm, M.R.P.C. 1.10(a) is also relevant." *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, 2011 WL

5

2692968, at *6 (D. Del. June 22, 2011). MRPC Rule 1.10(a) provides:

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless (1) the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

Rule 1.10(a), therefore, "imputes one attorney's conflicts to all other attorneys in his firm." *United States v. McDade*, 404 Fed. Appx. 681, 683 (3d Cir. Dec. 22, 2010).

"[W]hether disqualification is appropriate depends on the facts of the case and is never automatic." *Boston Sci. Corp. v. Johnson & Johnson, Inc.*, 647 F. Supp. 2d 369, 374 n.7 (D. Del. 2009) (citations omitted). This Court "approaches motions to disqualify counsel with cautious scrutiny, mindful of a litigant's right to the counsel of its choice." *Intellectual Ventures I*, 2011 WL 2692968, at *6; *see also Satellite Fin. Planning Corp. v. First Nat. Bank of Wilmington*, 652 F. Supp. 1281, 1283 (D. Del. 1987) ("A movant for disqualification must have evidence to buttress his claim of conflict because a litigant should, as much as possible, be able to use the counsel of his choice.").

## III. DISCUSSION

The parties agree that three of the four requirements for a violation of MRPC Rule 1.9(a) are met: (1) Fish had an attorney-client relationship with Monolithic;

6

(2) Volterra's interest in this litigation is materially adverse to Monolithic's interest; and (3) Monolithic did not consent to Fish's representation of Volterra in this matter. The parties dispute, however, whether the present litigation between Volterra and Monolithic is "substantially related" to Fish's prior representation of Monolithic.

To determine whether a current matter is "substantially related" to a matter from a former representation, a court must answer the following three questions:

> (1) What is the nature and scope of the prior representation at issue? (2) What is the nature of the present lawsuit against the former client? (3) In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?

*Satellite Fin. Planning Corp.*, 652 F. Supp. at 1283 (citations omitted).

### A. What is the nature and scope of the prior representation at issue?

Fish provided legal services to Monolithic for five years between 2007 to 2012. Fish represented Monolithic in litigation and patent prosecution matters that involved DC-to-DC converter technology. Fish also conducted a "technology review" for Monolithic and counselled Monolithic through the formation of Monolithic's joint venture with Powertech. Fish's representation of Monolithic never involved Volterra, Volterra patents, or the accused Power Solution product.

7

### B. What is the nature of the present lawsuit against the former client?

Volterra has sued Monolithic for infringement of three Volterra patents that cover a subset of DC-to-DC converter technology related to coupled inductors. In the Complaint, Volterra defines the accused products broadly as "DC-to-DC Power Converters," but the Complaint names just one accused product, Monolithic's Power Solution. D.I. 1 ¶ 18. Volterra has reserved the right to accuse additional products "as warranted by discovery and the Court's schedule." D.I. 21, Ex. 19 at 1.

### C. In the course of the prior representation, might the client have disclosed to its attorney confidences that could be detrimental to the client in the present action?

In resolving this third question, "the court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information 'might' have been disclosed which would be relevant to the present suit." *Satellite Fin. Planning*, 652 F. Supp. at 1284 (citation omitted). To justify disqualification, "[m]ore facts of a relationship are needed than a simple statement of prior work done in a superficially similar area." *Id.* at 1285.

It is undisputed that Monolithic disclosed confidences to Fish in connection with Fish's prior representations. But Monolithic has failed to establish that those confidences could be used by Fish to Monolithic's detriment in this case.

8

Monolithic's principal argument is that this case and the work Fish did for Monolithic in the past are substantially related because they both concern DC-to-DC converters. "DC-to-DC converter technology," however, is too broad a subject area to establish a substantial relationship between the representations. As a 2013 Institute of Electrical and Electronics Engineers textbook states, DC-to-DC converters are "currently being employed in various electronic equipment and systems" and they "look so varied in their topologies and operation that the diversity of dc-to-dc converters is seemingly amazing, even mysterious." D.I. 35, Ex. A at 123. More than 36,000 U.S. patents mention DC-to-DC converter technology in their written descriptions and more than 8,000 patents mention the technology in their claims. D.I. 35, Ex. H; D.I. 35, Ex. I. Monolithic alone sells hundreds of different DC-to-DC converters. The "DC-DC Power Converters" category on Monolithic's website lists 746 products, D.I. 35, Ex. E, and the first 15 pages of Monolithic's product catalog covers only "DC/DC Power Conversion" with over 300 products, D.I. 35, Ex. G.

Monolithic also argues that a substantial relationship between the representations exists because Fish served as its "IP general counsel" and that because Fish's work for Monolithic was "wide-ranging, spanned the course of five years, and touched on [Monolithic]'s entire business," "it is impossible to predict or protect against all potential harm to [Monolithic]." D.I. 18 at 15. Monolithic

9

alleges that Fish "focused on all of [Monolithic]'s IP issues" and "encouraged [Monolithic] to disclose to Fish its most strategic, sensitive, and confidential know-how and business aspirations." D.I. 18 at 5.

As an initial matter, I am not persuaded that Fish acted as Monolithic's "IP general counsel." Monolithic's engagement letter with Fish makes no reference to "IP general counsel." *See generally* D.I. 20, Ex. 2. Moreover, during the time Fish represented Monolithic, Fish represented Monolithic's competitors, including Volterra; Monolithic had its own in-house legal department with a General Counsel and a Director of Patents; and other law firms did patent work for Monolithic. But, in any event, Monolithic does not identify specific confidential information or even a specific type of confidential information that Fish likely obtained from its putative "general counsel" representation that could be used to Monolithic's detriment in this case.

In short, Monolithic has not clearly demonstrated that Fish's representation of Volterra in this case is substantially related to Fish's prior work for Monolithic.[1]

---

[1] Monolithic also asserts that "Fish advised [Monolithic] on the steps for setting up and establishing a joint venture with [Powertech] . . . which led to Fish asserting patents on DC-to-DC converter-related technologies against competitors on behalf of Powertech." D.I. 18 at 7 (citation omitted). That work, however, did not involve Volterra, Volterra patents, or the accused product. Also, such evidence is not relevant to the present motion because Fish represented Powertech when it asserted Powertech's patents, not Monolithic; Monolithic expressly agreed that Fish's representation of Powertech was not a representation of Monolithic. D.I. 20, Ex. 3 at 14.

Monolithic has therefore failed to meet its burden to establish that a conflict exists under Rule 1.9(a). And because no conflict exists under Rule 1.9(a), no conflict is imputed to the Fish law firm under Rule 1.10(a).

## IV. CONCLUSION

For the foregoing reasons, I will deny Monolithic's motion to disqualify. The Court will enter an order consistent with this Memorandum.