IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOLTERRA SEMICONDUCTOR, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 19-2240-CFC |
| MONOLITHIC POWER SYSTEMS, INC., | ) ) ) ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF SPECIAL MASTER**

**INTRODUCTION**

By order of the Court dated May 14, 2021, Judge Connolly referred to me, as a Special Master, Defendant's Second Motion to Disqualify Fish & Richardson, P.C.. (D.I. 100, 150)  By way of procedural background to the disqualification motion, Plaintiff Volterra Semiconductor LLC ("Volterra") sued Defendant Monolithic Power Systems, Inc. ("Monolithic") for infringement of U.S. Patent Nos. 6,362,986; 7.525,408; and 7,772,955.  (D.I. 1)  Monolithic moved to disqualify Volterra's counsel from the law firm of Fish & Richardson, P.C. ("Fish"), on the grounds that Fish had previously represented Monolithic in matters that are substantially related to the pending case.  (D.I. 17)

As characterized by Judge Connolly, Volterra and Monolithic are semiconductor companies that specialize in high-performance power management solutions.  The asserted Volterra patents cover direct current to direct current (DC-to-DC) power converters that are based upon a coupled inductor architecture.  In its complaint, Volterra accused by name only one Monolithic product, the "48V-IV Power Solution for CPU, SoC or ASIC Controller" ("the 48Pv-

1

IV Power Solution"), but reserved the right to add additional accused products and additional claims as warranted by discovery.

By Memorandum Opinion dated August 26, 2020, Judge Connolly denied Monolithic's motion to disqualify. (D.I. 59) In so doing, Judge Connolly concluded that: (1) despite the years-long representation of Monolithic by Fish (including 13 matters related to DC-to-DC converter technology), Monolithic presented no persuasive evidence that Fish served as Monolithic's "IP general counsel;" and (2) Monolithic failed to identify any specific confidential information that Fish likely obtained from its past representation of Monolithic sufficient to establish that Fish's representation of Volterra in the current litigation is substantially related to Fish's prior work for Monolithic, "'DC-to-DC converter technology' [being] too broad a subject area to pass muster to establish a substantial relationship between the representations." (D.I. 59 at 9)

Monolithic subsequently filed a Motion for Reconsideration (D.I. 63), which motion was not pursued by Monolithic based on an agreement reached with Volterra that Volterra would limit the scope of the case to the 48V-IV Power Solution and "products that are substantially similar to it." (9/10/20 transcript at 24) Within days of that compromise, Volterra filed its Second Amended Complaint identifying two new controllers as components that can be used to form the accused product (the MP2888A and MP2965 controllers).[1] (D.I. 71) The Court ultimately denied Monolithic's Motion for Reconsideration on November 5, 2020, finding that Monolithic had failed to demonstrate any of the necessary grounds to warrant reconsideration, and that Volterra had not breached the September 10, 2020 agreement by bringing indirect infringement claims based upon the MP2888A and MP2965 controllers. (D.I. 97)

---

[1] Monolithic also argues that Volterr'a infringement contentions reference two additional models of a third controller (MP2972 and MP2975) that can be used to form the 48V-IV Power Solution.

In its Second Motion to Disqualify, Monolithic argues that the two new controllers (MP2888A and MP2965) raise new issues warranting disqualification, and that the Court should address the "68 specific points of conflict" alluded to by Monolithic in its past submissions (identified, as far as I can tell, in ex. A1 of Monolithic's submissions). I have reviewed the voluminous record provided by Monolithic (including the Tseng declaration and attached invoices submitted in connection with Monolithic's first motion, since they are referenced in ex. A1), and will address such record below.

## LEGAL STANDARDS

As noted by Judge Connolly in his initial decision in this matter (and not disputed by the parties), a district court has the "inherent authority to supervise the professional conduct of attorneys appearing before it," including the power to disqualify an attorney from a representation. *United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir. 1980) (citations omitted). Because motions to disqualify are generally disfavored, the moving party has the burden to "clearly demonstrate that 'continued presentation would be impermissible.'" *Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.,* 491 F. Supp. 2d 510, 513 (D. Del. 2007).

The District of Delaware has adopted the Model Rules of Professional Conduct, Rule 1.9(a) of which provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

For a representation to violate Rule 1.9, the representation must meet four elements:

> (1) the lawyer must have had an attorney-client relationship with the former client; (2) the present client's matter must either be the same as the matter the lawyer worked on for the first client, or a substantially related matter; (3) the interests of the second client must

3

> be materially adverse to the interests of the former client; and (4) the former client must not have consented to the representation after consultation.

*Apeldyne Corp. v. Samsung Elecs. Co., Ltd.,* 660 F. Supp. 2d 557, 561 (D. Del. 2009) (internal quotation marks and citation omitted). In addition to the above, Rule 1.10(a) of the Model Rules "imputes one attorney's conflicts to all other attorneys in his firm." *United States v. McDade,* 404 Fed. Appx. 681, 683 (3d Cir. Dec. 22, 1010).

As is evident from the briefing and the record, "whether disqualification is appropriate depends on the facts of the case and is never automatic." *Boston Scientific Corp. v. Johnson & Johnson, Inc.,* 647 F. Supp. 2d 369, 374, n.7 (D. Del. 2009) (citations omitted). The District Court in Delaware has approached motions to disqualify counsel "with 'cautious scrutiny,' mindful of a litigant's right to the counsel of its choice." *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.,.* 2011 WL 2692968, at *6 (D. Del. June 22, 2011).

## DISCUSSION

The parties agree that three of the four requirements for a violation of Model Rule 1.9(a) have been met, the only dispute being whether the present litigation between Volterra and Monolithic is "substantially related" to Fish's prior representation of Monolithic. To determine whether the current matter is "substantially related" to a matter from a former representation, the following three questions must be addressed:

> (1) What is the nature and scope of the prior representation at issue?
> (2) What is the nature of the present lawsuit against the former client?
> (3) In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current dispute?

*Satellite Fin. Planning Corp. v. First Nat. Bank of Wilmington,,* 652 F. Supp. 1281, 1283 (D. Del. 1987) (citations omitted).

4

In his August 26, 2020 memorandum opinion, Judge Connolly noted that Fish provided legal services to Monolithic for five years, from 2007 to 2012, its engagements ranging from litigation and patent prosecution matters that involved DC-to-DC technology, to conducting a 2007 "technology review," to counselling Monolithic through the formation of a joint venture arrangement with Powertech.  (D.I. 59 at 7)  Notwithstanding the above, Judge Connolly found no evidence that Fish's various engagements had elevated its role to that of  Monolithic's "IP general counsel," or that any of the past engagements involved substantially related subject matter to the present litigation.

### The Nature and Scope of the Prior Representation

Monolithic, in its argument, does not appear to revive its "IP general counsel" characterization of Fish, and I do not intend to revisit the issue or Judge Connolly's decision rejecting such characterization.  According to the summary description contained in Judge Connolly's August 26, 2020 Memorandum Opinion, "Fish represented Monolithic in litigation and patent prosecution matters that involved DC-to-DC technology," as well as in such business matters as counselling Monolithic through the formation and dissolution of a joint venture with Powertech.  The voluminous record assembled by Monolithic is consistent with Judge Connolly's prior description.

### The Nature of the Present Lawsuit Against the Former Client

Rather than rely on the breadth of Fish's past representation, Monolithic posits in its Second Motion to Disqualify that the newly identified controllers  potentially broaden the scope of discovery from a single product to all DC-to-DC converters, a broad enough scope to include within it Fish's past engagements.  More specifically, although Monolithic concedes that the 48V-IV Power Solution is the only accused product in this case, it insists that the recent

identification of the MP2888A and MP2965 controllers (which are general use controllers[2]) "significantly expands the case, not only to the new controllers themselves, but potentially to all DC-to-DC converters." (D.I. 101 at 17, 18)  Monolithic again generally relies on its voluminous record to support the sweeping proposition that Fish's past representation of Monolithic extensively covered DC-to-DC converter technology and, therefore, the instant litigation is now substantially related to such representation.

Monolithic's logic in this regard is inconsistent with the way patent litigation proceeds, limited as it is by the claims of the asserted patents which, instantly, all relate to converters that feature coupled inductors.  Monolithic's attempt to expand the scope of this case to the broadest universe of DC-to-DC converters lacks either an evidentiary or legal foundation.  The scope of the instant litigation is appropriately confined for purposes of the pending motion to the accused product (and substantially similar products) and the identified components in light of the asserted claims

### Prior Access by Fish to Confidential Information that could be Detrimental to Monolithic in this Litigation

With the scope of the case so defined, a review of the record reveals that Fish's past representation is not linked to the newly identified controllers, even in light of Monolithic's argument that the newly identified controllers have direct lineage to controllers which were developed during Fish's 2007-2012 representation, that is, MP2951 (developed in 2010) and MP 2953 (developed in 2011).[3]  The documents that relate to these controllers (exs. B1- B14), however, nowhere mention Fish, nor are there any other documents in the record that link Fish to

---

[2] General use controllers can be used with many different types of DC-to-DC converters, including converters that do not feature the claimed coupled inductors.
[3] As noted, there is no dispute that the accused product and its component controllers were not introduced until years after Fish' representation had ended.  (D.I. 101 at 11; D.I. 110 at 6)

the development of these controllers.  The only connection between Fish's past work and the "new" technology exemplified in MP2951 and MP2953 is the fact that some of the Monolithic inventors responsible for developing MP2951 and MP2953 were interviewed by Fish for its 2007 technology review which, clearly, did not implicate the 2010-2011 technology underlying MP2951 and MP2953.

Neither does a review of Monolithic's "68 specific points of conflict" (ex. A1) support disqualification.  Exhibit A1 (which is in this font) refers to the Tseng declaration (primarily describing work via Fish invoicing) and documents (exs. A2-A43) submitted in connection with the previously denied Motions to Disqualify and for Reconsideration.  These documents reference the various engagements undertaken by Fish on behalf of Monolith during the years 2007-2012.  None of these documents refer to the predecessor controllers (MP2951 or MP2953); indeed, only 4 of these documents are dated from 2010 (A2, A14, A19) or 2011 (A3); none are dated from 2012.  Likewise, the only invoices specifically identified in the Tseng declaration date from 2007-2009.  An independent review of the invoices from 2010 to 2012 disclose no evidence of Fish working on matters related to the predecessor controllers.

## CONCLUSION

In its first Motion to Disqualify Fish from representing Volterra in this litigation, Monolithic relied on the rationale that Fish's past representation was extensive[4] and related generally to DC-to-DC converter technology.  Judge Connolly rejected both underpinnings for this rationale, and denied the motion.  In its current (and third) attempt to disqualify Fish, Monolithic's argument really has not changed.  Without citing even a single document that links

---

[4] A review of the record confirms that Fish was not the only outside counsel retained by Monolithic during the relevant time frame (*see, e.g.,* D.I. A1; D.I. 110 at 8), and that Monolithic never referred to Fish as its "IP general counsel."

7

(directly or indirectly) Fish to the accused product, Monolithic instead (and again) cites generally to the voluminous record it has submitted as implicit support for the proposition that any DC-to-DC technology developed during the relevant time frame of Fish's engagements should serve to disqualify Fish from this litigation, even if Fish was not involved in the development.

I conclude, however, that Monolithic's optic is far too broad and inconsistent with the law. Without presenting specific evidence that Fish either worked on (or had access to confidential information relating to) the accused product, Monolithic has failed to clearly demonstrate that the current litigation is substantially related to Fish's past representation, or that Fish had access to confidential information that could be detrimental to Monolithic in the current litigation. As Monolithic has failed to carry its burden of proof, I recommend that Monolithic's Second Motion to Disqualify (D.I. 100) be denied.

To the extent that the Court adopts my recommendation to deny Monolithic's Second Motion to Disqualify, I further recommend that Monolithic be required to pay the costs at least of my review of the record. Although Monolithic insisted that a review of its "68 specific points of conflict" was critical, Monolithic did little to help illuminate these "points of conflict" (as summarized in ex. A1) as it failed to use pin cites in its briefing, failed to provide a table of contents for the voluminous appendices, and failed to even insert exhibit dividers to make the review an efficient one. It does not strike me that Volterra should have to share the costs of such careless lawyering.

Volterra requests that the decision on this motion be made with prejudice. I hesitate to recommend such, as the scope of discovery has been broadened by Volterra's Second Amended Complaint and infringement contentions.

Objections to this Report and Recommendation shall be made consistent with Paragraph 9 of the Court's May14, 2021 Order.

Respectfully submitted,

Dated:  June 28, 2021        /s/ Sue L. Robinson
　　　　　　　　　　　　　　　Sue L. Robinson
　　　　　　　　　　　　　　　Special Master