# EXHIBITS 1-3

## REDACTED IN THEIR ENTIRETY

# Exhibit 4

# High Frequency, High Current Density Voltage Regulators

## Jinghai Zhou

Dissertation submitted to the Faculty of the
Virginia Polytechnic Institute and State University
in partial fulfillment of the requirements for the degree of

Doctor of Philosophy
in
Electrical Engineering

Fred C. Lee, Chairman
Dushan Boroyevich
Daan van Wyk
Guo-Quan Lu
Douglas K Lindner

April 22, 2005
Blacksburg, Virginia

Keywords: voltage regulator module, self-driven, current-tripler, coupling inductors

Copyright 2005, Jinghai Zhou

MAXIM_00011320



**Figure 4.11 Dynamic current sharing**

During the transient, the two phases can share the current effectively. Using the same parameters as those listed in Table 4.2, a 25A load step at 100A/us slew rate is applied to the circuit. When the load transient repetitive rate increases, the current sharing is still good, as shown in Figure 4.11, in which the repetitive rate is 200kHz.

Generally speaking, the conventional peak current mode control is capable of sharing the phase current. As long as good current sharing is maintained, the stronger coupling between the inductors will not have any detrimental impact on the circuit, such as severe DC flux imbalance.

### 4.1.3.   Existing Strong Coupling Implementations

Pit-Leong's analysis reveals the benefit of strong coupling. As a special case, the strongest coupling is $\alpha=1$, which means $M=L_s$ in Figure 4.12a. This can be simply represented by a transformer model, as shown in Figure 4.12b. According to equations (4.2) (4.3) and (4.4), the

128

MAXIM_00011466

three equivalent inductances are all zero. To filter the switching pulse into the output voltage, an additional filter inductor has to be added. The complete coupling inductor circuit is actually implemented by two magnetic components: a well-coupled center-tapped autotransformer and a separate output inductor (Figure 4.13a). The physical structure is shown in Figure 4.13b. The structure is also called a "combining transformer" as in [79]. In the following discussions, this structure is referred as "center-tap coupling inductors".



Figure 4.12 Two-winding coupled inductors (a) and the equivalent circuit when $L_k$=M (b)



Figure 4.13 Center-tap coupling inductors (a) and the implementations (b)

There is another special case for the coupling inductor shown in Figure 4.1. According to the analysis in section 4.1.2.1, the coupling coefficient approaches one when the outer leg air gaps move to the center leg. Eventually, there will be no outer leg air gap at all. The leakage inductance $L_k$ stays the same during this air gap redistribution. The center leg air gap can be further increased until the entire center leg is removed. Figure 4.14a shows the leakage inductance as a function of the center leg air gap based on the core dimensions in Table 4.1. Meanwhile, the coupling coefficient increases as the center leg becomes shorter and shorter, as illustrated in Figure 4.14b.

MAXIM_00011467



(a)    (b)

**Figure 4.14 Effect of removing the center leg**

Based on this understanding, a scalable multi-phase surface mount coupling inductor structure is proposed by [77, 78], as shown in Figure 4.15. For each phase, there is one copper winding around the H-core so that the leg for leakage flux path (center leg in Figure 4.1) is eliminated.



**Figure 4.15 A scalable multi-phase surface mount coupling inductor structure proposed by Volterra in [77]**

## 4.2.   Proposed Strong Coupling Inductor Structure with Short Winding Length

The coupling inductor structure shown in Figure 4.15 has one disadvantage: in order to make the inverse coupling between phases, the windings must be around the core legs. The winding length is longer than in the non-coupled inductor, and one more copper layer is needed in the layout to connect to the switching node, as illustrated in Figure 4.16.

130

MAXIM_00011468

# Reference

12V VRM Technologies:

[1]   G. Marcyk, "Breaking barriers to Moore's Law," Presentation at Intel Developer Forum, Spring 2002. Available at ftp://download.intel.com/research/silicon/MarcykIDF022802.pdf.

[2]   P.P. Gelsinger, "Microprocessors for the new millennium: Challenges, opportunities, and new frontiers," in Proc. IEEE ISSCC, 2001, pp. 22-25.

[3]   Intel document, "Voltage Regulator-Down (VRD) 10.1 Design Guide for Desktop LGA775 Socket," Available at ftp://download.intel.com/design/Pentium4/guides/30235604.pdf.

[4]   Intel document, "Voltage Regulator Module (VRM) and Enterprise Voltage Regulator-Down (EVRD) 10.2 Design Guidelines," Available at ftp://download.intel.com/design/Xeon/XeonMP/devtools/30676001.pdf.

[5]   Ed Stanford, "New processors will require new powering technologies," Magazine of Power Electronics Technology, Feb. 2002, pp. 32-42.

[6]   Ed Stanford, "Power Technology Roadmap for Microprocessor Voltage Regulators," APEC2004, Available at http://www.apec-conf.org/2004/APEC04_SP1-1_Intel.pdf.

[7]   Neil J. Barabas, "A Very High Current, Wide Bandwidth Voltage Source For Microprocessor Testing," IEEE APEC'98.

[8]   M. Zhang, M. Jovanovic and F. C. Lee, "Design Considerations for Low-Voltage On-board DC/DC Modules for Next Generations of Data Processing Circuits," IEEE Transactions on Power Electronics, March 1996, pp.328-337.

[9]   J. A. Cobos, P. Alou, Q. Garciaand, J. Uceda, "Several Alternatives for Low Output Voltage on Board Converters," IEEE APEC, 1998, pp. 163-169.

[10]  S. Sanders, A. Wu and R. Rossetti "An active clamp circuit for voltage regulation module (VRM) applications," IEEE Transactions on Power Electronics, Sept. 2001, pp. 623 - 634.

[11]  L. Amoroso, M. Donati, X. Zhou and F. C. Lee, "Single Shot Transient Suppressor (SSTS) for High Current High Slew Rate Microprocessor," IEEE APEC, 1999.

[12]  Xunwu Zhou; Pit-Leong Wong; Peng Xu; Lee, F.C.; Huang, A.Q., "Investigation of Candidate VRM Topologies for future Microprocessors," IEEE Transactions on Power Electronics, Nov 2000, pp. 1172 - 1182.

169

MAXIM_00011507

[13]   X. Zhou, P. Xu and F. C. Lee, "A High Power Density, High Frequency and Fast Transient Voltage Regulator Module with a Novel Current Sharing and Current Sharing Technique," IEEE APEC, 1999.

[14]   Y. Panvo and M. M. Jovanovic, "Design Consideration for 12-V/1.5-V, 50-A Voltage Regulator Modules," IEEE APEC, 2000.

[15]   X. Zhou, P. Xu and F. C. Lee, "A Novel Current-Sharing Control Technique for Low-Voltage High-Current Voltage Regulator Module Applications," IEEE Transaction on Power Electronics, November 2000, pp. 1153-1162.

[16]   J. Lange "Tapped inductor improves efficiency for switching regulator," Electronic Design, Vol.27, no.16, 2 Aug. 1979, pp. 114-116.

[17]   A. Pietkiewicz and D. Tollik, "Small-signal analysis of a coupled-inductor step-down switching DC-DC converter," in Proc. IEEE INTELEC, 1986, pp. 241-246.

[18]   M. Rico, J. Uceda, J. Sebastian and F. Aldana, "Static and dynamics modeling of tapped-inductor DC-to-DC converters," in Proc. IEEE PESC, 1987, pp. 281-288.

[19]   Y. Ren, K. Yao, M. Xu, and, F. C. Lee, "Analysis of the Power Delivery Path from the 12 V VR to the Microprocessor," Applied Power Electronics Conference and Exposition, 2004. Vol: 1 Pages: 285 – 291.

[20]   Ron Lenk, "Introduction to the tapped buck converter," HFPC'00, pp.155-166.

[21]   K. Yao, F.C. Lee, Y. Meng and J. Wei, "Tapped-inductor buck converter with a lossless clamp circuit," in Proc. IEEE APEC, 2002, pp. 693-698.

[22]   P. Xu, J. Wei and F.C. Lee, "The active-clamp couple-buck converter-a novel high efficiency voltage regulator module," in Proc. IEEE APEC, 2001, pp. 252-257.

[23]   J. Wei, P. Xu, H. Wu, F.C. Lee, K. Yao and M. Ye, "Comparison of three topology candidates for 12V VRM," in Proc. IEEE APEC, 2001, pp. 245-251.

[24]   J. Wei, P. Xu, F.C. Lee, K. Yao and M. Ye, "Static and dynamic modeling of the active clamp coupled-buck converter," in Proc. IEEE PESC, 2001, pp. 260-265.

[25]   P. Xu, J. Wei, K. Yao, Y. Meng and F.C. Lee, "Investigation of candidate topologies for 12V VRM," in Proc. IEEE APEC, 2002, pp. 686–692.

[26]   J. Wei, P. Xu and F.C. Lee, "A high efficiency topology for 12 V VRM-push-pull buck and its integrated magnetics implementations," in Proc. IEEE APEC, 2002, pp. 679–685.

[27]   K. Yao, Y. Meng and F.C. Lee, "A novel winding coupled buck converter for high step-down DC/DC conversion," in Proc. IEEE PESC, 2002.

170

[28]   J. Wei and F. C. Lee, " A Novel Soft-Switched, High-Frequency, High-Efficiency, High-Current 12V Voltage Regulator ¾ The Phase-Shift Buck Converter", IEEE APEC'03, Vol. 2, Page(s): 724-730, Feb. 2003.

**48V VRM Technologies**

[29]   B. Narveson, "How many isolated DC-DC's do you really need?", APEC 1996 conference proceedings, Vol. 2, pp. 692-695.

[30]   R.V. White, "Emerging on-board power architectures," Applied Power Electronics Conference and Exposition, 2003. Volume: 2, 9-13 Feb. 2003, Pages:799 – 804.

[31]   Mike Barry, " Design Issues in Regulated and Unregulated Intermediate Bus Converters." Applied Power Electronics Conference and Exposition, 2004. pp. 1389 – 1394.

[32]   N. Frohleke, P. Wallmeier, and H. Grotstollen, "Investigation of Active-Clamped Topologies for Low Output Voltage DC/DC Modules," HFPC, 1996, pp. 322-332.

[33]   T. Ninomiya, N. Matsumoto, M. Nakahara, K. Harada, "Static and Dynamic Analysis of Zero-Voltage-Switched Half-Bridge Converter with PWM control," IEEE PESC, 1991, pp. 230-237.

[34]   P. Imbertson, N. Mohan, "New PWM Converter Circuits Combining Zero Switching Loss with Low Conduction Loss", IEEE INTELEC, 1991, pp. 179-185.

[35]   Bill Andreycak, "Phase shifted, zero voltage transition design considerations and the uc3875 pwm controller," Application note, Unitrode, U136A, May 1997.

[36]   Mao Ye, Peng Xu, Bo Yang and Fred C. Lee, "Investigation of Topology Candidates for 48V VRM," APEC 2002, Seventeenth Annual IEEE, Vol. 2 , 2002. pp. 699 –705.

[37]   K. O'Meara, " A New Output Rectifier Configuration Optimized for High Frequency Operation," HFPC, 1991, pp. 219-226.

[38]   Y. Jang, M.M. Jovanovic, and Y. Chang, " A new ZVS-PWM full bridge converter," IEEE transaction on power electronics, vol. 18, No. 5, September, 2003, pp1122-1129.

[39]   L. Huber and M. Jovanovic, "Forward Converter with Current-Doubler Rectifier: Analysis, Design, and Evaluation Results," IEEE APEC, 1997, pp. 605-611.

[40]   W. Tabisz, F. C. Lee and D. Chen, "A MOSFET Resonant Synchronous Rectifier for High-Frequency DC/DC Converters," IEEE PESC, 1990, pp. 769-779.

[41]   C. Blake, D. Kinzer and P. Wood, "Synchronous Rectifier versus Schottky Diodes: a Comparison of the Losses of a Synchronous Rectifier versus the Losses of a Schottky Diode Rectifier," IEEE APEC, 1994, pp. 17-23.

[42]   Alpha J. Zhang, et al., "Synchronous Rectifier Circuit," U.S. Patent 6370044, April 9, 2002.

171

*Reference*

[43]   Stephen J. Chapman, "Electric Machine and Power System Fundamentals," McGraw-Hill Companies, Section 3.10, 2002.

[44]   O. Garcia, J. Cobos, J. Uceda and J. Seastian, "Zero-Voltage Switching in the PWM Half Bridge Topology with Complementary Control and Synchronous Rectification," IEEE PESC, 1995, pp. 286-292.

[45]   H. J. Kim and J. K. Ji, "Active Clamp Forward Converter with MOSFET Synchronous Rectification," IEEE PESC, 1994, pp. 895-901.

[46]   D. J. Harper, D. R. Hyde, G. M. Fry and J. A. Houldsworth, "Controlled Synchronous Rectifier," HFPC, 1994, pp. 185-193.

[47]   M. M. Jovanovic, M. T. Zhang and F. C. Lee, "Evaluation of synchronous-Rectification Efficiency Improvement Limits in Forward Converters," IEEE Transactions on Industrial Electronics, August 1995, pp. 387-395.

[48]   G. Stojcic and C. Nguyen, "MOSFET Synchronous Rectifier for Isolated, Board-Mounted DC-DC Converters," IEEE INTELECT, 2000, pp. 258 - 266.

[49]   Y. Panvo and M. M. Jovanovic, "Design and Performance Evaluation of Low-Voltage/High-Current DC/DC On-Board Modules," IEEE APEC, 1999, pp. 545 - 552.

[50]   X. Zhou, B. Yang, L. Amoroso, F. C. Lee and P. Wong, "A Novel High-input-voltage, High Efficiency and Fast Transient Voltage Regulator Module: The Push-pull Forward Converter," Proc. IEEE APEC, 1999, pp. 279-283.

[51]   F. C. Lee, P. Barbosa, P. Xu, J. Zhang, B. Yang and F. Canales, "Topologies and Design Considerations for Distributed Power System Applications," IEEE Proceeding, Vol. 89, No. 6, June 2001, pp. 939-950.

[52]   P. Xu, M. Ye and F. C. Lee, "A Family of Novel Interleaved DC/DC Converters for Low-Voltage High-Current Voltage Regulator Module Applications," IEEE PESC, 2001.

[53]   Y. Ren, M. Xu, D. Sterk and F. C. Lee, " 1MHz Self-Driven ZVS Full-Bridge Converter for 48V Power Pods," IEEE PESC'03, 2003, pp. 1801-1806.

[54]   Demercil S. Oliveira Jr. and Ivo Barbi " A Three-Phase ZVS PWM DC/DC Converter with Asymmetrical Duty Cycle for High Power Applications" Proc. PESC, 2003. pp. 616-621.

**SR Gate Driving Schemes**

[55]   B. Acker, C. Sullivan and S. Sanders, "Current Controlled Synchronous Rectification," IEEE APEC, 1994, pp. 185-191.

[56]   J. Cobos, O. Garcia, J. Sebastian, J. Uceda, "Active Clamp PWM Forward Converter with Self Driven Synchronous Rectification," IEEE INTELEC, 1993, pp.200-206.

172

MAXIM_00011510

[57]   Pedro Alou, Jose A. Cobos, et al., "A New Driving Scheme for Synchronous Rectifiers: Single Winding Self-Driven Synchronous Rectification," in IEEE Transaction on Power Electronics, Vol. 16, No. 6, Nov. 2001, pp. 803-811.

[58]   A.Fernandez, J. Sebastian, M. M. Hernando, P. Villegas, "Optimisation of A Self-Driven Synchronous Rectification System for Converters with A Symmetrically Driven Transformer," Proc. APEC '04. pp. 858 – 864.

[59]   M. Jovanovic, J. Liu, C. Zhou, M. Zhang and F. C. Lee, "Design Consideration for Forward Converter with Self-Driven Synchronous Rectifiers," VPEC Annual Seminar, 1993, pp.105-112.

[60]   X. Xie, H. Chung, and M.H. Pong, "Studies of Self-Driven Synchronous Rectification in Low Voltage Power Conversion," PEDS'99, July 1999, Hong Kong, pp212-217.

[61]   Yuhui Chen, "Resonant gate drive techniques for power MOSFETs," Thesis of Virginia Polytechnic Institute and State University, May 2000.

[62]   K. Yao and F.C. Lee, "A Novel resonant gate driver for high frequency synchronous buck converters," IEEE Trans. Power Electron, vol. 17, pp. 180-186, March 2002.

## Integrated Coupling Inductors

[63]   Ferroxcube application note, "Design of Planar Power Transformers".

[64]   J. Spreen, "Coupled Power Supply Inductors for Reduced Ripple Current," U. S. Patent 4703409, October 27, 1987.

[65]   G. Bloom, "Integrated Magnetic Power Converter," U. S. Patent 4864478, September 5, 1989.

[66]   I. Jitaru and A. Ivascu, "Increasing the Utilization of the Transformer's Magnetic Core by Using Quasi-Integrated Magnetics," HFPC, 1996, pp. 238-252.

[67]   P. Wong, Q. Wu, P. Xu, B. Yang and F. C. Lee, "Investigating Coupling Inductor in Interleaving QSW VRM," IEEE APEC, 2000, pp. 973-978.

[68]   P. Xu, Q. Wu, P. Wong and F. C. Lee, "A Novel Integrated Current Doubler Rectifier," IEEE APEC, 2000, pp. 735-740.

[69]   W. Chen, F. C. Lee, X. Zhou and P. Xu, "Integrated Planar Inductor Scheme for Multi-Module Interleaved Quasi-Square-Wave (QSW) DC/DC Converter," IEEE PESC, 1999, pp. 759-762.

[70]   K. Yao, P. Wong and F.C. Lee, "The Inductor Design for the Multi-Channel Voltage Regulator Module," HFPC, 2000, pp. 231-238.

[71]   W. Chen, G. Hua, D. Sable, F. C. Lee, "Design of High Efficiency, Low Profile, Low Voltage Converter with Integrated Magnetics", IEEE APEC, 1997, pp. 911-917.

173

MAXIM_00011511

[72]   A. Pietkiewicz and D. Tollik, "Coupled-Inductor Current-Doubler Topology in Phase-Shifted Full-Bridge DC-DC Converter", IEEE INTELEC, 1998.

[73]   E. Santi and S. Cuk, "Issues in Flat Integrated Magnetics Design," IEEE PESC, 1996.

[74]   P. Wong, "Performance Improvements of Multi-Channel Interleaving Voltage Regulator Modules with Integrated Coupling Inductors", Dissertation, VPI&SU, Blacksburg, VA, March 2001.

[75]   I. G. Park and S. I. Kim, " Modeling and analysis of multi-interphase transformers for connecting power converters in parallel," PESC '97 Record, 28th Annual IEEE, Volume: 2, 22-27 June 1997 Pages: 1164 – 1170.

[76]   Jieli Li; Sullivan, C.R.; Schultz, A., "Coupled-inductor design optimization for fast-response low-voltage DC-DC converters," APEC 2002. Seventeenth Annual IEEE, Volume: 2, 10-14 March 2002, Pages: 817 – 823.

[77]   Jieli Li, Schultz, A., Stratakos, A., Sullivan, C.R., "Using Coupled Inductors to Enhance Transient Performance of Multi-Phase Buck Converters," APEC 2004. Seventeenth Annual IEEE, Volume: 2, 10-14 March 2002, Pages: 817 – 823.

[78]   Aaron M. Schultz, Charles R. Sullivan, "Voltage Converter with Coupled Inductive Windings, and Associated Methods," U. S. Patent 6362986 B1, March 26, 2002.

[79]   Anatoli V. Ledenev, Gennady G. Gurov, Robert M. Porter, "Multiple Power Converter System Using Combining Transformers," U. S. Patent 6545450 B1, April 8, 2003.

[80]   Balakrishnan, A., Joines, W.T., and Wilson, T.G., "Air-gap reluctance and inductance calculations for magnetic circuits using a Schwarz-Christoffel transformation," Power Electronics, IEEE Transactions on, Volume: 12, Issue: 4, July 1997 Pages: 654 – 663.

[81]   H. Njiende, N. Froehleke, and W. A. Cronje, "Modeling and analysis of integrated magnetic components," PESC '03. IEEE 34th Annual Conference on, Volume: 1, 15-19 June 2003 Pages: 283 – 288.

[82]   J. Sun; K. F. Webb, and V. Mehrotra, "An improved current-doubler rectifier with integrated magnetics," APEC 2002. Seventeenth Annual IEEE, Volume: 2, 10-14 March 2002 Pages: 831 – 837.

[83]   J. Sun; K. F. Webb, and V. Mehrotra, "Integrated magnetics for current-doubler rectifiers," IEEE Trans. On Power Electronics, Volume: 19, No. 3, May 2004 Pages: 582 – 590.

[84]   Q. Chen, F. C. Lee, J. Jiang and M. M. Jovanovic, "A New Model for Multiple-Winding Transformer," Proc. IEEE PESC Conf., 1994, pp. 864-871.

[85]   V. A. Niemela, G. R. Skutt, A. M. Urling, Y.-N. Chang, T. G. Wilson, H. A. Owen, Jr and R. C. Wong, "Calculating the Short-Circuit Impedances of A Multiwinding Transformer from Its Geometry," Proc. IEEE PESC Conf. 1989, pp. 607-617.

174

[86] V. A. Niemela, H. A. Owen, Jr and T. G. Wilson, "Cross-Coupled-Secondaries Model for Multiwinding Transformers with Parameter Values Calculated from Short-Circuit Impedances," Proc. IEEE PESC Conf. 1990, pp. 822-830.

[87] C. Hawkes, T. Wilson and R. Wong, "Magnetic-Field Intensity and Current-Density Distribution in Transformer Windings," Proc. IEEE PESC, 1989, pp. 1021-1230.

[88] K. D. T. Ngo, E. Alpizar and J. K. Watson, "Modeling of Magnetizing Inductance and Leakage Inductance in a Matrix Transformer," IEEE Trans. Power Electronics, Vol. 8, April 1993, pp. 200-207.

[89] X. Huang and K. D. T. Ngo, "Design Techniques for Planar Windings with Low Resistance," Proc. IEEE APEC, 1995, pp. 533-539.

[90] K. D. T. Ngo and M. H. Kuo, "Effects of Air Gaps on Winding Loss in High-Frequency Planar Magnetics," Proc. IEEE PESC, 1988, pp. 1112-1119.

[91] S. Cuk and Z. Zhang, "Coupled-Inductor Analysis and Design," Proc. IEEE PESC Conf. 1986, pp. 655-665.

[92] S. Cuk, L. Stevanovic and E. Santi, "Integrated Magnetic Design with Flat Low Profile Core," Proc. HFPC Conf., 1990.

[93] T. G. Imre, W. A Cronje, J. D. van Wyk and J. A. Ferreira, "Experimental Validation of Loss Calculations for a Planar Inductor," Proc. IEEE PESC, 1999, pp. 586-591.

[94] T. G. Imre, W. A Cronje, J. D. van Wyk and J. A. Ferreira, "Loss Modeling for Planar Inductors," Proc. IEEE IAS, 1999, pp. 2108-2114.

[95] I. W. Hofsajer, J. D. van Wyk and J. A. Ferreira, "Volume Considerations of Planar Integrated Components," Proc. IEEE PESC, 1999, pp. 741-745.

[96] R. Prieto, J. A. Cobos, O. Garcia and J. Uceda. "Interleaving Techniques in Magnetic Components," Proc. IEEE APEC, 1997, pp. 931-936.

[97] R. Prieto, J.A. Cobos, O. García, P. Alou and J. Uceda, "Taking into Account all the Parasitic Effects in the Design of Magnetic Components," Proc. IEEE APEC, 1998, pp. 400-406.

[98] L. Daniel, C. R. Sullivan and S. R. Senders, "Design of Microfabricated Inductors," Proc. IEEE PESC, 1996, pp. 1447-1455.

[99] S. Ramakrishnan, R. L. Steigerwald and J. A. Mallick, "A Comparison Study of Low-Profile Power Magnetics for High-Frequency High-Density Switching Converters," Proc. IEEE APEC, 1997, pp. 388-394.

[100] W. M. Chew and P. D. Evans, "High Frequency Inductor Design Concept," Proc. IEEE PESC, 1991, pp. 673-678.

175

*Reference*

[101] J. Lopera, M. Pernia, J. Alonso and P. Nuno, "A Complete Transformer Electric Model, Including Frequency and Geometry Effects," Proc. IEEE PESC, 1992, pp. 1247-1252.

[102] J. Reinert, A. Brockmeyer and R. W. de Doncker, "Calculation of Losses in Ferro- and Ferrimagnetic Materials Based on the Modified Steinmetz Equation," Proc. IEEE IAS, 1999, pp. 2087-2092.

[103] L. Ye, R. Wolf and F. C. Lee, "Some Issues of Loss Measurement and Modeling for Planar Inductors," Philips Fellowship Report, VPEC, September 1997.

[104] David C. Hamill, "Gyrator-Capacitor Modeling: A Better Way of Understanding Magnetic Components," Proc. IEEE APEC, 1994. pp. 326 – 332.

**VRM modeling and transient analysis:**

[105] Raymond B. Ridley, "A new, continuous-time model for current-mode control," in IEEE Trans. Power Electronics, Vol. 6. No. 2. April 1991, pp. 271-280.

[106] A. R. Brown and R. D. Middlebrook, "Sampled-data modeling of switching regulators," in Proc. Power Electronics Specialists Conf., June 29-July 3, 1981, pp. 349-369.

[107] N. H. Kutkut and G. Luckjiff, "Current mode control of a full bridge dc-to-dc converter wit a two inductor rectifier," Power Electronics Specialists Conference, 1997. PESC '97 Record., Page(s):203 – 209.

[108] B. Choi, "Step load response of a current-mode-controlled DC-to-DC Converter," in IEEE Trans. Aerosp. Electron. Syst., vol.33, pp. 1115-1121, Oct. 1997.

[109] C. Sun, B. Lehman and R. Ciprian, "Dynamic modeling and control in average current mode controlled PWM DC/DC converters," in Proc. IEEE PESC, 1999, pp. 1152-1157.

[110] A.F. Rozman and K.J. Fellhoelter, "Circuit considerations for fast sensitive, low-voltage loads in a distributed power system," in Proc. IEEE APEC, 1995, pp. 34–42.

[111] J.A. O'Connor, "Converter optimization for power low voltage, high performance microprocessors," in Proc IEEE APEC, 1996, pp. 984–989.

[112] D. Goder and W. R. Pelletier, "V2 architecture provides ultra-fast transient response in switch mode power supplies," in Proc. HFPC, 1996, pp. 16-23.

[113] J. Xu, X. Cao and Q. Luo, "The effects of control techniques on the transient response of switching DC-DC converters," in Proc. IEEE PEDS, 1999, pp. 794-796.

[114] P. Wong, F.C. Lee, X. Zhou and J. Chen, "VRM transient study and output filter design for future processors," in Proc. IEEE IECON, 1998, pp. 410-415.

[115] P. Wong, F.C Lee, X. Zhou and J. Chen, "Voltage regulator module (VRM) transient modeling and analysis," in Proc. IEEE IAS, 1999, pp. 1669-1676.

MAXIM_00011514

*Reference*

[116] D. Briggs, R. Martinez, R. Miftakhutdinov and D. Skelton, "A fast, efficient synchronous-buck controller for microprocessor power supplies," in Proc. HFPC, 1998, pp. 170-176.

[117] R. Miftakhutdinov, "Analysis of synchronous buck converter with hysteretic controller at high slew-rate load current transients," in Proc. HPFC, 1999, pp. 55-69.

[118] L.D. Smith, R.E. Anderson, D.W. Forehand, T.J. Pelc and T. Roy, "Power distribution system design methodology and capacitor selection for modern CMOS technology," IEEE Trans. Advanced Packaging, Vol. 22, Issue: 3, Aug. 1999, pp. 284-291.

[119] R. Miftakhutdinov, "Analysis and optimization of synchronous buck converter at high slew-rate load current transients," in Proc. IEEE PESC, 2000, pp. 714-720.

[120] C.J. Mehas, K.D. Coonley and C.R. Sullivan, "Converter and inductor design for fast-response microprocessor power delivery," in Proc. IEEE PESC, 2000, pp. 1621-1626.

[121] R. Miftakhutdinov, "Optimal design of interleaved synchronous buck converter at high slew-rate load current transients," in Proc. IEEE PESC, 2001, pp. 1714-1718.

[122] S.A. Chickamenahalli, S. Mahadevan, E. Stanford and K. Merley, "Effect of target impedance and control loop design on VRM stability," in Proc. IEEE APEC, 2002, pp. 196-202.

[123] R. Redl, B. P. Erisman and Z. Zansky, "Optimizing the Load Transient Response of the Buck Converter," IEEE APEC, 1998, pp. 170-176.

[124] P. Wong, F. C. Lee, X. Zhou and J. Chen, "Voltage Regulator Module (VRM) Transient Modeling and Analysis," IEEE IAS, 1999, pp. 410-415.

[125] G. J. Mehas, K. D. Coonley and C. R. Sullivan, "Converter and Inductor Design for Fast-Response Microprocessor Power Delivery," IEEE PESC, 2001, pp. 1621-1626.

[126] A.Waizman and C.Y. Chung, "Resonant free power network design using extended adaptive voltage positioning (EAVP) methodology," IEEE Trans. Advanced Packaging, vol. 24, pp. 236-244, Aug. 2001.

**Device**

[127] S. Clemente, B. R. Pelly, "Understanding Power MOSFET Switching Performance," IEEE IAS, 1981, pp. 763-776.

[128] L. Spaziani, "A Study of MOSFET Performance in Processor-Targeted Buck and Synchronous-Rectifier Buck Converters," HFPC, 1996, pp.123-137.

[129] C. S. Mitter, "Device Consideration for High Current, Low Voltage Synchronous Buck Regulator (SBR)," IEEE Conference: Wescon'97, Santa Clara, CA, pp. 281-288.

177

MAXIM_00011515

*Reference*

[130]  S. Deuty and C. S. Mitter, "Transistor Paradigm Shift Required to Meet the Power Demands for Microprocessors," IEEE Performance, Computing and Communication Conference, 1999, pp. 483-488.

[131]  R. Sodhi, S. Brown Sr. and D. Kinzer, "Integrated Design Environment for DC/DC Converter FET Optimization," IEEE ISPSD, 1999, pp. 241-244.

[132]  S. Deuty, "Optimizing Transistor Performance in Synchronous Rectifier, Buck Converters," IEEE APEC, 2000, pp. 675-678.

[133]  A. Lidow, D. Kinzer, G. Sheridan and D. Tam, "The Semiconductor Roadmap for Power Management in the New Millennium," IEEE Proceeding, Vol. 89, No. 6, June 2001, pp. 803-812.

[134]  R. Sodhi, R. Malik, D. Asselanis and D. Kinzer, "High-Density Ultra-Low Rdson 30 Volt N-Channel Trench FETs for DC/DC Converter Applications," IEEE ISPSD, 1999, pp. 307-310.

[135]  Q. Zhao and G. Stojcic, "Characterization of Cdv/dt Induced Power Loss in Synchronous Buck Dc-dc Converters," APEC2004, Feb. 2004.

[136]  International Rectifier, "Power MOSFET selection for non-isolated dc/dc converters," www.irf.com. Oct., 2003.

178

MAXIM_00011516

# Vita

The author, Jinghai Zhou, was born in Zhoushan, Zhejiang, P. R. China in 1973. In 1995, he received a Bachelor of Engineering degree in Electrical Engineering, and in 1998, he received a Master of Engineering degree in Power Electronics, all from Zhejiang University, Hangzhou, China.

In fall 2000, the author joined the Center for Power Electronics Systems (CPES) at Virginia Polytechnic Institute and State University. His research interests include electronic ballast, voltage regulator modules (VRMs), magnetic design and modeling and DC/DC converters.

MAXIM_00011517

# EXHIBIT 5

## REDACTED IN ITS ENTIRETY

# Exhibit 6

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Civil Action No. 19-2240-CFC

VOLTERRA SEMICONDUCTOR LLC,            )
                                       )
       Plaintiff,                      )
                                       )
v.                                     )
                                       )
MONOLITHIC POWER SYSTEMS, INC.,        )
                                       )
       Defendant.                      )


– – –

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

– – –

VIDEOTAPED DEPOSITION OF

JINGHAI ZHOU, Ph.D.

Friday, September 3, 2021

8:59 a.m. PDT

– – –

Reported by:

Lisa A. Knight

Job no: 3097

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 44

1    between.

2         Q.    Okay.  So in February 2006, you

3    were Direct- -- sorry, Applications Manager;

4    right?

5         A.    Yes.

6         Q.    And when did you receive your

7    first promotion?

8         A.    I do not remember exactly.

9         Q.    Approximately.

10        A.    2010 or '9.  Yeah.

11        Q.    And what was your new job title

12   after that promotion?

13        A.    The new job title will be

14   Senior Manager.

15        Q.    Senior Applications Manager or

16   just Senior Manager?

17        A.    Senior Manager of Applications.

18        Q.    Approximately when was your

19   next promotion?

20        A.    Approximately 2015-16ish,

21   promoted to a Director.

22        Q.    Is that Director of

23   Applications?

24        A.    Yes.

25        Q.    After your promotion to

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 45

1      Director of Applications, was your next

2      promotion to Senior Director of Cloud

3      Solutions in January of 2019?

4           A.      That is correct.

5           Q.      What were your job

6      responsibilities when you were Director of

7      Applications?

8           A.      As a Director of Applications,

9      I'm managing the Applications team; and also

10     I'm responsible for hiring, build up the

11     team; and also responsible for product

12     definition.

13          Q.      Anything else?

14          A.      That's my main job functions.

15          Q.      Approximately how many people

16     were in the Applications team?

17          A.      Approximately 10 to 15.

18          Q.      Did all 10 to 15 people report

19     directly to you?

20          A.      No.  They have managers, and

21     the managers are reporting to me.

22          Q.      And so when you say 10 to 15

23     people, that includes both the managers and

24     the people that report to those managers?

25          A.      Yes.  That's correct.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 49



5        MR. LAVENUE:  Given the nature

6      of the testimony, I'd like to mark the

7      transcript as Highly Confidential,

8      Attorneys' Eyes Only.

9   BY MR. PIROUZNIA:

10        Q.     How does the history of the

11   digital controller you just mentioned relate

12   to the MP2888A controller?

13        A.

21        Q.     Were you involved in the

22   development of that key architecture?

23        A.     Yes.

24        Q.     What was your role in

25   developing the key architecture of MPS's

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 50

1    digital controller design?

2           A.      Well, as a manager back then,

3    I was mainly reviewing the work that my team

4    was working.   And I'm driving the schedules.

5    And also try to -- mostly it's the review

6    work.

7           Q.      Did your review work include

8    reviewing the technical details of the

9    controller architecture?

10          A.      Yes.

11          Q.      Did you provide feedback

12   regarding the technical details of the

13   controller architecture?

14          A.      Counsel, could you repeat your

15   question?   I missed one of your words.

16          Q.      Yeah.

17          Did you provide feedback after

18   you reviewed the technical details of the

19   digital controller architecture?

20          A.      Well, most of those reviews

21   will be done in the meeting -- you know,

22   face-to-face meeting or the online meetings.

23   And most of my feedback would be done in that

24   meeting verbally; just point to the team, you

25   know, what we should do, what is the right

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 51

1    direction we should go.

2           Q.      So you mainly provided verbal

3    feedback regarding the technical details of

4    the digital controller architecture; right?

5           A.      Yes.

6           Q.      Approximately when was the

7    MP2888A controller developed?

8           A.      Again, Counsel, I don't

9    remember exactly, but if -- 2017 -- maybe

10   earlier, 2016-17ish.

11          Q.      What was your role in

12   developing the MP2888A controller?

13          A.      It's very similar, like I was

14   always been doing.  You know, I review the

15   architecture, review with the team until, you

16   know -- ask questions and see where we can

17   improve.

18          Q.      Was the MP2888A controller

19   customized for any particular customer?

20          A.      MP2888A was a controller

21   designed according to a specific customer's

22   specification.

23          Q.      And who was that?

24          A.      The customer name NVIDIA.

25          Q.      Did NVIDIA approach MPS to

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 85

1    solutions like the two-stage 48-volt solution

2    you guys presented at APEC 2018?

3         A.     Yes, I do.

4         Q.     Your most recent job title is

5    Vice President of Cloud Computing as of

6    July of 2021; right?

7         A.     That is correct, Counsel.

8         Q.     How did your job

9    responsibilities change when you went from

10   Senior Director of Cloud Solutions to

11   Vice President of Cloud Computing?

12        A.     It was only -- actually only

13   two months into the job.  So I'm still trying

14   to get familiar with what my exact -- what

15   I'm, you know, up to.

16               But I think my expectation for

17   this is I have more responsibility for the

18   business to grow and to make sure, you know,

19   we maintain the right direction of this Cloud

20   Computing group within MPS.  And that's, you

21   know, a high level.  Yes.

22        Q.     I'm going to drop Exhibit 3

23   into the Chat now, which is a declaration you

24   submitted earlier in this case.  And I'll

25   share my screen with you.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 91

1      Q.    Can you give me an example of a

2  single of the numerous customers you refer to

3  in paragraph 2 that expressed concern and

4  confusion about the breadth of products

5  implicated in this lawsuit?

6      A.    Counsel, could you repeat your

7  question?  It's very long question.

8      Q.    Can you give me an example of a

9  single customer of the numerous customers you

10  reference in paragraph 2?

11      A.    Let me read this

12  paragraph again.

13            (Document[s] reviewed.)

14            Can you flip to the next page,

15  please?

16            (Document[s] reviewed.)

17            Yeah.  Now I -- yes, I read

18  through the report.  You can go back to the

19  previous page.

20            Thank you.

21      Q.    I'll repeat my question for

22  you:  Can you give me an example of a single

23  customer of the numerous customers you

24  referred to in paragraph 2?

25      A.    ████████████████████████

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 92

1  ████████████████████████████████████████

2  ████████████████████████████

3  ███████████████████████

4           And MPS was proposing -- was

5  providing both a coupled inductor solution

6  and a noncoupled inductor solutions.

7           And because of this -- because

8  of this litigation and what ended up was the

9  ████  project was cancelled.  And the ████

10 project, they went to the discrete solution

11 altogether.

12          I think that's an example of

13 this paragraph.

14      Q.     Are there any other exemplary

15 customers you can think of?

16      A.     Not that I recall, Counsel.

17      Q.     Were you personally involved in

18 the pitch to Intel?

19      A.     I was not, Counsel.

20      Q.     Do you know when that pitch to

21 Intel occurred?

22      A.     I do not recall.

23      Q.     Do you know if it was before or

24 after the lawsuit was filed?

25      A.     I do not recall exactly.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 115

1      for the specific project, it's not my

2      interest.  It's none of MPS interest.

3                  So our sole focus is to provide

4      the best semiconductor ICs for our valued

5      customers.

6           Q.      Are you aware of any projects

7      that MPS worked on with its customers that

8      included coupled inductors prior to the

9      NVIDIA 48-volt project?

10          A.      I do not recall.

11          Q.      Does that mean you're not aware

12     of any?

13          A.      Again, I do not recall.

14          Q.      I'm just not sure that's clear

15     in the record.

16                  Can you not recall today or you

17     just don't know one way or the other if any

18     projects existed?

19          A.      Could you repeat your question,

20     Counsel, so I can answer it better?

21          Q.      Never mind.  I think the

22     record's clear.

23                  Besides ████ and █████ are

24     you aware of any third parties that MPS

25     discussed this lawsuit with?

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 116

1          A.        I was not.

2          Q.        And you're currently not aware

3    of any?

4          A.        I was not aware of any.

5          Q.        Besides ████████   ████████   and

6    ████████  are you aware of any third parties

7    that MPS discussed Volterra's patents with?

8          A.        Oh, let me rephrase that,

9    because the ████████ communication was also --

10   I remember I was on a CC list, but the

11   gentleman, Ahmed, was also in the copy.

12         Q.        I see.

13                   So you're saying NVIDIA's

14   another third party that you -- that MPS

15   discussed Volterra's patents with?

16         A.        What I'm saying is that in that

17   ████████ e-mail string, that all the

18   conversations, I was on the CC list, and also

19   that NVIDIA engineer, Ahmed, was on the CC

20   list.

21         Q.        So besides ████████  ████████  ████████

22   and ████████  are you aware of any third

23   parties that MPS discussed Volterra's patents

24   with?

25         A.        I was not aware of any others.

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 117

1           MR. PIROUZNIA:  All right.
2      Mr. Zhou, we've been going a little
3      over an hour.  Would you like to take
4      your lunch break right now?
5           THE DEPONENT:  That would be
6      great.
7           MR. PIROUZNIA:  I think we're
8      ready to go off the record.
9           THE VIDEOGRAPHER:  Okay.  We're
10     off the record.  The time is
11     12:36 p.m.
12          (Recess taken.)
13          THE VIDEOGRAPHER:  We're back
14     on the record.  The time is 1:43 p.m.
15  BY MR. PIROUZNIA:
16     Q.    Welcome back, Mr. Zhou.
17     A.    Thank you.
18     Q.    Did you discuss the substance
19  of your testimony during the lunch break?
20     A.    No.
21     Q.    I dropped Exhibit 4 in the
22  Chat.  It is MAXIM11320.  I'll share my
23  screen with you.
24          (Zhou Exhibit 4, Jinghai
25     Zhou Dissertation, Bates

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 118

1          MAXIM_00011320 to -517, was marked

2          for identification, as of this

3          date.)

4          Q.     Do you recognize this

5    document?

6          A.     Yes, Counsel.

7          Q.     And what is it?

8          A.     I'm reading the first page of

9    the document.  And let me see.  Is that a

10   complete document or just one page?

11         Q.     The document is 198 pages.  I

12   can flip through it or scroll to the end.

13   Whatever you prefer.

14         A.     Yeah, I would like to quickly

15   go through it to make sure that was the

16   document.

17                (Document[s] reviewed.)

18         Q.     That's the end of the Table of

19   Contents.  Would you like me to scroll down a

20   little more quickly now?

21         A.     Yes, you can do that.

22                (Document[s] reviewed.)

23                Thank you.

24         Q.     Do you recognize Exhibit 4,

25   Mr. Zhou?

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 119

1          A.       Yes, Counsel.

2          Q.       What is it?

3          A.       This is my Ph.D. dissertation

4    that I wrote 15, 16 years ago.

5          Q.       What was your dissertation

6    about?

7          A.       If I remember correctly -- and

8    I'm reading this title page -- it's about

9    voltage regulators.

10         Q.       Approximately how long did it

11   take for you to research and write your

12   dissertation?

13         A.       Well, that dissertation is a

14   summary of my more-than-four-years' Ph.D.

15   work at Virginia Tech.

16         Q.       When you say it's a summary of

17   the four years of your work, did you begin

18   working on your dissertation when you began

19   the Ph.D. program?

20         A.       Counsel, this is 15, 16 years

21   ago.  And I can't be sure, but what -- when

22   exactly I started to write the dissertation,

23   the writing part, but the research work is

24   definitely starting from pretty much Day 1,

25   including the classes I was attending and

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 120

1   also the study -- the literature search of

2   all the works outside in the -- yes.

3        Q.    You mentioned attending classes

4   and researching papers.

5              Was there any other research

6   that went into your dissertation?

7        A.    As a typical Ph.D. student, the

8   thing people -- we do was to first learn the

9   basic knowledge in the area; and also we have

10  to -- we had to study the work that others

11  are doing.  And that's the base.

12       Q.    So you researched work that

13  others were doing, and you also researched

14  the basic knowledge in the area of your

15  dissertation; right?

16       A.    Let me clarify that.

17             You know, this whole process

18  will pretty much last for the entire Ph.D.

19  program.

20             So it's not a sequential event;

21  it's ongoing process.  We have to actively

22  looking for the other research and also

23  continuously taking a class in that program

24  while we are doing the research for this

25  work.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 121

1        Q.      Approximately how many papers
2   did you have to read to prepare your
3   dissertation?
4        A.      I don't remember that.  As much
5   as you need to.  As much as you need to do
6   your research.  It's many.
7        Q.      Do you think it was more or
8   less than a hundred papers?
9        A.      I think it would be more than a
10  hundred.
11       Q.      More than 200?
12       A.      Yeah, it's definitely possible.
13       Q.      Do you think it was less than
14  500?
15       A.      I don't recall the number.
16       Q.      How did you find the papers
17  that you had to read?
18       A.      There's publications in the
19  library and also in the CPES -- Center of
20  Power Electronics, Virginia Tech, library,
21  the CPES library, and -- yeah, those are the
22  main sources we will have those documents.
23       Q.      When you read a paper of
24  interest, would you also read the papers that
25  are cited in that document?

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 122

1        A.      I can't remember exactly but --

2   after 15 years, but during my study, when

3   I was doing the research, that I will read

4   those papers.

5        Q.      Would the citations in a

6   research paper ever inform you of additional

7   papers that you might want to also read?

8        A.      Yes.

9        Q.      How did you keep track of all

10  the papers that you read?

11       A.      After 15 years, I don't track

12  all of them.  But back then, I -- honestly,

13  I don't remember exactly how I tracked them,

14  but I -- those papers are important to --

15  back then, when I do the research.

16       Q.      Because those papers were

17  important to your research, is it fair to say

18  that you did keep track of them in some way?

19       A.      I can't speak for now, but

20  I believe that the -- in this dissertation,

21  there should be a list of citations,

22  somewhere -- probably at the back -- very

23  back of the dissertation.  So that would be

24  the list.

25       Q.      So starting on page 169, which

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 123

1    is Bates MAXIM_11507, the title says

2    Reference; right?

3         A.     Excuse me, Counsel.  Can you

4    zoom in a little bit?

5              Thank you.

6              (Document[s] reviewed.)

7         Q.     Are these the references that

8    your dissertation relied on?

9         A.     It appears to be.  But that --

10   again, it's 15 years ago.  You're asking me a

11   question that I wrapped that up 15 years ago.

12        Q.     Mr. Zhou, do you see on

13   page 178 where the final reference number 136

14   is listed?

15        A.     136.  I need to read it.

16   International --

17             (Document[s] reviewed.)

18             Yes, I do.

19        Q.     In total, your dissertation

20   contained 136 cited references; right?

21        A.     As I'm reading it, yes.

22        Q.     In order to create this

23   reference list, you had to keep track of

24   those 136 pages -- papers; right?

25        A.     Back then, during my study,

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 124

1    yes.

2         Q.    In the beginning of your

3    dissertation, there was a list of figures.

4    I'll just flip to Roman numeral [sic] x on

5    MAXIM_11329.

6              Do you see the list of figures?

7         A.    I am.

8         Q.    And the list of figures ends on

9    Roman numeral [sic] xviii; correct?

10        A.    I'm reading it, xviii.  Yes.

11        Q.    Is it correct that your

12   dissertation includes hundreds of figures?

13        A.    Counsel, I didn't count, and

14   I have no way to tell how many figures I was

15   including -- that was included in this

16   dissertation.

17        Q.    Well, if we just look at

18   page xv -- 15 -- you see it starts at

19   Figure 4.1 for the 4 figures.  Right?

20        A.    Yes, I can see that.

21        Q.    And the last "4" figure is

22   4.53; right?

23        A.    Yes.

24        Q.    And then similarly for the "3"

25   figures, they got to 3.48; right?

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 125

1      A.     That is correct.

2      Q.     And the "2" figures go to 2.57;

3  right?

4      A.     Correct.

5      Q.     So can we agree that your

6  dissertation includes more than a hundred

7  figures?

8      A.     More than a hundred, yes.

9      Q.     At the time you wrote your

10  dissertation, was it common for you to cite

11  figures without investigating where they came

12  from?

13      A.     I don't recall the details, so

14  I have no comment on that.

15      Q.     Your dissertation was important

16  for you to graduate with your Ph.D.; right?

17      A.     The dissertation was part of

18  the program.

19      Q.     The citations in the

20  dissertation were important to the

21  dissertation's accuracy; right?

22      A.     In general, yes.

23      Q.     So considering how important

24  your dissertation was to you at that time,

25  would you have expected to cite figures in

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 126

1    your dissertation that you did not

2    investigate the origin of?

3         A.    Again, Counsel, this is

4    15 years ago.  I really don't remember the

5    exact details when the dissertation was

6    written.

7         Q.    Well, I'm not asking you about

8    the exact details, Mr. Zhou.  I just want to

9    know if, sitting here today, you would have

10   expected your younger self to investigate the

11   origin of figures before relying on them in

12   your dissertation.

13        A.    If we turn back the time by 15,

14   16 years, I would agree with that.

15        Q.    When you included figures from

16   other papers, would you cite to those other

17   papers?

18        A.    Counsel, could you repeat your

19   question?

20        Q.    Yeah.

21        A.    Thank you.

22        Q.    When you included figures in

23   your dissertation from other papers, would

24   you include a citation to the paper that the

25   figure originated from?

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY

Page 127

1          A.     Again, if I go back 15 years,

2    that's exactly what I will do.

3          Q.     How is your dissertation

4    judged?

5          A.     Counsel, what do you mean by

6    "judged"?

7          Q.     If we go to the first page,

8    I see a list of five individuals on the cover

9    sheet.

10                Do you see that?

11         A.     Yes, I do.

12         Q.     Who are these -- let me ask you

13   a different question.

14                Why are these individuals

15   listed on the cover of your Ph.D.

16   dissertation?

17         A.     These five professors are in my

18   Ph.D. committee.

19         Q.     What is the purpose of a Ph.D.

20   committee?

21         A.     If I remember, the Ph.D.

22   committee is to -- is the committee that will

23   review the -- review the dissertation and

24   also the committee that I do the Ph.D.

25   defense, for their approval of the work.

# Exhibit 7

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VOLTERRA SEMICONDUCTOR, LLC,

      Plaintiff,           Civ. No.

v.                        19-2240-CFC

MONOLITHIC POWER SYSTEMS, INC.,

      Defendant.

_____/


-------------------------------------------

** H I G H L Y   C O N F I D E N T I A L **

-------------------------------------------


REMOTE VIDEOCONFERENCE DEPOSITION OF

ROHAN SAMSI

October 13, 2021

9:00 a.m. Pacific Time


Reported by:

Anne E. Vosburgh, CSR-6804, RPR, CRR

Job No. 3327

HIGHLY  CONFIDENTIAL

Page  60

1                HIGHLY CONFIDENTIAL - R. Samsi

2      mean by that?

3           A.   I'm not very good with, you know,

4      the detailed stuff.  But, yeah, I mean, it

5      was basically -- you know -- I'm not really

6      that -- a magnetics person.  I'm more of a,

7      you know, control theory person.

8                So, you know, my understanding was

9      their first phase was coupled -- every phase

10     was coupled to every other phase, that's how

11     I understood it, right?  And in a pretty

12     strong way.  That's how I understood it,

13     right?

14               I wouldn't go into any more detail

15     than that because that ends my knowledge,

16     so...

17          Q.   When you were at Primarion and

18     later Infineon, were you aware of any of

19     Volterra's patents on coupled inductors?

20          A.   No, not -- I mean, we knew that

21     they had some patents but, again, every

22     company I've worked at, you're told don't go

23     looking for patents.  It just is trouble.

24     Leave that to the experts.

25               If you have a bright idea, take it

HIGHLY CONFIDENTIAL

Page 61

HIGHLY CONFIDENTIAL - R. Samsi

2    over to the patent attorney or, you know,

3    patent counsel, depending on where you're at,

4    and we'll take it from there, right?  And if

5    we need help in filing, we'll ask you to

6    describe your invention.  And that's it,

7    right?

8                    I never really went looking for

9    trouble, so...

10        Q.   Well, let me ask you a different

11   question.  When you were working on projects

12   at Primarion and Infineon for DC-to-DC

13   converters, was your decision on whether or

14   not to use a multi-phase coupled inductor

15   colored by Volterra's patents in any way?

16        A.   No.  I don't think the subject even

17   came up.

18        Q.   You were generally aware of the

19   patents, but it wasn't like something that

20   you considered in your day-to-day work?

21        A.   No, no -- yeah.  I don't think the

22   subject even came up, right.  So...

23        Q.   Do you recall how you generally

24   became aware of the patents?

25        A.   Oh, yeah, I mean, like customers

HIGHLY CONFIDENTIAL

Page 62

HIGHLY CONFIDENTIAL - R. Samsi

1

2    were using it.

3              And then you read articles in

4    EE Times about, you know, like, the inductor

5    makers had like Vitec and Pulse.  And the

6    people who were kind of supplying those

7    inductors to end customers would kind of talk

8    about how great it was.

9              So you would read it in a

10   publication, right, like EE Times or

11   someplace like that, right?

12             Or customers would tell you, they'd

13   be like, hey, this is really cool, you know.

14   And you'd be like, okay.  You know.

15        Q.   Is it fair to say Volterra's

16   coupled inductor patents were generally known

17   in the industry?

18        A.   Yeah.  You could say that.

19             MR. LAVENUE:  Objection.

20             THE WITNESS:  Sorry?

21             MR. LAVENUE:  I just made an

22        objection.  Go ahead.

23             THE WITNESS:  Oh, I -- okay.

24        I'll -- am I --

25

HIGHLY CONFIDENTIAL

Page 63

1          HIGHLY CONFIDENTIAL - R. Samsi

2    BY MR. PIROUZNIA:

3         Q.   No, you're fine.  That's the first

4    time an objection has happened today.  But

5    from time to time, Mr. Lavenue will make an

6    objection.

7              So if you could just pause so we

8    can get his objection on the record, and then

9    he'll make an objection.  So it's just to

10   keep a record and for the court reporter.

11        A.   Okay.  Could you repeat the

12   question?

13        Q.   I think the record is clear.  I

14   didn't have a question after you answered the

15   one, it's just you and Mr. Lavenue kind of

16   spoke at the same time.

17        A.   Oh, I apologize.  My bad.  Sorry,

18   Lionel.

19        Q.   Actually I don't think they got

20   your answer on the record, so let me repeat

21   my question.

22             I asked:  Is it fair to say

23   Volterra's coupled inductor patents were

24   generally known in the industry?

25             MR. LAVENUE:  And I'll object as

HIGHLY CONFIDENTIAL

Page 64

HIGHLY CONFIDENTIAL - R. Samsi

1    foundation for that.  Thank you.

2         A.   I don't know if they were

3    well-known but, I mean, we -- I kind of knew

4    that they had something.

5              Now, how did I get that knowledge?

6    I don't remember.  I knew that they had

7    something on the coupled inductor.  Let's put

8    it that way.

9    BY MR. PIROUZNIA:

10        Q.   And you mentioned that you knew

11   about that because customers or inductor

12   manufacturers would publicize their work with

13   Volterra, right?

14        A.   Yeah.  Yeah.

15        Q.   When you transitioned to working at

16   MPS, did you still consider Volterra or Maxim

17   to be a competitor?

18        A.   No, not really.  They kind of

19   declined pretty dramatically.  I mean, they

20   were -- if you were to rank competitors, they

21   weren't even on the radar, to be honest with

22   you, right?

23             You know, and then that, I think,

24   happened before I even moved into MPS, right?

HIGHLY CONFIDENTIAL

Page 80

1          HIGHLY CONFIDENTIAL - R. Samsi

2      A.   Maxim is a pretty broad-based

3    semiconductor company.  Volterra was the arm

4    that was competing -- or would have competed

5    with me.

6           Due to their decline, I don't

7    think, you know, Maxim as an entity really

8    was that relevant, right?  So...

9      Q.   And earlier when you talked about

10   hearing about Volterra's coupled inductor

11   patents, what time frame was that in?

12      A.   Oh, that was 2008, 2009.  Again, I

13   didn't go out and seek them out.  I haven't

14   done any patent search.  I -- you know, just

15   people talking about it, hey, they have

16   patents and blah, blah, blah, right?

17      Q.   After 2008 and 2009, did anyone

18   ever speak to you about Volterra's coupled

19   inductor intellectual property?

20      A.   Sporadically it comes up but it's

21   not -- you know, people are aware, right?

22   It's one of those things.  People are --

23           It's like the Google search

24   algorithm, right?  Everybody knows Google's

25   got their search algorithm.  Coca-Cola has

HIGHLY CONFIDENTIAL

Page 81

1              HIGHLY CONFIDENTIAL - R. Samsi

2     got its secret recipe.  One of those things.

3          Q.   So let's take a step back.  When

4     did you first encounter coupled inductors?

5          A.   I would say, again, 2008, 2009,

6     that time frame.  Because before that I was

7     not in this particular field, right?  So

8     before that there was no -- I had no exposure

9     of, you know --

10              Yes, there were coupled inductors

11    but they were coupled in a different way.

12    They were for flyback applications and for

13    how -- you know, how -- you know, AC-DC type

14    applications.

15              So they were wound inductors with a

16    cord and such for -- and I used it, right?

17    Just not for this application.

18         Q.   And so in your mind, how did those

19    older coupled inductors used in different

20    applications differ from the coupled

21    inductors you learned of in 2008/2009?

22         A.   Well, so, you know, coupled

23    inductors have been around for a long time.

24    I mean, if you look at AC-DC, right, you

25    generate a buyer supply from your secondary

HIGHLY CONFIDENTIAL

Page 115

1           HIGHLY CONFIDENTIAL - R. Samsi

2     document that says here's what addresses your

3     concerns.  Right?  It was a document authored

4     by one of MPS's counsel, patent counsel, that

5     was shared with -- with ████ is my

6     recollection.

7           Q.   And whose idea was it to draft that

8     document?

9           A.   I don't remember that, but that

10    was -- it was -- the document itself was

11    authored by Roland, right?  Roland Tso, he

12    was our patent counsel.

13          Q.   And do you recall that ████ was

14    referring to one of the Volterra's patents in

15    this email from December 11th?

16          A.   I don't remember but, yeah, he had

17    concerns about Volterra, not specifically

18    which patent, but he had concerns, right.

19          Q.   Did ████ bring up Volterra during

20    your phone call or meeting when you discussed

21    this issue?

22          A.   I think he did.

23          Q.   Do you recall in what context he

24    referred to Volterra?

25          A.   He mentioned that there were some

HIGHLY CONFIDENTIAL

Page 116

1                   HIGHLY CONFIDENTIAL - R. Samsi

2       coupled inductor patents, and he didn't want

3       to step on that, right?  That's -- I mean,

4       I'm paraphrasing here, but that's what he

5       said.

6           Q.   Was that surprising to you?

7           A.   Not really.  I mean, every time the

8       word "coupled inductor," you know, in some

9       ways, you know, in the past 10-plus years,

10      it's been coupled inductor and then the next

11      is, oh, Volterra's got some patents on

12      coupled inductors.

13              But, I mean, if you looked at it

14      that way, then, you know, Intel's got some

15      processor patents, it doesn't allow everybody

16      else to stop making processors, right?  So it

17      kind of goes hand-in-hand in some ways, so...

18              Just -- a part of it stems from,

19      you know, people like me and our ignorance,

20      right?  We don't know exactly what -- what

21      the details are, right?  So...

22          Q.   Besides Mr. Tso creating that

23      document, what other actions did MPS take

24      upon receiving this information from ███ at

25      ███

HIGHLY CONFIDENTIAL

Page 117

                    HIGHLY CONFIDENTIAL - R. Samsi

1

2          A.    No, that wasn't the only thing.

3     There were requests from multiple people for

4     whatever reason, right?  That, hey, you know,

5     coupled inductors, you know that there are

6     patents from Volterra.

7               So, you know, we had -- best way

8     was to go to our patent counsel and say, you

9     know, tell us if we're doing something wrong

10    and if we're doing something wrong, we'll

11    stop doing it.

12              And his assessment was no.  And he

13    put out a document which we shared, right, to

14    say, no, there was no concern.

15         Q.    So besides ████ reaching out to

16    MPS, there were also other third parties that

17    had reached out to MPS regarding Volterra's

18    coupled inductor patents?

19         A.    I think so.  That's my

20    recollection.  I don't know.

21         Q.    Do you recall who those third

22    parties were?

23         A.    No.  No.

24         Q.    Do you remember -- I'm sorry.

25              Do you remember ████ reaching out

HIGHLY CONFIDENTIAL

Page 118

1          HIGHLY CONFIDENTIAL - R. Samsi

2     to MPS regarding Volterra's coupled inductor

3     patents?

4          A.   They may have, but I don't

5     explicitly remember them.  They may have.

6          Q.   How about ███████

7          A.   Again, I don't remember exactly who

8     did or did not.  But I do know it was not

9     just one -- it wasn't just ███████ at ███████

10    okay?

11         Q.   As far as the other companies that

12    voiced concerns about Volterra's coupled

13    inductor patents, was that at or around the

14    same time as ███████ December 2018 email?

15              MR. LAVENUE:  Objection, form and

16         foundation.

17         A.   I don't know if it was around the

18    same time, right?  But -- you know, timelines

19    are a little fuzzy in my head but, I mean,

20    there were concerns somewhere in the similar

21    time horizon, right, let's just say, not

22    specifically that time frame.

23    BY MR. PIROUZNIA:

24         Q.   Were those concerns voiced directly

25    to you or to someone else at MPS?

HIGHLY CONFIDENTIAL

Page 119

1              HIGHLY CONFIDENTIAL - R. Samsi

2          A.   Usually it came through like

3    salespeople.  You know, sometimes, you know,

4    it may have been to me as well.  I just don't

5    remember, right?  It was such a long time

6    ago.

7              All I remember is there were

8    concerns, and we had to figure out how to

9    address those concerns.

10        Q.   In what context did those concerns

11   come about?

12        A.   I don't know if I understand the

13   question.

14        Q.   You mentioned one example was that

15   salespeople might be have heard of these

16   concerns about Volterra's coupled inductor

17   patents, right?

18        A.   Yeah.  They usually hear it from

19   the customer, right.  I mean, it's

20   usually -- you know, salespeople -- if

21   anything, they're less technical than even I

22   am, which is -- so, you know, they're not

23   going to go sit and read patents.

24              Whatever they hear, they're hearing

25   from customers, people they're interacting

HIGHLY CONFIDENTIAL

Page 120

1                 HIGHLY CONFIDENTIAL - R. Samsi

2       with.

3           Q.    Why would the subject of coupled

4       inductors come up in an MPS sales employee's

5       conversations with customers?

6           A.    I think we were proposing some

7       coupled inductor solutions, right?  We were

8       proposing some of them.

9                 But, I mean, like I said, you know,

10      coupled inductor is a -- there's plenty of,

11      you know -- I don't think Volterra owns every

12      single coupled inductor.

13                They didn't invent it, right?

14      Certainly not.  I think they -- there was

15      plenty of prior art before that.

16                I mean, they have certain aspects

17      of it, in my opinion, that they, you know --

18      that they innovated on, and they have patents

19      on.

20                And in -- from my point of view, as

21      long as we were not stepping on those

22      patents, you know, whatever they may be, you

23      know, we had every right to use any kind of

24      prior art and, you know, provide solutions to

25      our customers.

HIGHLY CONFIDENTIAL

Page 121

1            HIGHLY CONFIDENTIAL - R. Samsi

2        Q.    So based on your understanding,

3    Volterra's patents cover a certain subset of

4    coupled inductors and their use, and not just

5    coupled inductors at large?

6        A.    That's right.   That's right.

7    That's right.   I think there was plenty of

8    prior art.

9            And, like I said, AC-DC, there was

10   coupled inductors used in flybacks well

11   before Volterra was even incorporated, I'm

12   pretty much about that.

13           Because I've opened up designs from

14   the 1970s and 80s that had, you know, AC-DC

15   coupled inductors.   I think there were DC-DC

16   coupled inductors in the 90s, right, well

17   before Volterra even existed.

18           So, again, it's not something new.

19   It's -- for sure they innovated and that's

20   why they had the patents so... but, again, it

21   depends on what those patents speak to.

22       Q.   And I think you said that when MPS

23   proposed certain coupled inductor solutions

24   to customers, some of those customers

25   responded with concerns about Volterra's

HIGHLY CONFIDENTIAL

Page 137

1             HIGHLY CONFIDENTIAL - R. Samsi

2             MR. PIROUZNIA:  No problem.  The

3        question was:

4             "What do you recall Mr. Tso told

5        you about his report?"

6             MR. LAVENUE:  Okay.  I'm going to

7        allow it.

8             Sorry for the diversion, but I had

9        to think through that privilege issue.

10            MR. PIROUZNIA:  No.  No.  It's

11       perfectly fine.  I appreciate it.

12            THE WITNESS:  Sorry.  What was the

13       question?

14   BY MR. PIROUZNIA:

15       Q.   Rohan, what do you recall Mr. Tso

16   told you about his report on Volterra's

17   coupled inductor patent?

18       A.   He basically said we don't infringe

19   and what -- our solution doesn't infringe.  I

20   mean, specifically, I don't know what he --

21   you know, more than just that, in terms of

22   words.  But that was what I came away with,

23   that discussion.

24       Q.   Do you recall whether Mr. Tso's

25   report was concerned about one particular

HIGHLY CONFIDENTIAL

Page 138

1                    HIGHLY CONFIDENTIAL - R. Samsi

2       patent or multiple Volterra coupled inductor

3       patents?

4              A.    I -- he told me he surveyed a

5       bunch.  But I don't know what a bunch means,

6       so, you know.

7              Q.    Mr. Tso told you his opinion

8       covered a bunch of different Volterra

9       patents; did I understand that right?

10             A.    Yeah.  He said "I studied the whole

11      thing."  But I don't know what bunch -- whole

12      thing, what does that even mean, right?

13                   I don't know the extent of his

14      homework, but he felt pretty comfortable

15      saying we don't have a problem with Volterra

16      or any of their patents.  And I thought,

17      great, if you feel that way, fantastic.

18             Q.    So your understanding, after

19      discussing Mr. Tso's report with him, was

20      that MPS had no concerns with any of

21      Volterra's coupled inductor patents, right?

22             A.    Yes.

23             Q.    Was that in regards to a specific

24      project, such as this NVIDIA project, or just

25      in general?

HIGHLY CONFIDENTIAL

Page 139

1               HIGHLY CONFIDENTIAL - R. Samsi

2          A.   Well, we had a solution -- again,

3     the details of the solution were shared with

4     Mr. Tso, and he responded based on that

5     solution, right, the details of that

6     solution.

7               And to see if that solution, right,

8     whatever that innovation, solution, whatever

9     you want to call it, infringed.

10              And his determination was it didn't

11    infringe any of their patents, right?  So...

12         Q.   When you say "that solution," are

13    you referring to this NVIDIA 48-volt solution

14    we've been talking about?

15         A.   I think this was part of that,

16    right?  I mean, it was one embodiment of that

17    solution.

18              It could be -- there were

19    different -- not everybody was doing what

20    NVIDIA was exactly doing or, you know, other

21    customers might be have been doing different

22    versions of it.  But, summarily, yeah, more

23    or less it was the same, is my understanding.

24         Q.   So it's your understanding that MPS

25    had a coupled inductor-based solution and

HIGHLY CONFIDENTIAL

Page 140

                    HIGHLY CONFIDENTIAL - R. Samsi

1       maybe there were different varieties of it

2       for NVIDIA and for other customers?

3            A.   Yeah, something like that.  That's

4       probably more accurate, right.

5            Q.   And that coupled inductor-based

6       solution was shared with Mr. Tso who then

7       reviewed Volterra's patents and generated his

8       opinion, right?

9            A.   That's right.

10           Q.   Do you see back on Exhibit 7 where

11      Ahmed said, "I am very concerned now, and I

12      need a quick clarification"?

13           A.   Sure.

14           Q.   Do you recall what Ahmed was

15      concerned about?

16           A.   Again, it was the coupled inductor

17      patents or -- you know, that we might be

18      infringing so... that's my recollection.

19           Q.   Do you recall discussing the

20      patents specifically with Ahmed?

21           A.   No.  Like I said, I'm not -- I'm

22      not an expert on patents.  I don't discuss,

23      you know, hey, this is the details and -- you

24      know, I --

HIGHLY CONFIDENTIAL



Page 144

1          HIGHLY CONFIDENTIAL - R. Samsi

2              Same process.  You go to your

3      in-house counsel and basically say, hey,

4      here's a concern.  Do you have any way of

5      allaying that concern?

6              And patent counsel would -- the

7      department -- there it was a department,

8      right?  So a whole big department.  And you

9      would just give it to them and they will work

10     on it and tell you what the answer was.

11          Q.   Did MPS have any specific policy

12     with how you were supposed to treat customers

13     raising patent issues?  Or was this just your

14     own personal policy?

15          A.   ████████████████████████████

   █   ███████████████    ████████████████████

   █   ██████████████████████████████████████████

   █   ███████████████████████████████████████

   █   ██████████

20                 ██████████████████████████

   █   █████████████████████████    █████████████

   █   ████████████████████████████████████████████

   █   ████████████████    ██████████████    ████████

   █   ██████████████████

25              So I'm happy to give it over to

HIGHLY CONFIDENTIAL

Page 145

```
 1             HIGHLY CONFIDENTIAL - R. Samsi
 2    somebody who is actually getting paid instead
 3    of, you know, taking on the trouble so...
 4         Q.   Understood.
 5              Do you recall having any other
 6    meetings with Ahmed about Volterra's patents
 7    other than this one we mentioned in
 8    Exhibit 7?
 9         A.   No.  Again, I may or may not have.
10              But, again, every one of those
11    meetings would have been just -- you know,
12    think of me like a mailman, right?  I'm
13    writing down.  I'm basically being the
14    messenger so -- if we did have one.  I'm not
15    even sure if we had one, right?  I don't
16    remember.
17         Q.   If we go back to Exhibit 6, and we
18    scroll up to the email on January 14th, 2019,
19    from Dawson, which is on MPS10092, do you see
20    where Dawson said, "Hi ███ please refer to
21    the attachment for the answer to your
22    question"?
23         A.   Sure.
24         Q.   So Dawson is the one who ended up
25    communicating Mr. Tso's opinion to ███
```

# EXHIBIT 8

## REDACTED IN ITS ENTIRETY

# Exhibit 9

**RESTRICTED – ATTORNEYS' EYES ONLY**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VOLTERRA SEMICONDUCTOR, LLC, | |
| Plaintiff, | |
| v. | C.A. No. 19-2240-CFC-SRF |
| MONOLITHIC POWER SYSTEMS, INC., | |
| Defendant. | |

**REBUTTAL EXPERT REPORT OF JOSHUA PHINNEY REGARDING U.S. PATENT NO. 6,362,986**

1

RESTRICTED – ATTORNEYS' EYES ONLY

███████████  MPS_DE-00010255.  This means that the coupling coefficient is merely ████

███████████, meaning that the windings are far from being perfectly coupled.



58.   ████ understood that its ████████████ coupled inductor was outside the
scope of any patent owned by Volterra and that the scope of Volterra's patents was limited to
coupled inductors that had a ratio of magnetizing inductance (Lm) to leakage inductance (Lk) of
greater than three.  *See* DAL0000001.  The ████████████ coupled inductors had a
ratio of magnetizing inductance to leakage inductance of less than three.  *See id*.  ████ told MPS
that ████ can sell "all coupled inductors to our customers," but coupled inductors "need to be used
with Maxim's IC" ***unless*** the coupled inductor has an Lm/Lk ratio of less than three.  *Id*.  MPS
told ████ that MPS "use[s] [a] standard coupled inductor" and not the "Volterra/Maxim type."
*Id*.  And since ████ did not require the ████████████ coupled inductors to be used with
Maxim's components, ████ itself did not consider these coupled inductors to be covered by any
Volterra patents.  ==Indeed, MPS employees discussed the subject of Volterra's patents on June 27,
2018, in a face-to-face meeting with employees of ████████.  Lee Tr. at 163:10-23.==  After

22

RESTRICTED – ATTORNEYS' EYES ONLY

these discussions, ███████ (licensees of the '986 patent) decided to move forward and make a coupled inductor in discussions with MPS and NVIDIA.

59.    ████ proposed specifications for the coupled inductor were the result of ████ design process. *See id.* at 1288 (MPS employee requesting that ████ "Please let [him] know when we can get your updated inductor design."); DAL0001287 (attaching specification proposal and requesting feedback); DAL0001506 ("Please see the ██████ coupled inductor spec we proposed to MPS for the NVidia 2nd stage power.").  MPS provided ████████ with waveforms and other parameters for the coupled inductor, but it was ████████, not MPS, who prepared various simulations, figures, and testing results related to the coupled inductor through an iterative process in a presentation dated July 20, 2018.   Lee Tr. 193:25-197:12; DAL0000270, DAL0000351.  In addition, ████████ possessed the software to perform the simulations that informed them about whether the coupled inductor could be manufactured with a target efficiency. *Id*.

### B.    The NVIDIA Power Solution

60.    Dr. Dickens provides his opinions on why the NVIDIA Power Solution infringes the Asserted Claims but he fails to analyze the individual components of the power solution. Below, I will provide a detailed description of these components to help explain why MPS does not infringe each of the Asserted Claims.

61.    The NVIDIA Power Solution includes an ████████ resonant converter module for DC-to-DC voltage conversion in its first power stage and a multi-phase DC-to-DC buck converter consisting of an ████████ controller, ██████ MOSFET drivers, and ████████ ██████ coupled inductors in its second power stage, as illustrated below.  In the following, I will describe each of the components of the NVIDIA Power Solution.

RESTRICTED – ATTORNEYS' EYES ONLY

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 1, 2021.

_____

Dr. Joshua Phinney

# Exhibit 10

RESTRICTED - ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VOLTERRA SEMICONDUCTOR LLC,<br><br>Plaintiff,<br><br>v.<br><br>MONOLITHIC POWER SYSTEMS, INC.,<br><br>Defendant. | C.A. No. 19-2240-CFC |

**REBUTTAL EXPERT REPORT OF DR. REGAN ZANE ON NONINFRINGEMENT OF
U.S. PATENT NOS. 7,525,408 AND 7,772,955**

instructed MPS to focus on the coupled inductors. J. Zhou Tr. at 173: 14-18; and D. Huang Tr. at 75:12-18.

72.    I further understand from Dr. Zhou's testimony that the reason why NVIDIA wanted to use a coupled inductor instead of a discrete inductor for the NVIDIA Power Solution was partly due to the size requirements of the NVIDIA Power Solution. J. Zhou Tr. at 183:15-21. Specifically, NVIDIA had "very clear dimension requirement[s]" and was "always striving for smaller size." J. Zhou Tr. at 183:22-184:11.

73.    I understand that, because MPS does not manufacture or sell any coupled inductors, MPS worked with ███████████. to design a coupled inductor. DAL0000001. MPS contacted ████ in March of 2018, after meeting with Dr. Abou-Alfotouh from NVIDIA, to discuss the use of █████ inductors in its proposal for the NVIDIA Power Solution. DAL0000001. As a starting point, I understand that MPS referenced several of ████ coupled inductors that had already been designed as potential candidates for testing. DAL0000001. I also understand that, at the onset of any work involving coupled inductors, MPS was clear that it was seeking to "use [a] standard coupled inductor" and not the "Volterra/Maxim type." DAL0000001. I understand that ████ told MPS about certain coupled inductors it believed were covered by Volterra's patent. DAL0000001. At the time, ████ was aware that its subsidiary, ████ had signed a licensing agreement with Volterra in 2009 for Volterra's coupled inductor patents. MAXIM_00007772-7782; Lee Tr. at 37:10-22; 38:17-23; 136: 8-23. ████ told MPS that they can sell "all coupled inductors to our customers," but coupled inductors "need to be used with Maxim's IC" unless the coupled inductor has a Lm/Lk ratio of less than three and only two phases. DAL0000001. Both the ███████████ and ██████████ have a Lm/Lk ratio of less than three, and have only two phases. ████ had a face-to-face meeting on

32

June 27, 2018 with MPS employees where the subject of Volterra's patents was discussed, afterwhich █████ decided to move forward with the coupled inductor project. DAL0000081.

74.     I understand from Dr. Zhou and Mr. Huang's testimonies that based on these brainstorming sessions with NVIDIA, MPS began to pull together a team to provide a proposal for NVIDIA, which consisted of Mr. Huang, Dr. Zhou, and several members from MPS's Hangzhou office. D. Huang Tr. at 151:02-18; MPS_DE-10989 (Email from J. Zhou to Q. Ouyang on May 09, 2018 dividing tasks up for the NVIDIA RFI).



MPS_DE-10989.

75.     Mr. Huang's testimony further discloses that MPS began designing the first stage of the proposed solution based on specifications, efficiency requirements, and topology choices from NVIDIA. D. Huang Tr. at 153:16-154:09. NVIDIA further provided a preliminary determination of MPS components which would go into the first-stage of the power module and would then work with MPS to ensure that those components and design choices would fit

431.    I declare that all statements made herein of my knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.


_____
Regan Zane


Dated:  October 1, 2021

# EXHIBIT 11

## REDACTED IN ITS ENTIRETY

# Exhibit 12

US006362986B1

(12) **United States Patent**
Schultz et al.

(10) Patent No.: **US 6,362,986 B1**
(45) Date of Patent: **Mar. 26, 2002**

(54) **VOLTAGE CONVERTER WITH COUPLED INDUCTIVE WINDINGS, AND ASSOCIATED METHODS**

(75) Inventors: **Aaron M. Schultz**, Sunnyvale, CA (US); **Charles R. Sullivan**, Hanover, NH (US)

(73) Assignee: **Volterra, Inc.**, Fremont, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/814,555**

(22) Filed: **Mar. 22, 2001**

(51) Int. Cl.[7] .......................................... **H02M 7/5387**

(52) U.S. Cl. .................................................... **363/132**

(58) Field of Search ........................ 363/16, 17, 56.01, 363/56.02, 97, 98, 131, 132

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,204,809 A | 4/1993 | Andresen | |
| 5,764,500 A * | 6/1998 | Matos | 363/132 |
| 6,018,468 A * | 1/2000 | Archer et al. | 363/17 |

OTHER PUBLICATIONS

"A Novel Modeling Concept for Multi–coupling Core Structures", Pit–Leong Wong, Fred C. Lee, Xiaochuan Jia and Daan van Wyk—Document prepared for the Center for Power Electronics Systems, Virginia Polytechnic Institute and State University, Blacksburg, VA 24061, Jan. 2001.
"Investigating Coupling Inductors in the Interleaving QSW VRW", Pit–Leong, Qiaoqiao Wu, Peng Xu, Bo Yang and

Fred C. Lee, Document prepared for the Center for Power Electronics Systems, Virginia Polytechnic Institute and State University, Blacksburg, VA 24061, Mar. 2000.

* cited by examiner

*Primary Examiner*—Matthew Nguyen
(74) *Attorney, Agent, or Firm*—Curtis A. Vock, Esq.; Lathrop & Gage L.C.

(57) **ABSTRACT**

A DC-to-DC converter generates an output voltage from an input voltage. The converter includes first and second inductive windings and a magnetic core. One end of the first winding is switched at about 180 degrees out of phase with one end of the second winding, between ground and the input voltage. The first winding is wound about the core in a first orientation, and the second winding is also wound about the core in the first orientation so as to increase coupling between windings and to reduce ripple current in the windings and other parts of the circuit. This version is a buck converter—versions that form boost, buck-boost and other converters are also provided. The invention also provides a multi-phase DC-to-DC converter for providing an output voltage from an input voltage. The converter has N (N≧2) inductive windings alternatively switched, again in the buck-converter version, between ground and the input voltage. Again, boost, buck-boost, or other versions are also provided. Each of the N windings has a turn-on switching transition separated in switching phase by at least about 360/N degrees from any other of the windings. Each of the windings also has a turn-off switching transition separated in phase by at least about 360/N degrees from any other of the windings. Each of the N windings is wound about the core in like orientation to increase coupling between windings and to reduce ripple current in the windings and other parts of the circuit. The invention also provides suitable core structures.

**40 Claims, 16 Drawing Sheets**



US 6,362,986 B1

13

Having described the invention, we claim:

1. A DC-to-DC converter for providing an output voltage from an input voltage, comprising first and second inductive windings and a magnetic core cooperatively forming a magnetizing inductance, a first voltage across the first winding being switched at about 180 degrees out of phase with a second voltage across the second winding, to regulate magnitude of the output voltage, the first and second voltages being formed from one or a combination of the input and output voltages, each of the first and second windings having a leakage inductance and being coupled to the magnetic core wherein magnetizing inductance is at least three times greater than the leakage inductance of either winding, the first winding being wound about the core in a first orientation, the second winding being wound about the core in the first orientation.

2. A converter according to claim 1, wherein the input voltage comprises first and second input voltages.

3. A converter according to claim 2, wherein the second input voltage comprises ground, wherein the converter operates as a buck converter.

4. A converter according to claim 1, further comprising one or more transistors for switching the windings out of phase wherein a current per time slope during the time intervals in which current is increasing through the windings is approximately defined by the output voltage divided by the leakage inductance subtracted from one half the input voltage divided by the leakage inductance.

5. A converter according to claim 1, wherein the windings and core are constructed and arranged to substantially maximize coupling between windings by maintaining the leakage inductance at a substantially constant level while increasing the magnetizing inductance.

6. A converter according to claim 1, wherein the core comprises first and second substantially parallel core elements, the first winding being wound about the first core element the first orientation, the second winding being wound about the second core element in the first orientation.

7. A converter according to claim 6, further comprising one or more connecting elements rigidly coupling the first and second parallel core elements together.

8. A converter according to claim 1, wherein the core comprises one of a gapped high-permeability element and a low-permeability element, to serve as a leakage path structure to carry at least part of a leakage flux, the leakage flux being defined as a flux present when each of the windings has an equal DC current.

9. A converter according to claim 8, wherein the leakage path structure comprises a core leg or shunt.

10. A converter according to claim 1, further comprising circuitry to activate one or more of the windings at a selected duty cycle.

11. A converter according to claim 10, wherein the duty cycle comprises a duty cycle between about 5% and 90%.

12. A converter according to claim 10, wherein the duty cycle is about 50%.

13. A converter according to claim 1, further comprising circuitry to alternatively activate each of the windings at about 50% duty cycle.

14. A converter according to claim 1, wherein one end of each of the windings is switched between the input voltage and ground.

15. A converter according to claim 1, wherein the first and second windings have an equal number of turns in the windings.

16. A converter according to claim 1, wherein the first winding has a first number of turns and the second winding

14

has a second number of turns, the first number being different from the second number, and wherein a NI product for each of the first and second windings is substantially equal.

17. A method for reducing ripple in a DC-to-DC converter of the type producing an output voltage from an input voltage, comprising the steps of:

orienting, in like direction, first and second windings about a common core to increase coupling between the windings; and

alternatively activating each winding about 180 degrees out of phase with the second winding, to regulate magnitude of the output voltage.

18. A method of claim 17, further comprising switching the voltages across the windings by connecting one end of each winding to a common output voltage, and individually switching the other end of each winding between ground and an input voltage.

19. The method of claim 17, further comprising the step of forming the core with two substantially parallel core elements, wherein the step of orienting comprises orienting each of the windings on a separate core element.

20. The method of claim 17, further comprising the step of activating one or more of the windings at a selected duty cycle.

21. The method of claim 20, wherein the step of activating comprises activating the windings at a duty cycle between about 5% and 90%.

22. The method of claim 20, wherein the step of activating comprises activating the windings at a duty cycle at about 50%.

23. The method of claim 17, further comprising the steps of forming a first number of turns in the first winding and a second number of turns in the second winding.

24. The method of claim 23, wherein the first number is different from the second number, and further comprising the steps of applying a first current through the first winding and applying a second current through the second winding, the first current being different from the second current, wherein a NI product for each of the first and second windings is substantially equal.

25. A DC to DC converter for providing an output voltage from one or more input voltages, comprising (a) a common magnetic core and (b) N inductive windings alternatively switched, at one end, to regulate magnitude of the output voltage, each of the windings having a turn-on switching transition separated in switching phase by at least about 360/N degrees from any other of the windings, each of the windings having a turn-off switching transition separated in phase by at least about 360/N degrees from any other of the windings, each of the N windings being wound about the core in like orientation, N being an integer greater than or equal to three.

26. A converter of claim 25, wherein each of the windings comprises a leakage inductance, each of the windings being coupled the common magnetic core wherein magnetizing inductance defined by magnetic interaction between the windings is greater than about three times the leakage inductance of any one of the windings.

27. A converter according to claim 26, further comprising one or more transistors for switching the windings out of phase wherein a current per time slope during the time intervals in which current is increasing through the windings is approximately defined by the output voltage divided by the leakage inductance subtracted from the input voltage divided by the leakage inductance divided by N.

28. A converter according to claim 26, wherein the windings and core are constructed and arranged to substan-

MPS_DE-00010059

# Exhibit 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Civil Action No. 19-2240-CFC

VOLTERRA SEMICONDUCTOR LLC,     )
                                  )
       Plaintiff,           )
                                  )
v.                                )
                                  )
MONOLITHIC POWER SYSTEMS,     )
INC.,                           )
                                  )
       Defendant.           )

- - -

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

- - -

VIDEOTAPED DEPOSITION OF

ROLAND TSO

Thursday, September 2, 2021

9:02 a.m. PDT

- - -

Reported by:

Lisa A. Knight

Job no: 3096

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 47

1    a patent with coupled inductors with Jinghai.

2         Q.    How about anyone else at MPS?

3         A.    I can't recall anyone else.

4         Q.    How did Jinghai bring ▓▓▓▓

5    e-mail to your attention?

6         A.    He told me about the ▓▓▓

7    inquiry.

8         Q.    Was that a verbal conversation?

9         A.    I believe that was a verbal

10   conversation.

11        Q.    Do you recall if it was in

12   person?

13        A.    Yes, it was in person.

14        Q.    In your experience at MPS, how

15   often have you received e-mails from vendors

16   identifying patents like ▓▓▓ did here?

17        A.    Can you rephrase?

18              By, you know, "how often," what

19   do you mean?

20        Q.    I guess, was it a surprise to

21   you that ▓▓▓ raised a potential patent

22   issue?

23        A.    You know, before, I really have

24   never heard of ▓▓▓  Yes, it was a surprise

25   to me about ▓▓▓ bringing up this issue.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 48

1        Q.      Has MPS had other vendors raise

2    patent issues with it during your course of

3    employment at MPS?

4        A.      We receive -- yes, we have

5    received patent -- notices of patents from

6    other parties.  Yes.

7        Q.      Did MPS have any policies or

8    procedures it follows when other parties

9    inform it of patents?

10       A.      ████      ███████████████████

11   ████████████████████████████████████████

12   █████████

13       Q.      █████████████████████████████

14   ████████████████████████

15       A.      ████████████████████████████████

16   ████████████████████████████████

17   ████████████

18                ████████████████████████████

19   ████████████████████████████████

20   ██████████████████████████████████

21   ████████████████████████████████████ ███

22   ██████████████████████████████████████

23   ████████████████████████████████

24   ███ ████████████  ███████████████████████

25   ███  ██████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 49

1        Q.    ███████████████████████
██    █████████████?

3        A.    ███████████████████
██    ██████████████████.

5        Q.    ███████████████████████
██    █████████████████

7        A.    ███████████████████
██    ████████    ██████████████████
██    ██████████████████████████████
██    ████████████.

11       Q.    Circling back to MPS's policies

12   and procedures.  Are those memorialized in

13   any way?

14       A.    ██████████████████
██    ██████████

16       Q.    You're not aware of --

17       A.    ██████████    ██████████████
██    ████████████████    ████

19       Q.    ███████████████████████
██    ██████████████████████
██    ████

22       A.    ███████████████████
██    ██████████████████
██    ███████████████████
██    ██████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 50



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 51

14     Q.     When Jinghai approached you

15   about the '986 patent, what did you discuss?

16          A.     When Jinghai approached me, he

17   brought up that ██████ had brought up the

18   '986, claim 17.  And I said, "Yes, I will

19   investigate."

20          Q.     What happened next?

21          A.     I started to investigate --

22   begun -- initiate the investigation.

23          Q.     What did that investigation

24   involve?

25          A.     The investigation involved

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 52

1    downloading the '986 patent, reviewing it,

2    and also pulling up the '986 file history and

3    reviewing that.  And then reviewing claim 17.

4              And then it also -- you know,

5    that's -- and also, you know, again, to

6    search for relevant prior art, and then to do

7    analysis.

8         Q.      Anything else?

9         A.      Let me see.

10              Basically, yeah, just to --

11    I downloaded the patent.  I reviewed it and

12    analyzed it and looked at claim 17.  Reviewed

13    the file history.  Searched for relevant

14    art -- prior art.  And I also, you know, read

15    some supplemental articles about coupled

16    inductors to bring me up to speed on coupled

17    inductors.

18         Q.      Now, you mentioned you searched

19    for prior art.

20              Did you perform that search

21    yourself?

22         A.      Yes, I did.

23         Q.      So you didn't hire any prior

24    art search firms?

25         A.      No, we did not.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 53

1      Q.    Why did you decide to handle
2   this patent analysis yourself, instead of
3   contacting an outside firm?
4      A.    Well, at that time, I had some
5   time to do the investigation.  And basically
6   I had the time and felt that I was able to
7   competently do the investigation.
8      Q.    Did you feel that you were
9   qualified to understand the technology in the
10   '986 patent?
11      A.    I felt that I was, you know, a
12   person of ordinary skill in the art to
13   analyze the '986 patent.
14      Q.    Did you feel you were a person
15   of ordinary skill in the art because of your
16   undergraduate degree in electrical
17   engineering?
18      A.    Because of my undergraduate
19   degree in electrical engineering and also my
20   experience gained working in the
21   semiconductor industry and also knowledge
22   gained in reviewing hundreds of patents.
23      Q.    In your experience reviewing
24   hundreds of patents, did you encounter
25   coupled inductors?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 54

1          A.       Prior to the ████

2   notification, I did not review any patents

3   that claimed coupled inductors.

4          Q.       And how did your experience

5   gained working in the semiconductor industry

6   assist you in analyzing the '986 patent?

7          A.       The experience gained in the

8   semiconductor industry provided me with

9   background knowledge on power converters and

10  circuitry and general electronics and how

11  components of electronics operate.

12         Q.       Can you describe for me how you

13  performed the prior art search for the '986

14  patent?

15         A.       First, I looked at the cited

16  references.  And usually I work from that and

17  look up the cited references to see if they

18  apply.  And also I would look at the cited

19  references to see what those cited references

20  cite to try to establish some sort of trail

21  in this field.  That's what I would do for

22  the -- for cited references.

23                  And then I would do an online

24  search, searching for relevant keywords to

25  see what types of prior art or whatever hits

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 55

1    I can get.

2              And then once I obtain the

3    list, I would examine each hit or reference

4    to see if it applied or not to claim 17 --

5    say, for the '986 patent, claim 17.

6        Q.    Is that the procedure you

7    followed for the '986 patent?

8        A.    Yes.  Besides also reviewing

9    the file history to see if there were any

10   limitations contained in the file history.

11       Q.    And so when you say you "looked

12   at the cited references," would those be what

13   we see on Exhibit 2, the '986 patent, under

14   number (56), References Cited?

15       A.    Yes.

16       Q.    So we have three patents listed

17   here and a number of publications; right?

18       A.    The publications that are

19   listed in the Other -- the heading Other

20   Publications.

21       Q.    I'm just going to scroll to the

22   second page to see if it's continued there.

23   But, no, it looks like this patent only has a

24   single page of references cited.

25              And you mentioned that you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 56

1    performed an online search after looking at

2    the cited references; right?

3        A.    Yes.

4        Q.    What platform did you use for

5    that online search?

6        A.    I used Google.

7        Q.    Google Patents or just Google,

8    generally?

9        A.    Google, generally.  And also

10   I used Google Patents.

11       Q.    Any other online platforms?

12       A.    No.  For this one, no.

13       Q.    What keywords did you search on

14   Google?

15       A.    On Google, I searched -- the

16   keywords, I put in "coupled inductors" and

17   I also put in "Pit-Leong Wong."  And

18   basically, you know, those were the ones,

19   because I see that Pit-Leong Wong in the

20   cited publications; he was listed as the

21   first author in these publications.

22       Q.    Were you familiar with

23   Pit-Leong Wong prior to looking at the

24   '986 patent?

25       A.    No, I was not.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 57

1       Q.      How about Fred C. Lee?

2       A.      Fred C. Lee you're talking

3   about that's listed?

4       Q.      Yes.

5       A.      Fred C. Lee, from what

6   I understand, is a famous professor at

7   Virginia Tech who I heard had built up the

8   power electronics department there.

9       Q.      When did you learn of that

10  knowledge?

11      A.      Well, when I was at Fairchild

12  Semiconductor, we had a conference where --

13  not conference, but we had a big get-together

14  with the engineers.  And Fred C. Lee was

15  invited to speak at that event.  And that's

16  when I first saw Fred C. Lee.

17      Q.      Did you meet him at that event?

18      A.      I was in the audience, but

19  I did not personally go up to talk to him.

20      Q.      Have you ever personally spoken

21  with Fred C. Lee?

22      A.      No.

23      Q.      Were you involved in MPS's

24  subpoena to Virginia Tech in this lawsuit?

25      A.      Can you define what

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 69

1    of coupled inductors as used in multiphase

2    buck DC-to-DC converters?

3         A.    Can you repeat that question?

4    It was kind of a long one.  I didn't quite

5    catch it.

6         Q.    Yeah.

7               So you mentioned that you found

8    older articles referencing coupled inductors

9    generally; right?

10        A.    I found older articles

11   referencing coupled inductors utilizing

12   electrical circuits and also in power

13   converters.

14        Q.    Were they utilized in

15   multiphase buck converters?

16        A.    I believe I did find a number

17   of older articles that discuss multiphase

18   buck converters.

19        Q.    That discuss multiphase buck

20   converters on their own and/or coupled

21   inductors?

22        A.    In conjunction -- I believe in

23   conjunction with coupled inductors.

24        Q.    And when you say "older," what

25   do you mean?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 70

1          A.      Well, you know, I believe

2    possibly -- remembering, maybe, five to ten

3    years prior maybe.

4          Q.      And why didn't you rely on

5    those references instead of the three you

6    selected?

7          A.      Well, the three that I

8    selected, I believe, cover every aspect to

9    invalidate claim 17.   And I felt that those

10   were the strongest references, so I used

11   those.

12         Q.      Did you ever consider

13   generating a noninfringement opinion with

14   respect to the '986 patent?

15         A.      Well, I had concluded

16   invalidity of claim 17.   And also, MPS does

17   not design, produce, nor sell coupled

18   inductors.   So since it was invalid, no

19   infringement, there was -- I felt it was not

20   necessary to do such an investigation.

21         Q.      Do you recall telling Dawson

22   Huang that MPS does not infringe the

23   '986 patent?

24         A.      I do not recall any such

25   conversation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 71

1          Q.     And a moment ago, you mentioned

2     that you concluded the patent was invalid and

3     so there was no infringement.  Right?

4          A.     Yes.

5          Q.     Was your conclusion of no

6     infringement based solely on the supposed

7     invalidity of the patent?

8          A.     My conclusion of no

9     infringement because it was concluded that

10    claim 17 was invalid.  So since the claim was

11    invalid, there's no infringement.

12         Q.     Did you ever look into the

13    actual coupled inductors that were accused of

14    infringement?

15         A.     Can you repeat that?  I'm not

16    sure of what you're asking.

17         Q.     So earlier you mentioned you

18    looked at the original Complaint; right?

19         A.     Yes.

20         Q.     Besides your analysis of the

21    original Complaint, did you ever analyze the

22    coupled inductors that are accused of

23    infringement in this lawsuit?

24         A.     I had analyzed the coupled

25    inductors involved in this lawsuit after --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 162

1        A.      I believe so.

2        Q.      Was it your idea or your

3   general counsel's idea to update the opinion

4   letter?

5        A.      I had a discussion.  And

6   I think it was a mutual agreement that we

7   should update it.

8        Q.      Why did you come to that

9   agreement?

10       A.      To reflect the filing of the

11  five IPRs and to reiterate our reliance on

12  the opinion -- the January 7th, 2019,

13  opinion.

14               So we need -- we felt we needed

15  an update to reflect what had happened since

16  the January 17th, 2019, [sic] opinion.

17       Q.      Do you recall earlier when we

18  discussed how you planned to rely on the

19  original invalidity letter to impact

20  willfulness and infringement claims?

21       A.      Yes.

22       Q.      Did you intend to rely on your

23  updated opinion letter for those same

24  purposes?

25       A.      Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 163

1          Q.     Did you intend to rely on your

2    updated opinion letter for any other

3    purposes?

4          A.     Than any other purposes of

5    what?  Can you --

6          Q.     Well, other than willfulness

7    and infringement.

8          A.     Infringement and also indirect

9    infringement.  Right?

10         Q.     When you updated your

11   invalidity opinion letter, did you consider

12   creating a noninfringement opinion letter?

13         A.     Well, our outside -- at the

14   time, our outside counsel had already

15   determined and concluded noninfringement

16   in -- for at least the reasons cited in

17   the -- excuse me.  I'm stumbling because it's

18   after lunch -- in the Interrogatories 14 for

19   infringement.  So I deemed it being not

20   necessary.

21         Q.     What Interrogatory 14 are you

22   referring to?

23         A.     To our answers for the

24   reasons -- for our answers to Interrogatory

25   14 for noninfringement.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 164

1      Q.      Based on your recollection,

2   Interrogatory 14 asked MPS why it believes it

3   does not infringe.  And MPS responded with

4   its reasons in response to that

5   interrogatory?

6      A.      That is what I believe of what

7   our outside attorneys had responded with.

8      Q.      Was there any other reason you

9   decided not to create any noninfringement

10  opinion letter?

11     A.      Well, basically, you know, we

12  had hired outside attorneys to defend MPS --

13            MR. LAVENUE:  Just be careful

14       not to disclose attorney-client

15       communications.

16            THE DEPONENT:  Okay.  Sure.

17     A.      Yeah, I believe this may be

18  privileged.

19  BY MR. PIROUZNIA:

20     Q.      At the end of your letter, you

21  conclude that your original analysis and the

22  IPRs are fully consistent; right?

23     A.      Yes.

24     Q.      How did you come to that

25  conclusion?

# EXHIBITS 14-15

## REDACTED IN THEIR ENTIRETY

# Exhibit 16



Deposition of:
# Rizwan Khalid

*August 23, 2021*

In the Matter of:

# Volterra Semiconductor LLC
# v. Monolithic Power Systems, Inc.

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

RESTRICTED, ATTORNEY'S EYES ONLY

Page 19

```
1      work with who?

2              MR. JONES:  Coupled conductors.

3         Q.  What about when you were working in test

4      management?

5         A.  Didn't directly work with them, no.  I'm sure

6      when we acquired Volterra there were presentations or

7      E-mails, but probably just went from one ear to

8      another because I was focused on test engineering at

9      that time.

10        Q.  So, actually, let's touch on Volterra.  Do

11     you work for Volterra or do you work for Maxim?

12        A.  Sorry.  What do you mean?  Right now?

13        Q.  Yes.

14        A.  Of course, Maxim.

15        Q.  Have you ever worked for Volterra?

16        A.  No.

17             MR. JONES:  I know that we have the tech on.

18     I'm going to see if I can mark this myself.

19             MR. BARKAN:  Forrest, do you want him to open

20     the package?

21             MR. JONES:  Yes, you can go ahead.

22             (Pause in proceedings.)

23             THE WITNESS:  Do you want me to open to a

24     certain page?

25             MR. JONES:  Yes.  We are going to be going to
```

RESTRICTED, ATTORNEY'S EYES ONLY

Page 20

1    what's marked as Tab 11 in the binder.

2              MR. BARKAN:  And at this point I'll designate

3    the transcript as "Confidential" under the protective

4    order.  The specific designation is "Restricted,

5    Attorney's Eyes Only."

6              MR. JONES:  I guess just to make sure, did

7    the marking of the exhibit as Exhibit 1 go through?

8              VERITEXT CONCIERGE:  Introducing that now and

9    adding the stamp.

10              (Deposition Exhibit 1 was marked for

11              identification.)

12              VERITEXT CONCIERGE:  This exhibit has been

13    introduced.

14    BY MR. JONES:

15        Q.  So if you could, just take a moment to look

16    at this document.  I'll note for the record that it

17    bears on the bottom right corner a Bates number of

18    MAXIM_00013677.

19              And when you've finished, let me know.

20              THE WITNESS:  I didn't read all of it, but if

21    you wanted me to I can.

22    BY MR. JONES:

23        Q.  I think we can start with just asking from

24    sort of your review of it, do you recognize this

25    document?

RESTRICTED, ATTORNEY'S EYES ONLY

Page 21

1        A.   Yes.

2        Q.   What is this document?

3        A.   It was a list of all the patents that was

4   provided to me by our magnetics expert that I

5   copy/pasted into an E-mail to Ahmed.

6             Ahmed -- I don't remember if he was working

7   in video or intel because I sent the same E-mail in

8   both -- both ways.   I just don't remember which way

9   this went.   Either video or intel.

10        Q.   So you sent this same E-mail to him at both

11   locations?

12        A.   Yes.   He asked for it.

13        Q.   So let's first -- let me make sure that the

14   Realtime is going.

15             I'd like to first ask, you just said that

16   this list was provided to you by your magnetics

17   expert.   Who is your magnetics expert?

18             THE WITNESS:   David, can I answer that

19   question?

20             MR. BARKAN:   Yes, you can answer.

21             THE WITNESS:   Okay.   Alex.   Alexander,

22   A-l-e-x-a-n-d-e-r.

23   BY MR. JONES:

24        Q.   And what would be his surname?

25        A.   I don't know how to pronounce it.   Ikneroff.

RESTRICTED, ATTORNEY'S EYES ONLY

```
                                                    Page 22

  1          Q.  Okay.  Ikernoficov.  Who is Alexander

  2     Ikernicof?

  3          A.  He is -- his title is, I think -- let's see

  4     here.  I think it's distinguished engineer in the

  5     magnetics team.  Distinguished engineer.  So

  6     (inaudible) technically.

  7             REPORTER MARTIN:  I'm sorry.  He cut out.  Am

  8     I the only one getting that?

  9             MR. BARKAN:  He sounds fine to me.  I'm not

 10     sure what's going on.

 11             REPORTER MARTIN:  Can you repeat your answer,

 12     please.

 13             THE WITNESS:  Yes.  So he is a distinguished

 14     engineer.  He is in charge of all the coupling

 15     inductor within Maxim.

 16             REPORTER MARTIN:  He's in charge of what

 17     designs?

 18             THE WITNESS:  Coupled inductor.

 19     BY MR. JONES:

 20          Q.  When you say you got this list from him, do

 21     you know if he drafted this list or if he got it from

 22     another document?

 23          A.  I don't know.

 24          Q.  What prompted you to ask for this list?

 25          A.  At Nvidia, when I met Ahmed, that was his
```

RESTRICTED, ATTORNEY'S EYES ONLY

Page 23

1    first job.  That was the first time I met Ahmed was at

2    Nvdia, he mentioned about a couple of inductors, and

3    he mentioned that we don't -- he doesn't see like we

4    are protected on our coupled inductors based on his

5    knowledge from our other vendors.  And that's what

6    prompted me to send him this list seeing if we are

7    protected.

8         Q.   When was this conversation with Ahmed?

9         A.   I don't -- it has been a while.  I mean I had

10   a conversation with Ahmed and then Nvdia and then

11   Intel.  So sometime between 2017 and 2019 in two

12   different companies.  So I don't remember if this is

13   11-12-2018 that is shown here is to Intel or Nvdia.

14   If you guys can confirm that, we can probably get the

15   date correctly.

16        Q.   Well, I'll note that this document was

17   produced from Maxim.  So to the extent that there's

18   metadata on what E-mail address that's actually sent

19   to, I think that that's something that your side is

20   going to be able to confirm.

21        A.   Okay.

22        Q.   Was this conversation that you were talking

23   about between you and Ahmed, were you the only two

24   involved in that conversation?

25        A.   I do not remember how many other Maxim people

RESTRICTED, ATTORNEY'S EYES ONLY

Page 24

1     were there, but we were in a meeting room in Nvdia.

2     Me and Ahmed.

3          Q.  It was only Ahmed from Nvdia?

4          A.  From Nvdia --

5               REPORTER MARTIN:  I'm sorry.  I don't know

6     why it keeps breaking up.  Can you repeat that answer

7     one more time, please.

8               (A discussion was held.)

9               THE VIDEOGRAPHER:  We are off the record.

10    The time is 1:00 p.m.

11               (A recess was taken from 10:00 a.m.

12               to 10:02 a.m.)

13               THE VIDEOGRAPHER:  We are back on the record.

14    The time is 10:02 a.m.

15               MR. JONES:  Hopefully, we got the technical

16    issues worked out.

17          Q.  Before the break, we were talking a little

18    bit about the meeting with Nvdia where you said that

19    Ahmed mentioned that another party had indicated that

20    you were not fully protected for coupled inductors?

21          A.  Correct.

22          Q.  Did Ahmed say who this other party was?

23          A.  No.

24          Q.  Do you know who this other party was?

25          A.  At that time?

RESTRICTED, ATTORNEY'S EYES ONLY

Page 25

1        Q.   At that time or now.

2        A.   100 percent I know who this is.   It was MPS.

3        Q.   At that time, did you know it was MPS?

4        A.   No.

5        Q.   At that time, did you suspect it was MPS?

6        A.   Not at that exact timing.   The first time I

7    met Nvdia, no.   The first time we had this discussion,

8    no.

9        Q.   Was there a time between that first

10   discussion and now at which you suspected that it was

11   MPS?

12       A.   Yes.   That was confirmed when one of my

13   customers -- I'm sure you have that in record -- one

14   of our customers from Intel messaged me saying, "MPS

15   is saying coupled inductors are not valid by Maxim, or

16   not valid anymore."   And there was a text between me

17   and this engineer at Intel, Tammie Bard.

18       Q.   We'll get to that.

19            After Ahmed mentioned this during this

20   in-person meeting at Nvdia, why did you send this

21   E-mail?   Why was the decision made to send this

22   E-mail?

23       A.   So I told him that we have patents and -- in

24   the meeting I told him we have patents, and they do

25   cover coupled inductor.   So he told me to send me the

RESTRICTED, ATTORNEY'S EYES ONLY

Page 26

1    list in the meeting.  So then I went back, talked to

2    Alex, who we have discussed about, and asked him to

3    send me the list, and then I sent it to you guys --

4    sent it to Allen at Nvdia.

5         Q.  So when you say you told him that you had

6    patents that do cover coupled inductors -- that's a

7    little bit of a tongue twister -- what did you

8    understand that coverage to be?

9              MR. BARKAN:  Objection.  Vague.  Calls for a

10   legal conclusion.

11             THE WITNESS:  I still have to answer I'm

12   assuming?

13             MR. JONES:  Yes.

14             MR. BARKAN:  Yes.

15             THE WITNESS:  Sorry.  Can you just repeat the

16   question?

17   BY MR. JONES:

18        Q.  Sure.  Not asking as a lawyer, but just you

19   in that conversation --

20        A.  Uh-huh.

21        Q.  -- when you said that you had -- that Maxim

22   had patents covering coupled inductors --

23        A.  Yeah.

24        Q.  -- what did you understand that coverage to

25   be?

RESTRICTED, ATTORNEY'S EYES ONLY

Page 27

1        A.  My understanding is that any solution that is

2    using the power converters, along with coupled

3    inductors is patented by Maxim and can only be used by

4    Maxim solution, Maxim control power solution.

5        Q.  And what did you base that understanding on?

6        A.  Internal discussions with our teams.  We knew

7    from a while that coupled inductor provides us a lot

8    of value and advantages that our competitors don't,

9    and it's one of -- you can say one of the key

10    elements, advantages that Maxim has.

11        Q.  I think I asked a slightly different question

12    than the one that you answered.

13        A.  Please answer again.

14        Q.  Sure.  You mentioned in your answer

15    advantages of coupled inductors, but my question is

16    more about the coverage for coupled inductors, what

17    the basis is for thinking, as you say, that any power

18    converter with a coupled inductor is covered.

19        A.  Based on our internal discussions.  I

20    obviously didn't read all the patents.

21        Q.  Internal discussions with who?

22        A.  With a bunch of people at Maxim, like a lot

23    of internal meetings, just knowing -- I mean obviously

24    Alex being one of them, but just a bunch of meetings

25    like how it's protected and it's Maxim's IP and things

# EXHIBITS 17-26

## REDACTED IN THEIR ENTIRETY

# Exhibit 27

RESTRICTED - ATTORNEYS' EYES ONLY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


VOLTERRA SEMICONDUCTOR, LLC,

      Plaintiff,

                    CASE NO.:
v.                     19-02240

MONOLITHIC POWER SYSTEMS, INC.,

      Defendant.


RESTRICTED - ATTORNEYS' EYES ONLY

VIDEOTAPED REMOTE DEPOSITION OF

JOSHUA WILLIAM PHINNEY

Friday, October 22, 2021

9:05 a.m. Eastern Daylight Time


Reported by:

GRETA H. DUCKETT, CCR, RPR, CRR, CVR-S, RVR-M-S

JOB NO.: 3426

RESTRICTED - ATTORNEYS' EYES ONLY

Page 92

1   different sense.  But another thing that you do

2   is you switch how the terminals are connected

3   between the windings.  And so, you know,

4   there's this way that the sense of the windings

5   and how it's wound and the sign of the current

6   sort of interact, and they can sort of cancel

7   out one another.

8            So if you change one and change the

9   other also, you can still be oriented in like

10  direction.  So what's really important to look

11  at is which direction the flux is going,

12  because the flux sort of accounts for the fact

13  that you can change -- you can change its

14  direction, the flux's direction, through either

15  a change in current or a change in how you wind

16  the winding.

17       Q.    Do both Figure 3A and Figure 3B

18  show the windings wound in like orientation?

19       A.    Yeah.  I think that's true in

20  the -- the way the patent describes it at this

21  point is trying to elucidate what "winding in

22  like direction" means.  And even though these

23  Figure 3A and 3B differ in the sense of one of

24  the windings and so forth -- they differ in

25  little ways -- they're both still oriented in

RESTRICTED - ATTORNEYS' EYES ONLY

Page 93

```
1    like direction, because they've been wound such

2    that the flux has that -- the opposite

3    directions.

4         Q.    And the flux has the opposite

5    directions when the current passes from Vx1 and

6    Vx2 to Vc, correct?

7         A.    Yeah.  It will do it for that

8    condition.  I think it will even do it if it's

9    coming from the load 2.  I think you'll still

10   have the condition where the flux will collide.

11   It will, perhaps, just go the other way if the

12   current is reversed.

13        Q.    So you're saying if we go from Vc

14   to both Vx1 and Vx2, we'll still collide in the

15   opposite direction, right?

16        A.    I think that's right.  If you don't

17   mind me holding up my hand and just looking.

18   Yeah, that's right.

19        Q.    What if our current goes from Vx1

20   to Vx2?

21        A.    So there's no load -- no load

22   current on Vout?

23        Q.    Right.

24        A.    In that case, unless I'm

25   mistaken -- I haven't considered this until you
```

RESTRICTED - ATTORNEYS' EYES ONLY

Page 94

1    asked.  But if I'm not mistaken, the flux in

2    both windings will go in the same direction.

3    The structure will generate a high impedance to

4    that current.  That's effectively a

5    differential mode current.  Because by the

6    terms of your question, we've made the current

7    into one winding, like into the terminal Vx1 is

8    equal and opposite with the current in Vx2.  So

9    the current I put into Vx2 comes out of the --

10   the current I put into Vx1 comes out of Vx2.

11                  That is a differential mode

12   current.  And that will -- that's what the

13   structure is designed to impede.  It will

14   generate a large impedance because that will

15   link flux into the core.  That will no longer

16   have the property of, you know, of -- of

17   because of symmetric excitation, forcing the

18   flux to not go through the mutual pathway, but

19   return through the leakage pathways.

20          Q.      If the current went from Vx1 to

21   Vx2, you said that the fluxes would then both

22   be going in the same direction around the core,

23   right?

24          A.      Yeah.  I think that's right because

25   you're -- if I'm understanding your question

RESTRICTED - ATTORNEYS' EYES ONLY

Page 95

1    right, you're saying that the current I put

2    into Vx1 will be the current that comes out of

3    Vx2.

4         Q.    And if the current you put into Vx1

5    came out of Vx2, would this inductor in

6    Figure 3A still be in like orientation?

7         A.    I haven't considered that, but I

8    think, yes, it would.  And that's why it would

9    act as a differential mode choke.  That's

10   why -- because it was oriented in like

11   direction, that's why it would generate a large

12   impedance in response to that differential mode

13   current.

14        Q.    And it's desirable to have the

15   inductor act as a differential mode choke for

16   this particular application, right?

17        A.    I think, for interleaved

18   converters, it can be a great idea.  This is --

19   you know, this is a -- something that's clear

20   from Wong Investigating, for instance, because

21   by alternatively activating the windings and

22   interleaving the windings, you're creating

23   already kind of a differential excitation.  You

24   have some parts of the excitation where the

25   current in one winding is doing one thing and

RESTRICTED - ATTORNEYS' EYES ONLY

Page 96

1    the current in the other winding is going the

2    opposite direction.

3              You're introducing a lot of

4    differential excitation by interleaving.  So

5    this kind of structure is helpful in that

6    regard because it generates impedance for

7    the -- to the differential mode component of

8    the AC current.

9        Q.    If we flip to Figure 1, does this

10   also show windings wound in a like orientation?

11              MR. RAVULA:  Objection.

12              Vague.

13       A.    I'd say it does.  And this is one

14   of the figures that the patent uses to explain

15   what "like orientation" means.

16       Q.    Does -- let me ask you a different

17   question.

18              Let's go back to your opening

19   report and go to paragraph 51, where you talk

20   about the claim constructions in this case.

21   That's on page 12.  Let me know when you're

22   there.

23       A.    I'm there.

24       Q.    And you reviewed the parties' claim

25   construction briefing in this case, right?

# EXHIBITS 28-32

## REDACTED IN THEIR ENTIRETY

# Exhibit 33



Thomas J. Bean
Director

Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
Direct: 973-596-4779 Fax: 973-639-6287
tbean@gibbonslaw.com

May 27, 2021

### PRIVILEGED AND CONFIDENTIAL
### ATTORNEY-CLIENT COMMUNICATION
### AND ATTORNEY WORK PRODUCT

**VIA ELECTRONIC MAIL**

Roland Tso, Esq.
Monolithic Power Systems, Inc.
79 Great Oaks Blvd.
San Jose, California 95119

**Re:  Invalidity Opinion Regarding U.S. Patent No. 7,772,955**

Dear Mr. Tso:

In response to your request, we have undertaken for Monolithic Power Systems, Inc. ("MPS"), a limited study of the validity, or lack thereof, of claims 1-3, 5, 10, 12-21 and 23-28 ("Studied Claims") of U.S. Patent No. 7,772,955 ("'955 Patent"), which is attached as Exhibit 1. We have not studied, nor render any opinion regarding the validity of any other claim of this patent. The records of the USPTO, Assignment Branch, indicate that the patent is owned by Volterra Semiconductor LLC as of the date of this letter.[1]

Our analysis of the Studied Claims was limited to potential issues arising under 35 USC §§ 102 and 103, that would render any or all the studied claims invalid. With regard to this analysis of the Studied Claims, we limited our analysis to only those prior art references identified in the Inter Parties Review Petition filed by MPS in the USPTO, Patent Trial and Appeal Board ("PTAB"), namely IPR2020-01351 (the "IPR Petition").

We acknowledge that MPS filed a second petition for IPR, namely IPR2020-01350, against '955 Patent claims that we were not requested to analyze for our invalidity study. Because in our opinion, the prior art cited in MPS's IPR petition for IPR2020-01351, invalidates the Studied Claims, we did not review, nor provide any opinions concerning the different prior

---

[1]  The ownership of '408 Patent is based on the USPTO records showing that U.S. Patent Application No. 10/318,896, the parent application to the divisional application that resulted in the '955 Patent, is owned by Volterra Semiconductor LLC as of the date of this letter.

2899545.1 116969-105307

RESTRICTED – ATTORNEY'S EYES ONLY                                          MPS_DE-00010473

# Exhibit 34



Thomas J. Bean
Director

Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
Direct: 973-596-4779 Fax: 973-639-6287
tbean@gibbonslaw.com

May 27, 2021

**PRIVILEGED AND CONFIDENTIAL
ATTORNEY-CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT**

**VIA ELECTRONIC MAIL**

Roland Tso, Esq.
Monolithic Power Systems, Inc.
79 Great Oaks Blvd.
San Jose, California 95119

Re:   **Invalidity Opinion Regarding U.S. Patent No. 7,525,408**

Dear Mr. Tso:

In response to your request, we have undertaken for Monolithic Power Systems, Inc.
("MPS"), a limited study of the validity, or lack thereof, of independent claim 14 and its
dependent claim 20 ("Studied Claims") of U.S. Patent No. 7,525,408 ("`408 Patent"), which is
attached as Exhibit 1. We have not studied, nor render any opinion regarding the validity of any
other claim of this patent. The records of the USPTO, Assignment Branch, indicate that the
patent is owned by Volterra Semiconductor LLC as of the date of this letter[1].

Our analysis of the Studied Claims was limited to potential issues arising under 35 USC
§§ 102 and 103, that would render any or all the studied claims invalid. With regard to this
analysis of the Studied Claims, we limited our analysis to only those prior art prior art references
identified in the Inter Parties Review Petition filed by MPS in the USPTO, Patent Trial and
Appeal Board ("PTAB"), namely IPR2020-01348.

For the reasons explained in the following sections, it is our opinion that a court of
competent jurisdiction would find:

a)   Claim 14 is invalid as anticipated under 35 USC § 102 and/or obvious under
35 USC § 103 based on *Shultz* (defined below and attached as Exhibit 2).

---

[1]   The ownership of `408 Patent is based on the USPTO records showing that U.S. Patent
Application No. 10/318,896, the parent application to the divisional application that resulted
in the `408 Patent, is owned by Volterra Semiconductor LLC as of the date of this letter.

Newark/NJ   New York   Pennsylvania   Delaware   Washington DC   Florida                                              gibbonslaw.com

RESTRICTED – ATTORNEY'S EYES ONLY                                         MPS_DE-00010840

# Exhibit 35



Robert E. Rudnick
Director

Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
Direct: 973-596-4727 Fax: 973-639-6318
rrudnick@gibbonslaw.com

May 27, 2021

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY-CLIENT COMMUNICATION**
**AND ATTORNEY WORK PRODUCT**

**VIA ELECTRONIC MAIL**

Roland Tso, Esq.
Monolithic Power Systems, Inc.
79 Great Oaks Blvd.
San Jose, California 95119

Re: **Invalidity Opinion Regarding U.S. Patent No. 6,362,986**

Dear Mr. Tso:

In response to your request, we have undertaken for Monolithic Power Systems, Inc. ("MPS"), a limited study of the validity, or lack thereof, of independent claim 17 and its dependent claims 18, 20, 21 and 23 ("Studied Claims") of U.S. Patent No. 6,362,986 ("'986 Patent"), which is attached as Exhibit 1. We have not studied, nor render any opinion regarding the validity of any other claim of this patent. The records of the USPTO, Assignment Branch, indicate that the patent is owned by Volterra Semiconductor LLC as of the date of this letter.

Our analysis of the Studied Claims was limited to potential issues arising under 35 USC §§ 102, 103 and 112, that would render any or all the studied claims invalid. With regard to our invalidity analysis of the Studied Claims in view of prior art under 35 USC §§ 102 and 103, we limited our analysis to only those prior art prior art references identified in the Inter Parties Review Petitions filed by MPS in the USPTO, Patent Trial and Appeal Board ("PTAB"), namely IPR2020-01368 and IPR2020-01370.

For the reasons explained in the following sections, it is our opinion that a court of competent jurisdiction would find the Studied Claims:

        a) Invalid as indefinite under 35 USC § 112,

        b) Invalid as obvious under 35 USC § 103 based on *Pietkiewicz* (defined below and attached as Exhibit 2), and

LetterheadFooter