# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOLTERRA SEMICONDUCTOR LLC, | ) )  ) | **PUBLIC VERSION** |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 19-2240-CFC-SRF |
| MONOLITHIC POWER SYSTEMS, INC., | ) ) ) | ███████████████ |
| Defendant. | ) ) | |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT, DEFOREST MCDUFF, PH.D.

FISH & RICHARDSON PC
Robert M. Oakes (#5217)
222 Delaware Ave., 17th Floor
P.O. Box 1114
Wilmington, DE 19801
Tel: (302) 652-5070
oakes@fr.com

David M. Barkan
500 Arguello Street, Suite 500
Redwood City, CA 94063
Tel:  (650) 839-5070
barkan@fr.com

Dated:  December 17, 2021

*Counsel for Plaintiff Volterra Semiconductor LLC*

## TABLE OF CONTENTS

I.      NATURE AND STAGE OF PROCEEDINGS ...................................................1

II.     SUMMARY OF THE ARGUMENT ...................................................................1

III.    STATEMENT OF FACTS ...................................................................................1

        A.      Dr. McDuff is a Recognized Expert .......................................................1

        B.      Dr. McDuff's Apportionment of Damages .............................................1

        C.      Dr. McDuff's Royalty Base for his Per-Unit Royalty Opinions...............3

        D.      Dr. McDuff's Comparable License Analysis...........................................4

IV.     LEGAL STANDARD...........................................................................................5

        A.      *Daubert* Standard for Excluding Expert Testimony ...............................5

V.      ARGUMENT........................................................................................................5

        A.      Dr. McDuff's "Technological" Apportionment .....................................6

                1.      Dr. McDuff Relied on Substantial Evidence That the Maxim
                        VR14 Solution Practices Patented Technology ...........................7

                2.      Dr. McDuff's Use of the Maxim VR14 Price Analysis is Tied to
                        the Facts of this Case .................................................................11

        B.      Dr. McDuff Soundly Identifies the Infringing Sales.............................13

        C.      Dr. McDuff's Comparable License Analysis is Well Supported...........15

VI.     CONCLUSION ..................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)................................................................16

*Asplundh Mfg. Div. v. Benton Harbor Eng'g*,
   57 F.3d 1190 (3d Cir. 1995)....................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ................................................................................5

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
   879 F.3d 1332 (Fed. Cir. 2018).............................................................11

*Guardant Health, Inc. v. Foundation Medicine, Inc.*,
   C.A. No. 17-1616-LPS-CJB, 2020 WL 2461551
   (D. Del. May 7, 2020)....................................................................10, 11

*Helios Software, LLC v. SpectorSoft Corp.*,
   No. 12-81, 2015 WL 3622399 (D. Del. Dec. 7, 2017) .....................14

*i4i Ltd. Partnership v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010).........................................................6, 13

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)....................................................10, 15

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
   62 F.Supp.3d 368 (D. Del. 2014) ..........................................................5

*MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*,
   No. 14-804, 2017 WL 6268072 (D. Del. Dec. 7, 2017)...................14

*Omega Patents, LLC v. Calamp Corp.*,
   13 F.4th 1361 (Fed. Cir. Sep. 14, 2021) ..............................................1

*W.L. Gore & Associates, Inc. v. C.R. Bard, Inc.*,
   *No.*, C.A. No. 11–515–LPS, 2015 WL 7761056 (D. Del. Dec. 2, 2015) ..........10

## I.      NATURE AND STAGE OF PROCEEDINGS

MPS moved to exclude testimony of Volterra's damages expert, Dr. DeForest McDuff.  D.I. 272.

## II.     SUMMARY OF THE ARGUMENT

MPS's motion fails to address salient portions of Dr. McDuff's analysis, failing to even present the specific methodology that Dr. McDuff painstakingly detailed in his report.  At best, MPS presents arguments that challenge the weight that should be afforded to Dr. McDuff's testimony, not its admissibility.

## III.    STATEMENT OF FACTS

On September 17, 2021, Volterra served the opening damages expert report of Dr. DeForest McDuff.  On October 8, 2021, Volterra served a reply expert report.

### A.      Dr. McDuff is a Recognized Expert

Dr. McDuff has been recognized as an expert in patent damages. *Omega Patents, LLC v. Calamp Corp.*, 13 F.4th 1361  (Fed. Cir. Sep. 14, 2021).  MPS does not appear to challenge Dr. McDuff's expertise in the field of patent damages. *See generally* D.I. 280.

### B.      Dr. McDuff's Apportionment of Damages

Dr. McDuff presents three methods for apportionment: (1) apportioned ▮▮▮▮▮▮▮▮, (2) apportioned profits, and (3) apportioned rate from Volterra

licensing, with each serving as a check on the other.  Ex. 1 at ¶67.

Dr. McDuff's apportioned ████████████ method is based on a three-step process ("the ████████████ Process").  At step 1, Dr. McDuff determines the ████████████ that Volterra's practicing products command over competitor products, using three reference points: (1) Maxim's proposed solution in response to ██████ VR14 specification ("the Maxim VR14 Solution"), (2) Maxim/Volterra and MPS sales data, and (3) Maxim's response to an Nvidia RFQ.  *Id.* at ¶¶69-72.  At step 2, he calculates the *portion* of the ████████████ that should be attributed to the patented technology.  *Id.* at ¶¶73-74.  At step 3, he applies that apportioned ████████████ to determine a per-unit royalty range.  *Id.* at ¶74.

At step 2 of the ████████████ Process, Dr. McDuff utilizes a price analysis spreadsheet created by Maxim for the Maxim VR14 Solution ("the Maxim VR14 Price Analysis").  *Id.* at ¶¶73-74 (citing MAXIM_00014151).  Dr. McDuff first identifies Maxim's third party component costs.  *Id.* at ¶73.  He then identifies the cost savings between Maxim's third-party component costs compared to that of a competitor solution, which is made possible specifically due to the patented technology.  *Id.*  Dr. McDuff then calculates the savings resulting from the use of the patented technology as a percentage of the third party component costs.  *Id.* at ¶74.  The underlying Maxim VR14 Price Analysis was prepared during the regular

2

course of business, prior to this litigation.  Ex. 2 at 52:22-53:19.

Additional evidence supports Dr. McDuff's use of the Maxim VR14 Solution in conjunction with the Maxim VR Price Analysis as a means of apportionment.  For example, Dr. McDuff relies on Mr. Alberto Viviani, a Volterra Managing Director, well-versed with the Maxim VR 14 solution, the Maxim VR14 Price Analysis, and the market to ascertain the applicability of the Maxim VR14 Solution.  Ex. 1 at ¶73, n.154; *see also* Ex. 2 at 15:17-19; 52:5-76:21.  In addition, Dr. McDuff relies on a website that describes the Maxim VR14 Solution as "Boosted Coupled Inductor," which is Volterra's "patented technology."  Ex. 1 ¶¶73-74; *see also* Ex. 4.  Finally, Dr. McDuff relies on an interview with Dr. Dickens, Volterra's technical expert, to establish that the Patents-in-suit cover "foundational" technology related to coupled inductors as employed in solutions like the Maxim VR14 solution.  Ex. 1 at ¶34, n.98-99; ¶73, n.153.

## C.    Dr. McDuff's Royalty Base for his Per-Unit Royalty Opinions

Dr. McDuff determined the royalty base used in his royalty rate calculation by tabulating sales of MPS's controllers and power stages.  Ex 1 at ¶¶39-40, 105.  With respect to Volterra's direct infringement allegation, Dr. McDuff explained that the acts of direct infringement (demonstration and use of the inventions through the Nvidia Evaluation Board and/or the APEC trade

show) would result in a reasonable royalty "measured as the discounted upfront royalty payment for the expected future value of the patents within MPS's accused sales to Nvidia." *Id.* at ¶113.  Dr. McDuff then calculated the present value of this amount based on his apportioned royalty rate analysis described above and MPS's produced and projected sales data through trial. *Id.* at ¶115. With respect to Volterra's allegations of induced infringement, Dr. McDuff provided data to estimate the portion of Nvidia production boards likely imported into the U.S. and explained that the total royalty can be apportioned geographically based on this data. *Id.* at ¶¶102(c), 102(d), 103; Ex. 6 at ¶10.

### D.    Dr. McDuff's Comparable License Analysis

Dr. McDuff also offers an alternative royalty approach based on an "arms-length" license agreement between Volterra International and ███████ ███████████████████████████. Ex. 1 at ¶¶91-95.  Dr. McDuff first analyzes the technical comparability of the ███████████████ and the license that would result from the hypothetical negotiation. *Id.* at ¶92(a).  In performing this evaluation, Dr. McDuff consulted with Dr. Dickens and evaluated the types of products and patents that were part of the license, the relevant intellectual property, the commercialization aspects of the license, and the technology overlap with the patents-in-suit. *Id.* at ¶92(a), n.172.  Dr. McDuff then analyzed the economic comparability, which included evaluation of timing, the

4

Licensor/Licensee relationship, the nature and scope of the license, the licensed technology, and the profitability of the parties. *Id.* at ¶92(b). Dr. McDuff also addressed factors that are different and acknowledges that the agreement would be more probative if it had been between Volterra and a third party or had been closer in the time to the hypothetical negotiation. *Id.* at ¶92(b)(i)-(ii). Taking all these factors together, Dr. McDuff concluded that the Volterra license provided a suitable comparison as a secondary alternative method from which he could derive a reasonable per-unit royalty, which he determined to be in the range of ███████████. *Id.* at ¶95.

## IV.   LEGAL STANDARD

### A.   *Daubert* Standard for Excluding Expert Testimony

Through the *Daubert* process, the Court acts as a gatekeeper to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). However, a *Daubert* motion should be denied where there is a logical basis for the expert's opinion testimony. *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F.Supp.3d 368, 388 (D. Del. 2014).

## V.   ARGUMENT

MPS challenges Dr. McDuff's reliance on Maxim's internal VR14 price comparison analysis, identification of the sales base, and reliance on comparable

licenses.   MPS's challenge boils down to whether Dr. McDuff's use of the evidence is reasonable in the context it is presented, which is insufficient to support a motion to exclude expert testimony.   *See i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").

## A.    Dr. McDuff's "Technological" Apportionment

For his ███████████ Process, Dr. McDuff follows the three-step process described in Section III.B above.  The Maxim VR14 Price Analysis shows the price of the proposed Maxim VR14 Solution and the price of a competitor solution that does not use coupled inductors, as well as associated costs such as the costs of third party components.  Ex. 5.  Notably, the Maxim VR14 Price Analysis was created before this litigation and purely for business purposes.  Ex. 2 at 52:22-53:19.  Using this analysis, Dr. McDuff calculates the cost of third party components for the Maxim VR14 Solution to be ████.  Ex. 1 at ¶73.  Next, Dr. McDuff determines the cost savings by comparing Maxim's third party component costs to those of the competitor solution (██████), finding the savings to be █████  *Id.* at ¶¶73-74.  █████ is ██████ of the full █████ ███████████) that Maxim commands over competitors in Maxim's VR14

6

Price Analysis.  *Id.*  To be clear, this ███ value represents only the portion of the ███████ attributable to use of the patented inventions, not the entire ██████████.  *Id.*

### 1.    Dr. McDuff Relied on Substantial Evidence That the Maxim VR14 Solution Practices Patented Technology

Contrary to MPS's assertion, Dr. McDuff never *assumed* that the Maxim VR14 Solution practices the Asserted Patents.  D.I. 280 at 8.  Instead, Dr. McDuff relied on his interview with Volterra's technical expert Dr. Dickens for his understanding that the component cost savings was directly attributable to the use of the patents inventions.  Ex. 1 at ¶73, n.153-155 ("I understand from Dr. James Dickens that Maxim's products requiring fewer third-party components as compared competitors' products that do not incorporate coupled inductors is directly attributable to the patented coupled inductor technology as claimed and provided by the Patents-in-Suit").

In addition to his detailed discussion with Dr. Dickens, Dr. McDuff also relied on his interview with Mr. Viviani and documentary evidence that Maxim's VR14 solution employed Volterra's patented coupled inductor technology.  *Id.* at ¶73, n.154-155.  As to Mr. Viviani, Rule 701 simply requires that "a lay opinion witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses."  *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201

(3d Cir. 1995).  Here, Mr. Viviani has both the experience and the specialized knowledge to offer lay opinions regarding the Maxim VR14 Solution and any associated documents.

Mr. Viviani is trained as an engineer and is presently Maxim's Managing Director.  Ex. 3 at 11:5.  He has worked at Maxim for approximately 11 years.  *Id.* at 16:9-15.  He started as a design engineer, and eventually moved up to lead one of Maxim's business units.  *Id.* at 16:19-22.  He testified that Volterra's patent portfolio, which includes the Patents-in-suit, are used by the business unit that he manages.  *Id.* at 15:16-18.  He has also worked at other companies within the field of integrated circuits and related power management.  *Id.* at 17:24-18:8.

Mr. Viviani also has specialized knowledge with respect to the Maxim VR14 Solution.  He referred to a presentation of the Maxim VR14 solution as "a typical presentation we do" and further identified one of the slides as "part of our slide set when we introduced our VR14 solution to the customers."  Ex. 2 at 17:25-18:2.  Mr. Viviani was also able to describe the Maxim VR14 Solution, how it came to be, and numerous other aspects of the solution.  *Id.* at 21:23-26:3.  In addition to explaining his knowledge of the Maxim VR14 Solution, Mr. Viviani's testimony establishes the necessary connection between the patented technology and the Maxim VR14 Solution.  Mr. Viviani stated that "the patents cover the use of coupled inductors inside multiphase voltage

8

regulators." *Id.* at 93:3-5.  Mr. Viviani further established that the Maxim VR14 solution is a multiphase voltage regulator.  *Id.* at 21:17-19 ("So the VR14 is an ███ specification, and so our multiphase solutions are used, among other things, for ████████"); 73:5-6 ("Q: What is the VR14 master? Is that a chip? A: Oh, that's a multiphase controller, yes.").

The fact that the Maxim VR14 Solution practices the patented technology is also supported by the Maxim VR14 Price Analysis (again in conjunction with information provided by Dr. Dickens).  The Maxim VR14 Price Analysis was not prepared for litigation.  *Id.* at 52:22-53:19.  Instead, it was created pre-suit in the ordinary course of business for the same purpose for which Dr. McDuff used it—to provide a price analysis for the Maxim VR14 coupled inductor solution against other available solutions that do not employ coupled inductors. *Id.*  The Maxim VR14 pricing spreadsheet includes a cost breakdown for the "VR14 BCL1212" in comparison to a "Competitor TLVR."  Ex. 5.  BCL refers to a Boosted Coupled Inductor.  Ex. 2 at 33:21-34:6.   TLVR is a different, newer type of inductor that does not perform as well as a coupled inductor in this type of application.  *Id.* at 40:23-25.  Thus, this Maxim VR14 Price Analysis supports the conclusion that the Maxim VR14 Solution practices the patented technology.

Finally, MPS's motion ignores the publicly available Maxim website that

9

Dr. McDuff also relies.  The website describes the Maxim VR14 Solution as relating to "Boosted Coupled Inductors" and refers to such technology as "patented technology" of Volterra.  Ex. 4.  This is supported by Dr. Dickens' description to Dr. McDuff that the Patents-in-suit cover the "foundational" aspects of coupled inductor technology by Dr. Dickens.  Ex. 1 at ¶34, n.98-99; ¶73, n.153.

MPS's remaining arguments are meritless.  MPS relies on *Lucent Techs* and *W.L. Gore*, but both of these cases compare patented technology to licenses or other patents—not to a practicing product as is the case here.  Thus, in those cases, expert testimony regarding what was covered by the other patents or the license was needed.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009);  *W.L. Gore & Associates, Inc. v. C.R. Bard, Inc., No.*, C.A. No. 11–515–LPS, 2015 WL 7761056, at *3 (D. Del. Dec. 2, 2015).  Here, relevant knowledge (provided by Mr. Viviani) in conjunction with an understanding of the technical coverage of the Patents-in-Suit (provided by Dr. Dickens), as well as a website describing the practicing product, established the bases for Dr. McDuff's opinions.

Finally, MPS's reliance on *Guardant Health* is misplaced.  D.I. 280 at 10. In *Guardant Health*, the damages expert did not tie the value of the patented feature to the accused products.  *Guardant Health, Inc. v. Foundation Medicine,*

*Inc.*, C.A. No. 17-1616-LPS-CJB, 2020 WL 2461551, at *17-19 (D. Del. May 7, 2020). In other words, the expert did not appropriately apportion the value of the patented technology. *Id.* Here, Dr. McDuff did indeed apportion the value to the patented feature of the accused products. Ex. 1 at ¶¶73-75.

### 2. Dr. McDuff's Use of the Maxim VR14 Price Analysis is Tied to the Facts of this Case

The relevant question is whether the expert's opinion is tied to the facts of the case. *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018). Here, the answer is undoubtedly yes.

The Maxim VR14 Price Analysis was not created for litigation, but was rather created in the ordinary course of business. Ex. 2 at 52:22-53:19. Mr. Viviani testified that the spreadsheet was the type of document Volterra produces routinely to judge the market and analyze how to most effectively price a solution. *Id.* Mr. Viviani also testified that the pricing information for competitor (non-coupled inductor) solutions was gathered in the ordinary course of business. *Id.* at 51:23-25. Mr. Viviani's testimony underscores the notion that this is the type of analysis that is routinely performed by companies within the industry when they are bringing a product such as the Maxim VR14 Solution to market.

Furthermore, Dr. McDuff uses the Maxim VR14 Price Analysis to

11

apportion *down* the resulting royalty.  In step 1 of the ███████████ Process, Dr. McDuff uses three different approaches with different reference evidence to obtain a per-unit royalty range. Ex. 1 at ¶69.  Of the three reference points, the Maxim VR14 Price Analysis results in the lowest per-unit royalty (as compared to the apportioned profits or apportioned license rate approaches).  *Id*. at ¶69(a). At step 2, Dr. McDuff uses the Maxim VR14 Price Analysis again to apportion the ███████████ determined at step 1 down to the patented technology, even though other evidence supports a higher per-unit royalty rate.  *Id*. at ¶¶71-72. Thus, the Maxim VR14 Price Analysis is used properly with the testimonial evidence and documentary evidence to establish a per-unit royalty range for the Patents-in-Suit.

Furthermore, MPS presents no argument that Maxim is an unreliable source of pricing information for a coupled inductor solution.  Nor has MPS showed that the data itself is unreliable.  Instead, MPS claims the prices in the spreadsheet are speculative and imaginary, but these allegations are meritless. D.I. 280 at 11.  The Maxim VR14 Price Analysis is the type of analysis regularly performed by Volterra in the course of its business.  Ex. 2 at 52:22-53:19. Volterra creates such analyses to determine how to position itself within the market.  *Id*.  While MPS may complain of an inherent bias of data provided by Maxim, such complaints go to the weight that should be afforded to the

testimony, not to its admissibility. *Microsoft Corp.*, 598 F.3d at 856 ("Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury."). Thus, Dr. McDuff properly relied on the Maxim VR14 Price Analysis provided by Volterra to perform his analysis.

**B.    Dr. McDuff Soundly Identifies the Infringing Sales**

Dr. McDuff clearly laid out the "Geography" factors relevant to his analysis, considering four categories of evidence relevant to the size of the royalty base. Ex. 1 at ¶102. Here, Dr. McDuff identified MPS's own testimony about MPS's acts of direct infringement in the US. *Id.* at ¶102(a). Later in his report, he explained how this evidence should be used by the jury; namely; if the jury determines that these acts of direct infringement are responsible for MPS winning the Nvidia contract then the "finder of fact could reasonably award the full apportioned amount" of damages. *Id.* at ¶118. More specifically, Dr. McDuff explained that in the hypothetical negotiation analysis, "if the alleged infringement in this case occurred at either event of infringement, and that infringement led directly or indirectly to MPS's win of the Nvidia contract, the resulting royalty would be based on the expected future value of that contract at the time of the infringement." *Id.* at ¶113. He further explained that if the jury finds that the acts of direct infringement by MPS in the United States only contributed to a proportionate likelihood of MPS winning the Nvidia contract,

then the royalty base can be accordingly and proportionately reduced by the jury. *Id.* at ¶119.

Dr. McDuff provided further data for the jury to allocate the geographic royalty base based upon industry data from two different data sources, each of which are probative of the percentage of Nvidia production boards likely imported into the U.S. *Id.* at ¶¶102(c)-(d). Dr. McDuff explained how the jury would use this data in his reply report. Ex. 6 at ¶¶9-10. Dr. McDuff thus allowed for the possibility that a finder of fact may determine that not all of MPS's sales constitute infringement and that applicable sales base to which the royalty is applied will be readily adjusted accordingly. Ex. 1. at ¶103.

MPS may disagree with the evidence cited by Dr. McDuff for each of those scenarios, but those are facts for the jury to determine. Thus, it is not the methodology that is being challenged, but whether the facts are sufficient to support resulting conclusion. *See, e.g.*, *MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*, No. 14-804, 2017 WL 6268072, at *5 (D. Del. Dec. 7, 2017) (holding that defendants' objection that expert did not sufficient explain to what extent each factor impacts the final royalty rate is not a Daubert issue); *Helios Software, LLC v. SpectorSoft Corp.*, No. 12-81, 2015 WL 3622399, at *4 (D. Del. Dec. 7, 2017) ("[Defendant's] criticisms of the adequacy of [the expert's] new apportionment analysis—including the extent to which his Georgia-Pacific analysis fully

14

accounts for non-patented features, including those which were previously accused of infringing the '571 and '237 patents, and any contradictions with his previous opinions—go to the weight rather than the admissibility of his analysis."). MPS will be free to cross-examine Dr. McDuff on his factual predicates underlying his reasonable royalty opinion.

### C.  Dr. McDuff's Comparable License Analysis is Well Supported

A "comparable" license does not have to be an identical license. It need only be "sufficiently comparable." *Lucent Techs., Inc.,* 580 F.3d at 1330 ("Lucent admits that "none of the real world licenses introduced at trial arose from circumstances identical to those presumed to prevail in the hypothetical royalty negotiation," but Lucent only "had the burden to prove that the licenses were sufficiently comparable to support the lump-sum damages award.").

Dr. McDuff identifies both technical and economic similarities between the ███████████████ and the hypothetical license. Ex. 1 at ¶¶92-93. With regard to technical similarities, Dr. McDuff noted that the types of product, switching regulators, would the same for both licenses. *Id.* at ¶92. The ███████████ also includes at least one of Patents-in-Suit specifically identified (*i.e.*, the '986 which had issued at the time) and with significant overlap to the Patents-in-Suit based on reliance from Dr. Dickens (*i.e.*, and thus the other Patents-in-Suit would have been included as well, had they been issued at the time). *Id.* ██████████

15

████████ involves the same type of intellectual property as would the hypothetical license. *Id.* Finally, the two license would involve the same form of commercialization, i.e., manufacturing and selling based on a license. *Id.*

Dr. McDuff then goes on to describe the economic similarities that make the licenses comparable. *Id.* at ¶93. As discussed above, one such factor is that one of the Patents-in-Suit was included in the ████████. *Id.* Furthermore, the license was based on an "arm's-length" standard for accounting which means that the license was negotiated as though the the parties were non-related entities. *Id.* Finally, Dr. McDuff also compared company margins of the parties to the ████████ and the hypothetical negotiation, finding the parties in each case to be similarly situated. *Id.*

MPS's attacks are based on an interpretation and weighing of facts and none of them, individually or collectively, renders Dr. McDuff's analysis flawed as a matter of law. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (affirming denial of motion to strike damages expert, stating the "degree of comparability of [certain] license agreements as well as any failure on the part of [the] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion."). A jury would be free to weigh MPS's critique and still accept Dr. McDuff's opinion that the ████████ was technologically and otherwise

comparable to the hypothetical license.

## VI.   CONCLUSION

Volterra respectfully requests that the Court deny MPS's motion to exclude

testimony and opinions from Dr. McDuff.

Dated:  December 17, 2021                FISH & RICHARDSON P.C.

By: */s/ Robert M. Oakes*
  Robert M. Oakes (#5217)
  222 Delaware Avenue, 17th Floor
  P.O. Box 1114
  Wilmington, DE 19899
  Telephone:  (302) 652-5070
  oakes@fr.com

  David M. Barkan
  500 Arguello Street, Suite 500
  Redwood City, CA 94063
  Tel:  (650) 839-5070
  barkan@fr.com

*Counsel for Plaintiff Volterra*
*Semiconductor Inc.*

<u>**CERTIFICTE OF COMPLIANCE**</u>

I hereby certify that the foregoing **Plaintiff's Answering Brief In Opposition to Defendant's *Daubert* Motion to Exclude the Testimony Of Plaintiff's Damages Expert, Deforest Mcduff, Ph.D.** complies with the typeface requirements and word limits of Paragraph 20(c) of the Scheduling Order entered in this case (D.I. 69).  This brief has been prepared in 14-Point Times New Roman and contains 3,702 words, excluding the cover page, table of contents, table of authorities, signature block, certificate of service and this certificate of compliance. Plaintiff's opposition to Defendant's case dispositive motions and *Daubert* motions combined contain 12,500 words or less.

*/s/Robert M. Oakes*
Robert M. Oakes (#5217)