IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VOLTERRA SEMICONDUCTOR LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **Redacted – Public Version** |
| v. | ) C.A. No. 19-2240-CFC-SRF |
| | ) |
| MONOLITHIC POWER SYSTEMS, INC., | ) ██████████████████ |
| | ) |
| Defendant. | ) |

## MONOLITHIC POWER SYSTEMS, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR ATTORNEY FEES

OF COUNSEL:
Bob Steinberg
Matthew J. Moore
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Surendra K. Ravula
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-6555

Thomas W. Yeh
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
(213) 485-1234

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190
(571) 203-2750

R. Benjamin Cassady
Forrest A. Jones
Chen Zang
Bradford C. Schulz
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: September 27, 2022

# TABLE OF CONTENTS

I.    NATURE AND STAGE OF PROCEEDINGS.................................................1

II.   SUMMARY OF THE ARGUMENT ..................................................................4

III.  STATEMENT OF FACTS ................................................................................5

    A.    Volterra Files Suit and Almost Immediately Covenants Not to
         Sue MPS's Customer ................................................................................5

    B.    Volterra Turns Around and Accuses Nvidia Power Solution Of
         Direct Infringement—Despite the Covenant Not To Sue....................7

    C.    Volterra and Its Experts Sandbag MPS and Inflate Damages
         Based on False Assertions........................................................................9

    D.    Finally, MPS Moves for—and Wins—Summary Judgment and
         *Daubert* Motions Disposing of Volterra's Untenable Claims ...........12

IV.  LEGAL STANDARDS .....................................................................................13

V.   ARGUMENT....................................................................................................14

    A.    MPS Is the Prevailing Party ...................................................................14

    B.    This Case Is Exceptional ........................................................................15

        1.    The Weakness of Volterra's Case, Confirmed by The
             Court's Rulings on MPS's Summary Judgment and
             *Daubert* Motions, Renders This Case Exceptional..................16

        2.    Volterra's Litigation Tactics Multiplied Proceedings to
             Raise MPS's Legal Expenses, Which Confirms This
             Case Is Exceptional....................................................................19

VI.  RULE 54 BIFURCATED BRIEFING ...........................................................20

VII.  CONCLUSION................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
   No. 09-MD-2118-SLR, 2012 WL 95592 (D. Del. Jan. 12, 2012) ....................21

*Energy Innovation Co., LLC v. NCR Corp.*,
   No. 1:18-cv-03919-SDG, ECF No. 65 (N.D. Ga. Mar. 20, 2020) ....................18

*Finnavations, LLC v. Payoneer, Inc.*,
   No. 18-444-RGA, 2019 WL1236358 (D. Del. Mar. 18, 2019).........................21

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994)........................................................................................14

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
   572 U.S. 559 (2014)........................................................................................14

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
   No. CV 05-897 (WHW)(CLW), 2018 WL 2378406 (D.N.J. May 23, 2018)....16

*Internet Media Interactive Corp. v. Shopify Inc.*,
   No. 20-416 (MN), 2020 WL 6196292 (D. Del. Oct. 22, 2020) ........................15

*Keith Mfg. Co. v. Butterfield*,
   955 F.3d 936 (Fed. Cir. 2020) ........................................................................15

*Kilopass Tech., Inc. v. Sidense Corp.*,
   82 F. Supp. 3d 1154 (N.D. Cal. 2015)..............................................................19

*MarcTec LLC v. Johnson & Johnson*,
   664 F.3d 907 (Fed. Cir. 2012) ........................................................................14

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014)..................................................................................*passim*

*Oplus Techs., Ltd. v. Vizio, Inc.*,
   782 F.3d 1371 (Fed. Cir. 2015) ......................................................................19

*Vehicle Interface Techs. LLC v. Jaguar Land Rover N. Am., LLC,*
  No. 12-1285-RGA, 14-339-RGA, 2015 WL 9462063 (D. Del. Dec. 28, 2015)...21

## STATUTES

35 U.S.C. § 285...................................................................................*passim*

## RULES

D. Del. L.R. 54.1(c) ....................................................................................15

Fed. R. Civ. P.
  54(d)(2)(B)(iii).....................................................................................20
  54(d)(2)(C)...................................................................................20, 21

## I.   NATURE AND STAGE OF PROCEEDINGS

This is a patent litigation brought by Plaintiff Volterra Semiconductor LLC ("Volterra") against defendant Monolithic Power Systems ("MPS").  Volterra is a wholly owned, non-practicing, intellectual property holding subsidiary of Maxim Integrated ("Maxim").[1]  Because Volterra owns the asserted patents, it is the plaintiff in this patent litigation.  Following summary judgment and *Daubert* motion losses, Volterra filed a motion to voluntarily dismiss this case with prejudice on September 12, 2022.  The Court granted Volterra's motion on September 13, 2022, rendering MPS the prevailing party.

MPS recognizes that requests for attorneys' fees are not appropriate in every patent case.  But this is not a typical case.  Volterra's decision to maintain an infringement claim against a product it had covenanted not to sue refutes any suggestion that this case was litigated in a good faith effort to enforce Volterra's patents; rather, disrupting MPS's business was the point.  Now that Volterra has voluntarily dismissed its claims with prejudice, MPS respectfully requests that the Court award its reasonable attorney fees incurred under 35 U.S.C. § 285.

In the timeframe leading up to the filing, ███████████████████████

███████████████████████████████████████████████████████████████████

---

[1] *See, e.g.,* Ex. 23 (J. Weidman) Tr. at 23:7-10, 37:17-22 (Volterra's 30(b)(6) witness admitting that Volterra does not sell products ████████████████).

███████████████   ████████████████████████   Because MPS does not manufacture or sell any accused products in the United States, Volterra's infringement contentions were, ultimately, based on MPS allegedly inducing Nvidia to use and sell a product called the "Nvidia Power Solution."  That context focuses the real issue here.  To balance Volterra's desire to ████████████████████████ ████████████████████████████   Maxim, on behalf of itself and Volterra, covenanted not to sue Nvidia or the accused Nvidia Power Solution.  Ex. 11 (MAXIM_00011579).  Despite the obvious ramifications the covenant had on its lawsuit, Volterra did not disclose until January 2021 that Maxim had granted Nvidia a covenant not to sue back in April 2020—***nine months earlier***, ***four months after filing the complaint*** in this case, and three months after the required initial disclosures.  *See, e.g.*, D.I. 69 ¶ 4(f), Appendix A; Ex. 1 (MPS First Set of RFPs, served Sept. 14, 2020) at RFP No. 8.  Throughout this litigation, Maxim hoped to

████████████████████████████████████████████████ ████████

To maximize pressure on MPS, Volterra offered expert opinions that were, bluntly, not credible and, in the Court's words, "disingenuous[]."  Ex. 21 (Aug. 2, 2022 Hearing Tr.) at 120:14-18; 143:10-15.  One expert, Dr. Dickens, attempted to expand the scope of the accused products after submitting his opening expert report, adding an Evaluation Board as an accused product with no analysis, instead of

identifying the accused products upfront.  Another expert, Dr. McDuff, advanced inflated damages based on a technical apportionment factor cut from whole cloth by relying on a Maxim engineer that told him certain Maxim products practiced the asserted patents, when in fact that engineer later repeatedly testified under oath that he did not analyze the asserted patents, and indeed, would not be the person to do such an analysis.

On November 19, 2021, MPS, at significant expense, filed three motions for summary judgment and two *Daubert* motions directed at Volterra's unreasonable litigation positions and conduct.  D.I. 273, 274, 276, 278, 280.  The Court granted MPS's most significant motions, finding no indirect infringement based on use or sale of the accused Nvidia Power Solution, and striking Volterra's experts' testimony about the Evaluation Board and the "technical apportionment factor," respectively, and all opinions based thereon.  D.I. 348, 350; Oral Order granting *Daubert* motion for Dr. Dickens.

On September 12, 2022, Volterra did what it should have done years ago when it covenanted away its right to sue for infringement by the accused products: Volterra dismissed the case with prejudice.  Considering the totality of the circumstances, MPS requests the Court find this case exceptional, because this is exactly the type of "unjustified" litigation that Congress intended to prevent through 35 U.S.C. § 285, and that a Court can redress through its inherent power.

## II.    SUMMARY OF THE ARGUMENT

1.    MPS requests attorneys' fees under 35 U.S.C. § 285, which permits the Court to grant attorneys' fees to the "prevailing party" in "exceptional cases."  An "exceptional case" is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

2.    This case is exceptional because Volterra pursued it for more than two years despite, its parent, Maxim, granting a covenant not to sue that prevented infringement by the primary accused products.  Volterra did not produce the covenant not to sue—which was signed shortly after the case started—until nine months after it was signed.  In addition, Volterra expanded the scope of the case and amount of damages through its technical and damages experts, who advanced unsupported positions that the Court ultimately struck.  The weakness of Volterra's litigating positions is underscored by Volterra ultimately dismissing its own case with prejudice once the parties approached trial on the merits.

## III.   STATEMENT OF FACTS

### A.   Volterra Files Suit and Almost Immediately Covenants Not to Sue MPS's Customer

Volterra filed this suit on December 9, 2019.  D.I. 1.  In its Complaint, Volterra made the unusual decision to accuse only a board that MPS demonstrated at the 2019 IEEE Applied Power Electronics Conference and Expositions ("APEC"), called the APEC Power Solution—a demonstration board that MPS never sold.  *Id*. Volterra's complaint did not contain any teardowns or other analysis of the accused product; instead, it relied on snipped screenshots from a YouTube video about the APEC Power Solution demonstration board presented at the show as "evidence" of infringement.   Shortly after Volterra filed suit, MPS informed Volterra that the APEC Power Solution is not an actual product, and was not sold on the market.  Ex. 2 (Jan. 28, 2020 MPS Letter to Volterra).   Volterra nevertheless maintained the lawsuit.

It quickly became apparent why:



Ex. 3 (MAXIM_00014047); Ex. 4 (MAXIM_00014049).

Ex. 5 (S.

5

Bochenek Tr.) at 257:25-260:9 ███████████████████████████████████████

███████████████.[2]

Almost immediately after filing suit, Volterra launched a campaign of systematically informing MPS's customers that it brought this lawsuit against MPS and its products with coupled inductors.  *See* Ex. 2 (Jan. 28, 2020 MPS Letter to Volterra); D.I. 40 (Declaration from Jinghai Zhou) ¶¶ 2-3.  And Maxim redoubled its efforts ████████████████████████████████████████ *See generally* Ex. 8 (MAXIM_00012113).  ██████████████████████

███████████████████████████████████████████████

█████████████████████████████ Ex. 9 (MAXIM_00012155).

Volterra's lawsuit had backfired.

Undeterred, █████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ Ex. 8 (MAXIM_00012113).  To that end, ███████████████████████████████████ Maxim sent Nvidia a signed letter (dated April 9, 2020), identifying ***this lawsuit*** as the subject of the letter, and agreeing that it would not disrupt MPS's supply of the MPS products to Nvidia.  Ex. 10 (MAXIM_00012143) at 147-48; Ex. 11 (MAXIM_00011579).

---

[2] *See also* Ex. 6 (Nvidia_0000099-128); Ex. 7 (A. Abou-Alfotouh Tr.) at 72:23-75:12 ████████████████████████████████████████████████
████████████████████████████████████

The letter stated that Maxim (including Volterra) "do not intend to disrupt Nvidia's usage or commercialization of Nvidia products" and "covenants not to sue Nvidia or Nvidia's subsidiaries, affiliates, or customers for infringement of the Asserted Patents in connection with the use or sale of the above-described Nvidia products or their derivatives."  Ex. 11 (MAXIM_00011579).  The letter also confirmed that Maxim and Volterra "will not seek to use the Asserted Patents to enjoin or otherwise prevent MPS Accused Products to Nvidia for use in the above-described Nvidia products."  *Id.*  Maxim signed the covenant not to sue in April 2020, and did not produce it until January 2021—nine months after it was executed.[3]

## B.    Volterra Turns Around and Accuses Nvidia Power Solution of Direct Infringement—Despite the Covenant Not to Sue

On May 28, 2021, Volterra served its final, amended infringement contentions.  In those contentions, despite having already entered into the covenant with Nvidia, Volterra accused MPS of inducing infringement of the asserted patents based on the Nvidia Power Solution.  D.I. 166 at 114.  Volterra's contentions charted the Nvidia Power Solution against the asserted claims, and alleged both that (i) "Nvidia" and "Nvidia's customers" "directly infringe" when they use, sell, and/or

---

[3] MPS requested all agreements to the asserted patents in a Request for Production served on September 14, 2020.  Ex. 1 (RFP No. 8), and Volterra was required to produce "[a]ll agreements, including licenses, transferring an interest in any asserted patent" with its Document Production Accompanying Disclosure of Asserted Claims and Infringement Contentions on October 14, 2020 (D.I. 69 ¶ 4(f), Appendix A). Volterra produced the covenant not to sue on January 20, 2021.

offer for sale the "Nvidia Accused Products," and that (ii) MPS "induces" "this direct infringement" by Nvidia and Nvidia's customers.  *See, e.g.*, D.I. 166-1 at 114, 116-117.

After receiving Volterra's infringement contentions, MPS immediately put Volterra on notice of what Volterra should have already known: that it cannot base its induced infringement allegations on the Nvidia Power Solution because it granted Nvidia a covenant not to sue.  D.I. 177 at 11-14 ("as least as of April 9, 2020, Maxim and Volterra knowingly agreed that Nvidia products and their derivatives that incorporate MPS parts are off-limits").   In response, rather than withdraw its contentions, Volterra claimed it "never agreed not to identify an NVIDIA product as directly infringing," ignoring that its inducement claims were contingent on direct infringement by the Nvidia Power Solution, which was subject to the covenant not to sue.  D.I. 180 at 7.

After Volterra refused to withdraw its accusation that the products covered by the covenant not to sue could nonetheless infringe, MPS followed-up with a letter to Volterra dated on October 11, 2021, detailing the state of the law for covenants not to sue explaining that "MPS cannot be held liable for indirect infringement based on Nvidia's direct infringement" in light of the covenant not to sue.  Ex. 12 (Oct. 11, 2021 MPS Letter to Volterra) at 4-6.  MPS requested that Volterra dismiss the lawsuit.  *Id.*  Volterra refused.  Ex. 13 (Nov. 1, 2021 Letter from Volterra).  Instead,

Volterra responded flippantly, in a letter dated on November 1, 2021 that cited no case law and no legal authority. *Id.* Volterra's response claimed other alleged direct infringers that either manufacture components or assemble the product (*e.g.,* ███ ███████████ could independently support its indirect infringement claims against MPS. *Id.* Regarding the allegations of direct infringement by *Nvidia*, however, Volterra did not dispute that the Nvidia products are covered by the covenant not to sue. Nor did Volterra dispute that the covenant not to sue authorized Nvidia to perform the allegedly direct infringing activity. *Id.* Instead, without explanation or legal support, Volterra claimed only that the covenant "allows it to identify Nvidia and Nvidia's customers as direct infringers for purposes of an indirect infringement claim against MPS" even though it covenanted not to sue Nvidia. *Id.* And so, the case continued.

### C. Volterra and Its Experts Sandbag MPS and Inflate Damages Based on False Assertions

Fact discovery closed on September 7, 2021, and the case proceeded to expert discovery. *See* D.I. 195. Having built its case on quicksand, Volterra and its experts continued to avoid grappling with the many deficiencies of its case.

**Volterra's technical expert, Dr. Dickens.** Dr. Dickens served an opening report opining that the Nvidia Power Solution directly infringed the asserted patents. D.I. 273-1 at Ex. A. Dr. Dickens's opening report explicitly stated: "I will collectively refer to the Nvidia Power Solution and APEC Power Solution as the

MPS Accused Functionalities." Ex. 14 (Dickens's Op. Rpt. ¶ 52). He did not identify anything else as an accused product.

Once MPS's expert served his report noting that Dr. Dickens's infringement opinions were limited to the Nvidia Power Solution, Volterra and Dr. Dickens changed course. In his **reply** report, Dr. Dickens illogically claimed that "when my [opening] report identifies the Nvidia Power Solution … that includes the evaluation board that MPS designed and created." Ex. 15 (Dickens's Reply Rpt. ¶ 14). That statement defies common sense because the evaluation board is different from the products Dr. Dickens explicitly identified as the "MPS Accused Functionalities," *i.e.*, the APEC Power Solution and the Nvidia Power Solution. D.I. 273 at 6-7. In fact, when MPS objected to Dr. Dickens's improper testimony expanding the scope of accused products, Volterra doubled down and maintained this meritless position through summary judgment, forcing the Court to address it by granting a *Daubert* motion.

**Volterra's Damages Expert, Dr. McDuff.** Volterra engaged in similar tactics with its damages expert, Dr. McDuff. As set forth in MPS's *Daubert* motion, which the Court granted, Dr. McDuff advanced a patchwork of alternative damages theories, all of which relied on a "technology apportionment factor." This factor was Volterra's only theory for apportioning the alleged damages to the asserted patents, as required by the Federal Circuit. D.I. 280 at 8-10. But Dr. McDuff's

"technology apportionment factor" assumed that a product that Volterra disclosed on the very last day of fact discovery, ██████████, practiced the asserted patents.   *See, e.g.*, Ex. 16 (Volterra's Second Supplemental Responses to Interrogatories, served Sept. 7, 2021) at Interrogatory No. 2.   Volterra never produced the details of ██████████████████████████████████████ ████████████████████████████.   Volterra's withholding of its identification of ████████ as relevant to damages until the last day prevented any follow-up discovery by MPS.

Due to the nonexistent evidentiary record about ████████████████ ████████████, Dr. McDuff claimed in his expert report that he was "relying on" a Maxim employee, Mr. Viviani, who (allegedly) told him all about ████████ ██████, including how it practiced the asserted patents—a necessary predicate of Dr. McDuff's opinions.   Ex. 19 (McDuff Dep. Tr.) at 176:11-23; *see also* D.I. 280. MPS sought to depose Mr. Viviani about his (alleged) discussions with Dr. McDuff. Ex. 17 (Oct. 14, 2021 Email from Volterra).   During the deposition, Mr. Viviani testified under oath that he did not know what patents cover ████████, that he "would not be the right person" to testify about the asserted patents, and that he was "not the right person to give … a very technical explanation" about ████████ ██████.   D.I. 280-1, Ex. E (Oct. 19, 2021 Viviani Dep. Tr.) at 43:21-44:6, 44:19-22, 21:23-22:14.   Those sworn concessions are directly at odds with Dr. McDuff's

expert reports and testimony, which state the opposite. *See* Ex. 18 (McDuff Rpt. ¶¶ 28, 32, 33, 35, 69, 73, n.64-65, n.92-100 (citing Mr. Viviani for propositions regarding comparable products for technical apportionment); Ex. 19 (McDuff Tr.) at 176:11-182:7 (relying on Mr. Viviani for any discussion about ███████████ ██████████████████████████████).

In the end, Volterra's tactics kept the case going and kept the damages exposure in the millions of dollars—all facts Volterra could wield as a cloud over MPS and as a weapon in the marketplace to avoid competing on the merits of its products. *See* Ex. 2 (Jan. 28, 2020 MPS Letter to Volterra); D.I. 40 (Declaration from Jinghai Zhou) ¶¶ 2-3; *see also* Ex. 22 (Jinghai Zhou Tr.) at 91:21-92:13 (████████████████████████████████████████).

### D.   Finally, MPS Moves for—and Wins—Summary Judgment and *Daubert* Motions Disposing of Volterra's Untenable Claims

On November 19, 2021, MPS moved for summary judgment of no indirect infringement based on the covenant not to sue.  D.I. 276.  MPS also filed *Daubert* motions challenging the improper opinions of Dr. Dickens and Dr. McDuff.  After briefing, in January 2022, MPS sent Volterra another letter about its interpretation of the covenant not to sue, incorporating MPS's briefs by reference and reiterating that the Nvidia based indirect infringement allegation is legally baseless and must be withdrawn.  Ex. 20 (Jan. 14, 2022 Letter to Volterra).  But Volterra never responded.

On August 2, 2022, the Court held a hearing on MPS's summary judgment and *Daubert* motions.  The Court granted MPS's summary judgment as to the Nvidia Power Solution, finding that use or sale of the Nvidia Power Solution could not directly infringe because of the covenant not to sue—exactly what MPS had repeatedly told Volterra.  D.I. 350.  At the summary judgment hearing, Volterra attempted to argue that it had evidence to support Nvidia's direct infringement through importation.  But that is not credible.  No evidence exists in the record about Nvidia's supply chain for the Nvidia Power Solution, besides the fact that it is manufactured abroad.  There is no record evidence showing that Nvidia imported the Nvidia Power Solution into the United States.

The Court also granted MPS's *Daubert* motions, striking Dr. Dickens's testimony about identifying the MPS evaluation board and Dr. McDuff's "technology apportionment factor" and all opinions based on it.  D.I. 348; August 4 Oral Order.

## IV.   LEGAL STANDARDS

Under 35 U.S.C. § 285, the Court "in exceptional cases may award reasonable attorney fees to the prevailing party."  An exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness*, 572 U.S. at 554.  "Section

285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less [] a high one." *Id.* at 557; *see also Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014).  Further, a party's litigation misconduct can suffice to make a case exceptional.  *MarcTec LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012).

Courts determine exceptionality "in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness*, 572 U.S. at 554.  While there is "no precise rule or formula for making these determinations," factors supporting exceptionality include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554, 558 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

## V.    ARGUMENT

Volterra's litigation conduct was egregious.  The Court's summary judgment and *Daubert* rulings speak for themselves.  Viewing as a whole Volterra's litigation conduct over the last three years, this Court should find this case exceptional.

### A.    MPS Is the Prevailing Party

There is no dispute that MPS is the prevailing party under 35 U.S.C. § 285. Volterra filed an unopposed motion to dismiss with prejudice, and the Court granted

the motion.  D.I. 351, 352.  An unopposed dismissal with prejudice entered by a court is a judgment of purposes for attorneys' fees.  *Keith Mfg. Co. v. Butterfield*, 955 F.3d 936, 939-940 (Fed. Cir. 2020); *see also Internet Media Interactive Corp. v. Shopify Inc.*, No. 20-416 (MN), 2020 WL 6196292, at *2-3 (D. Del. Oct. 22, 2020) ("Extending the reasoning of Keith Manufacturing to the facts here, this Court concludes that Plaintiff's voluntary dismissal with prejudice under Rule 41(a)(1)(A)(i) rendered Defendant a prevailing party in this case.").  This Court's Local Rules similarly explain that the "defendant is the prevailing party upon a dismissal ... of the case without judgment for the plaintiff on the merits."  D. Del. L.R. 54.1(c).

### B.    This Case Is Exceptional

The next question is whether this case is also "exceptional" under Section 285. It is.  First, Volterra's infringement case was based almost entirely on allegations of infringement against a product that it covenanted not to sue.  Second, despite knowing of the covenant not to sue, Volterra kept the case going for as long as it could after the covenant not to sue, maximizing the burden and expense to MPS. Exceptionality is plain here.

### 1. The Weakness of Volterra's Case, Confirmed by The Court's Rulings on MPS's Summary Judgment and *Daubert* Motions, Renders This Case Exceptional

Volterra's infringement theory hinged largely on its weak and illogical position that it could still accuse the Nvidia Power Solution of patent infringement in court despite covenanting not to sue the Nvidia product for infringement. But Volterra "ought to have recognized that [their] claims were baseless" in view of the covenant not to sue. *Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. CV 05-897 (WHW)(CLW), 2018 WL 2378406, at *10-11 (D.N.J. May 23, 2018). Volterra's decision to continue pursuing this case against the product it expressly covenanted not to sue renders this case exceptional. *See id.* at *10 (finding "litigation misconduct" after plaintiff "continue[d] to pursue claims that it knew were baseless").

Maxim, on behalf of itself and Volterra, explicitly entered an agreement in which they covenanted away the right to sue Nvidia for direct infringement through use or sale of the accused products. Ex. 11 (MAXIM_00011579). This covenant not to sue was entered directly in response to *this litigation*, and was explicitly about protecting Nvidia from *this litigation*.

And Volterra *knew* that the covenant would likely have a decidedly negative—indeed, fatal—impact on its claims. It failed to disclose the covenant not to sue for months after it was signed. *Supra* at 5-7. Volterra chose to roll the dice

based on a reservation to sue MPS in the letter.  Ex. 11 (MAXIM_00011579) ("Maxim and Volterra reserve the rights to sue, otherwise challenges and seek damages from MPS based on its sales or other business transactions with NVIDIA that are found to infringe the Asserted Patents.").  To Maxim and Volterra, the litigation was worth it if it meant keeping MPS and its products under a cloud of uncertainty.  So Volterra kept pressing this litigation forward through fact discovery, through expert discovery, and through dispositive motions.  MPS filed three summary judgment motions and two *Daubert* motions, prevailing on most of them. *Octane Fitness*, 572 U.S. at 554 (considering the "substantive strength of a party's litigating position" in assessing exceptionality).

Moreover, Volterra was warned, repeatedly, that proceeding with its infringement theories based on the Nvidia Power Solution given the covenant not to sue would have consequences.  *See, e.g.*, D.I. 177 at 7-8. 11-14; Ex. 12 (Oct. 11, 2021 Letter to Volterra).  MPS repeatedly laid out how Volterra's claims were barred as a matter of law for Volterra.  *See, e.g.*, D.I. 177 at 7-8. 11-14; Ex. 12 (Oct. 11, 2021 Letter to Volterra); D.I. 276; Ex. 20 (Jan. 14, 2022 Letter to Volterra).  MPS also repeatedly demanded that Volterra withdraw this allegation to save the parties from litigating this issue, and warned that it would seek its attorneys' fees, costs and expenses and any other appropriate sanctions if Volterra continues with these case

theories.  *See, e.g.*, Ex. 12 (Oct. 11, 2021 Letter to Volterra); Ex. 20 (Jan. 14, 2022 Letter to Volterra).  Volterra ignored these warnings.

This is not a close case where reasonable minds may differ as to the proper reading of a contract.  Rather, as the Court correctly noted during the summary judgment hearing, it "is very clear in the patent law, that a covenant not to sue is a license."  Ex. 21 (Aug. 2, 2022 Hearing Tr.) at 37:23-38:1.  Specifically, "once [Volterra] relinquish[ed] the right to exclude Nvidia, and therefore relinquish[ed] any claim they could have for direct infringement against Nvidia, they[] relinquished their right to go after third parties for inducing those exact conduct or those exact activities."  *Id.* at 17:24-38:1.  Volterra "just can't have it both ways."  *Id.* at 18:6-7.  Persisting with meritless infringement allegations barred by its own covenant not to sue is exactly the sort of exceptional conduct 35 U.S.C. § 285 is designed to protect against.  *See, e.g.*, *Energy Innovation Co., LLC v. NCR Corp.*, No. 1:18-cv-03919-SDG, ECF No. 65 (N.D. Ga. Mar. 20, 2020).

Faced with significant losses at summary judgment and *Daubert*, Volterra voluntarily dismissed its own case ***with prejudice***.  D.I. 351.  Its purpose had been accomplished, and it did not want to face trial on the merits.  This play of events says everything about the strength of Volterra's case (or lack thereof) from the time it entered into the letter providing Nvidia a covenant not to sue.  Volterra's willful ignorance of the law can only be attributed to its gamesmanship to prolong the

18

litigation and create a cloud over MPS.  It confirms exceptionality.  *See Kilopass Tech., Inc. v. Sidense Corp.*, 82 F. Supp. 3d 1154, 1165 (N.D. Cal. 2015) (Section 285 aims to deter "frivolous or unnecessary patent litigation" and to compensate "parties injured by such litigation").

### 2. Volterra's Litigation Tactics Multiplied Proceedings to Raise MPS's Legal Expenses, Which Confirms This Case Is Exceptional

This case is also exceptional because of Volterra's wrongful litigation conduct, which permeated every aspect of this case.  Volterra implemented an "abusive discovery strategy." *Oplus Techs., Ltd. v. Vizio, Inc.*, 782 F.3d 1371, 1373-74 (Fed. Cir. 2015).  The hallmarks of that strategy include Volterra's delay in producing the covenant not to sue, and its delay in identifying the Nvidia Power Solution as accused of direct infringement.  *See supra* at 5-8.  It also includes Volterra's attempt to add wholly new accused products in its infringement expert's *reply* report (and then steadfastly maintaining in Court that such products had been identified in the expert's opening report, when they plainly were not).  *Supra* at 9.  And it includes Volterra's damages expert submitting an expert report representing that Volterra witness Mr. Viviani told him that the ███████ product practiced the asserted patents—even though Mr. Viviani later repeatedly testified under oath that he was unfamiliar with the asserted patents and certainly could not have said what Dr. McDuff (and Volterra) claimed he did.  *Supra* at 9-11.

Volterra continued to press its unsupportable arguments at the summary judgment hearing, where the Court found Volterra's positions not credible, "disingenuous," and smacking of "gamesmanship."  Ex. 21 (Aug. 2, 2022 Hearing Tr.) at 121:22-122:16; 142:24-143:15.  In short, Volterra and Maxim wished to disrupt MPS's business operation for as long as possible.  Indeed, since the start of the case, MPS has received numerous inquiries from its customers, investors, shareholders, and financial reporters about the implications of Volterra's and Maxim's representations that the scope of the accused products is broad. *See* D.I. 40 (Zhou Declaration).  As a result of the ambiguous scope of Volterra's infringement allegations, MPS's customer relationships have been impaired.  *Id.*; *see also* Ex. 22 (Jinghai Zhou Tr.) at 91:21-92:13 (███████████████████████████████████ ████████████████████).

Egregious tactics like those employed by Volterra are, fortunately, rare in patent litigation.  But that is why this case "stands out."  *Octane Fitness*, 572 U.S. at 554 (holding that an exceptional case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position").  MPS respectfully requests that the Court award it fees.

## VI.  RULE 54 BIFURCATED BRIEFING

Pursuant to Fed. R. Civ. P. 54(d)(2)(C), MPS respectfully requests that the Court decide liability for attorney fees at this time.  Pursuant to Fed. R. Civ. P.

54(d)(2)(B)(iii), MPS estimates its fee amount to be approximately $8 million. This estimate includes only those fees incurred to defend this case after Volterra covenanted not to sue the accused products, and does not include any fees incurred in briefing the disqualification issue. MPS will provide briefing regarding the precise amount and reasonableness of its attorney fees at a later date. *See* Fed. R. Civ. P. 54(d)(2)(C) ("The court may decide issues of liability for fees before receiving submissions on the value of services."); *see also Finnavations, LLC v. Payoneer, Inc.*, No. 18-444-RGA, 2019 WL1236358, at *3, n.1 (D. Del. Mar. 18, 2019) (granting fee motion, and directing the parties to "meet and confer regarding a schedule to resolve the amount"); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, No. 09-MD-2118-SLR, 2012 WL 95592, at *4 (D. Del. Jan. 12, 2012); *Vehicle Interface Techs. LLC v. Jaguar Land Rover N. Am., LLC*, No. 12-1285-RGA, 14-339-RGA, 2015 WL 9462063, at *5 (D. Del. Dec. 28, 2015). Bifurcation under Rule 54(d)(2)(C) will enable the parties to tailor their evidentiary presentation to the Court's liability decision, thus streamlining the process and avoiding unnecessary expenditures of resources and paperwork. Accordingly, this brief does not address the amount or reasonableness of MPS's attorney fees. MPS stands ready to provide further submissions on those issues once instruction is received from the Court.

## VII.   CONCLUSION

The Court should award MPS at least the fees it incurred after Volterra covenanted not to sue the accused product, and any other relief the Court finds just.

/s/ Andrew E. Russell
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
Attorneys for Defendant

OF COUNSEL:
Bob Steinberg
Matthew J. Moore
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Surendra K. Ravula
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-6555

Thomas W. Yeh
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
(213) 485-1234

Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190
(571) 203-2750

R. Benjamin Cassady
Forrest A. Jones
Chen Zang
Bradford C. Schulz
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: September 27, 2022

## CERTIFICATION OF MEET AND CONFER

Pursuant to Local Rule 7.1.1., MPS certifies that a reasonable effort has been made to reach agreement with Volterra on the matters set forth in the above motion. The parties participated in a meet and confer via telephone conference on September 20, 2022.

*/s/ Andrew E. Russell*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's November 6, 2019 Standing Order, I hereby confirm that this brief complies with the type and number limitations set forth in the Standing Order. I certify that this document contains 4,890 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, table of contents and authorities, or the counsel blocks.

*/s/ Andrew E. Russell*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew E. Russell, hereby certify that on September 27, 2022, this

document was served on the persons listed below in the manner indicated:

### <u>BY EMAIL</u>

Robert M. Oakes
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899
(302) 652-5070
rmo@fr.com

David M. Barkan
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
(650) 839-5070
barkan@fr.com

Aaron P. Pirouznia
Noel F. Chakkalakal
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070
pirouznia@fr.com
chakkalakal@fr.com

*/s/ Andrew E. Russell*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

26

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOLTERRA SEMICONDUCTOR LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-2240-CFC |
| | ) | |
| MONOLITHIC POWER SYSTEMS, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT MONOLITHIC POWER SYSTEMS INC.'S
FIRST SET OF REQUESTS FOR PRODUCTION (NOS. 1-94)**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendant Monolithic Power

Systems, Inc. ( "MPS") requests that Plaintiff Volterra Semiconductor LLC ("Volterra") respond

to these requests in writing, in accordance with the definitions and instructions contained herein,

and produce all documents and things in Plaintiff's possession, custody, or control that are

requested below, within thirty (30) days after service pursuant to the Federal Rules of Civil

Procedure, and at the office of Latham & Watkins LLP, 555 Eleventh Street NW, Suite 1000,

Washington, DC 20004.

**DEFINITIONS**

As used herein and all further Requests, unless specified otherwise, the following

definitions apply:

1.      The terms "You," "Your," "Plaintiff," and "Volterra" refer collectively to Volterra

Semiconductor LLC ("Volterra"), its predecessors-in-interest, parents, subsidiaries, joint ventures,

affiliates, and other legal entities that are wholly or partially owned or controlled by Volterra,

either  directly  or  indirectly,  and  the  principals,  directors,  officers,  owners,  members,

Volterra's Asserted Patents with respect to the following functions for both categories: (i) research and development, (ii) engineering and design; (iii) manufacture; (iv) testing; (v) quality control; (vi) assembly and packaging; (vii) distribution; (viii) transportation, delivery, and importation; (ix) marketing; (x) sales; (xi) strategic planning; (xii) patent and other intellectual property issues; and (xiii) licensing.

**REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show the involvement of any Third Party with the establishment, operation, and control of, and/or financial interest in, Plaintiff and Plaintiff's activities related to this action.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents and things relating to the ownership, title, transfer, or assignment of each of the Volterra Asserted Patents or Related Patents.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents relating to any transactions that led to Plaintiff's ownership of the Volterra Asserted Patents.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents relating to any assignment, license, or other agreement relating to the Volterra Asserted Patents and any Related Patent between Plaintiff or any affiliates, subsidiaries, parents, predecessors-in-interest, other legal entities that are wholly or partially owned or controlled by Plaintiff.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents and things relating to any security interest in or lien on any of the Volterra Asserted Patents at any time.

**REQUEST FOR PRODUCTION NO. 93:**

All Documents relating to Plaintiff's attempts to sell or license the Volterra Asserted Patents or Related Patents, including put not limited to any actual or proposed license agreement, technology exchange agreement, joint or other development agreement, or any offer, acceptance, or rejection of the same.

**REQUEST FOR PRODUCTION NO. 94:**

All Documents relating to any valuation of the Volterra Asserted Patents or Related Patents, whether standing alone or as part of a larger portfolio.

OF COUNSEL:
Bob Steinberg
Matthew J. Moore
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER, LLP
Two Freedom Square
Reston, VA 20190-5675
(571) 203-2750

Surendra K. Ravula
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-6555

R. Benjamin Cassady
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: September 14, 2020

*/s/ Surendra K. Ravula*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I, Nathan R. Hoeschen, hereby certify that on September 14, 2020, this document

was served on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

Robert M. Oakes
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899
(302) 652-5070
oakes@fr.com

David M. Barkan
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
(650) 839-5070
barkan@fr.com

Jack B. Blumenfeld
Megan E. Dellinger
Andrew M. Moshos
MORRIS, NICHOLS, ARSHT
 & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mdellinger@mnat.com
amoshos@mnat.com

/s/ Nathan R. Hoeschen
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

# EXHIBIT 2

# FINNEGAN

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
WWW.FINNEGAN.COM

LIONEL M. LAVENUE
571.203.2750
lionel.lavenue@finnegan.com

January 28, 2020

Robert M. Oakes, Esq.                                      **Via Email**
Fish & Richardson, P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114

Re:     *Volterra Semiconductor LLC v. Monolithic Power Systems Inc.*
        No. 1:19-cv-02240-CFC (Del. 2019)

Dear Mr. Oakes:

We represent Monolithic Power Systems Inc. ("MPS") in the above-captioned matter.  Volterra has no basis for its patent infringement claims against MPS. Volterra could not possibly have a basis for its claims because MPS' accused product is not even on the market yet, and information about its design is not publicly available.

Volterra, for example, has not identified any support for its assertion that MPS' accused product satisfies any of the detailed structural limitations in any of the patent claims for U.S. Patent No. 7,525,408 (the '408 patent) and U.S. Patent No. 7,772,955 (the '955 patent). Instead, Volterra's Complaint relies entirely on "information and belief" without identifying any support. As a result, both the '955 and '408 claims should be dismissed for failure to state a claim.

Similarly, Volterra has not identified any support for its assertion that MPS' accused product infringes the patent claims of U.S. Patent No. 6,362,986 (the '986 patent). Volterra's Complaint relies almost entirely on "information and belief." Volterra relies only on two citations to support its infringement contentions, and neither of them support Volterra's Complaint. For example, Volterra's Complaint assumes that the physical orientation of a circuit is somehow related to the phase delay at which voltages in the circuit are switched. Compl., ¶ 30. The physical orientation of a circuit has nothing to do with how voltages in that circuit are switched. Indeed, a circuit can be oriented in any direction with no effect on the voltages in that circuit. Similarly, Volterra assumes that a predetermined efficiency of a circuit "***would not be possible*** if the magnetizing inductance was not at least three times greater than the leakage inductance" in that circuit. *Id.*, ¶ 31(emphasis added). The efficiency of a circuit depends on many factors that have nothing to do with the magnitude of leakage and magnetizing inductances. For at least these reasons, Volterra has not provided any support for infringement of these patent claims.

Robert M. Oakes, Esq.
Fish & Richardson, P.C.
January 28, 2020
Page 2

Moreover, we understand that Volterra has been contacting customers of MPS and informing them of these unsupported claims. This is further compounded by the insufficient allegations in Volterra's Complaint that "the accused products" are not limited to the 48V-1V Power Solution. Compl., ¶s 18, 22, 28. In fact, it is our understanding that the only product accused of infringement is the 48V-1V Power Solution. Please let us know if you disagree. If Volterra does not withdraw its claims against MPS and immediately cease and desist from contacting and/or interfering with customers of MPS, MPS will seek relief to which it is entitled, including but not limited to sanctions based on Federal Rule 11.

We appreciate your attention to this matter, and we look forward to a response by no later than February 5, 2020.

Sincerely,

Lionel M. Lavenue

cc:    Bob Steinberg, Esq., Latham & Watkins LLP
       Matthew J. Moore, Esq., Latham & Watkins LLP
       Saria Tseng, Esq., Monolithic Power Systems Inc.

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP

# EXHIBITS 3 - 10
# Redacted in their Entirety

# EXHIBIT 11



Maxim Integrated
160 Rio Robles,
San Jose, CA 95134
(408) 601 1000
www.maximintegrated.com

April 9, 2020

Troy Hastings
NVIDIA
2788 San Tomas Expressway
Santa Clara, CA 95051

**CONFIDENTIAL – SUBJECT TO NDA**

Dear Troy:

We understand that you are aware of a lawsuit between Maxim's subsidiary, Volterra Semiconductor, LLC ("Volterra") and Monolithic Power Systems ("MPS"), currently pending in Federal Court in Delaware in which Volterra asserts that MPS is infringing U.S. Patent Nos. 6,362,986 ("the '986 patent"); 7,525,408 ("the '408 patent"); and 7,772,955 ("the '955 patent") (collectively, the "Asserted Patents"). In the lawsuit, Volterra accuses certain MPS voltage converter with coupled inductor products (the "MPS Accused Products") of infringing the Asserted Patents. This letter does not provide NVIDIA with notice of the Asserted Patents.

Maxim recognizes that NVIDIA has a long history as a valued customer of Maxim and its subsidiaries. In consideration of the long-term breadth and depth of this business relationship, Maxim and its subsidiaries do not intend to disrupt NVIDIA's usage or commercialization of NVIDIA products in which the MPS Accused Products have already been designed into the NVIDIA product prior to the date of this letter (the "above-described NVIDIA products"). Maxim, on behalf of itself, and its subsidiary Volterra, therefore covenants not to sue NVIDIA or NVIDIA's subsidiaries, affiliates or customers for infringement of the Asserted Patents in connection with the use or sale of the above-described NVIDIA products or their derivatives. As used herein, a derivative is an NVIDIA product that uses the same MPS Accused Product as an above-described NVIDIA product and has passed NVIDIA's standard X-release product development milestone prior to or on May 31, 2022. The X-release product development milestone is defined as occurring at the first printed circuit board design milestone, where the schematic, layout and BOM are released in NVIDIA's system, and the printed cicuit board is ready to be fabbed.

To further avoid disruption to NVIDIA, Maxim and its subsidiaries will not seek to use the Asserted Patents to enjoin or otherwise prevent MPS from providing MPS Accused Products to NVIDIA for use in the above-described NVIDIA products.

To be clear, Maxim and Volterra reserve all rights to sue, otherwise challenge and seek damages from MPS based upon its sales or other business transactions with NVIDIA that are found to infringe the Asserted Patents. Nothing in this letter constitutes a license to NVIDIA or anyone else with respect to the Asserted Patents.

Please do not hesitate to contact me if you have any questions.

Very truly yours,

Achyut Shah
Vice President Cloud & Data Center Business Achyut.Shah@maximintegrated.com

# EXHIBIT 12

Bob Steinberg
Direct Dial: +1.213.891.8989
bob.steinberg@lw.com

10250 Constellation Blvd., Suite 1100
Los Angeles, California  90067
Tel: +1.424.653.5500  Fax: +1.424.653.5501
www.lw.com

## LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

October 11, 2021

**VIA EMAIL**

Robert M. Oakes, Esq.
Fish & Richardson, P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114

Re:     *Volterra Semiconductor LLC v. Monolithic Power Systems Inc.,*
        No. 1:19-cv-02240-CFC (Del. 2019)

Counsel:

        We write to provide additional notice that: 1) Volterra lacks standing to maintain this suit,[1] and 2) Volterra's indirect infringement claims based on direct infringement by NVIDIA are precluded.

### A.     Volterra Lacks Standing.

        Volterra lacks standing to maintain this patent infringement action because it has not joined ▮▮▮▮▮▮▮▮▮▮▮ to this suit.  *STC.UNM v. Intel Corp.*, 754 F.3d 940 (Fed. Cir. 2014).  Though ▮▮▮▮▮ was not listed as an assignee on the face of Volterra's Asserted Patents, ▮▮▮▮ is a joint owner of the Asserted Patents pursuant to both the ▮▮▮▮▮▮▮▮.[3]

        ▮ ▮▮▮▮▮▮▮▮▮▮▮▮

        Under the Agreement, ▮▮▮▮ holds title to each of the Asserted Patents.  Section 9 of the Agreement provides in full:

---

[1] MPS learned about the standing deficiencies during recent third-party discovery of Charles Sullivan and ▮▮▮▮.  Dr. Sullivan was deposed on August 18, 2021.  He produced documents on September 14, 2021.  ▮▮▮▮ produced documents on September 24, 2021 and has indicated to counsel that further documents are forthcoming.

[2] SULLIVAN_00000145 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[3] SULLIVAN_00001778 at 1785 ▮▮▮▮▮▮▮▮▮▮▮ at 1785 (produced by ▮▮▮▮▮▮▮▮).

**RESTRICTED—ATTORNEYS' EYES ONLY**

LATHAM&WATKINS LLP



- The '986 patent is directed towards a multiphase DC-to-DC converter including a coupled inductor having a common core, such as a ladder-shaped core, with windings wound about in like-direction. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- The '408 patent claims are directed towards a type of N-phase coupled inductor that has first and second magnetic elements connected using N connecting magnetic elements to form N-1 passageway; ████████████████████████████████████

- The '955 patent claims are directed towards a type of two-phase coupled inductor that includes a magnetic core forming a passageway, which allows two windings to pass

---

[4] SULLIVAN_00000145 at 147 (emphases added).

[5] SULLIVAN_00000145 at 152 (Attachment B).

[6] SULLIVAN_00001793 at 1795; SULLIVAN_00001778 at 1782; 8/18/21 Sullivan Tr. at 11:14-16.

[7] 9/7/21 Volterra's First Supplemental Responses at pp. 25-27 (Volterra's response to Interrogatory No. 4); 8/18/21 Sullivan Tr. at 58:4-59:8, 25:21-26:9.

[8] SULLIVAN_00000145 at 152 (Attachment B); 9/7/21 Volterra's First Supplemental Responses at pp. 25-27 (Volterra's response to Interrogatory No. 4).

**RESTRICTED—ATTORNEYS' EYES ONLY**

**LATHAM&WATKINS** LLP

through.



For example, in his master's thesis, Mr. Li describes Figure 3.8 as "***our*** new topology for multi-phase coupled inductors with a 'ladder' structure."[10]

**2.**

---

[10] SULLIVAN_00000045 at 88 (emphasis added).

[11] *See, e.g.*, 8/18/21 Sullivan Tr. at 193:3-8; 191:25-192:1.

[12] *See, e.g.*, 8/18/21 Sullivan Tr. at 196:13-20.

at 1785 (produced by Charles Sullivan on September 14, 2021).

[14] SULLIVAN_00001778 at 1785.

[15] SULLIVAN_00001778 at 1785 (emphasis added).

**RESTRICTED—ATTORNEYS' EYES ONLY**

**LATHAM&WATKINS**LLP



Volterra bears the burden of establishing standing, and that burden cannot be shifted to MPS. *Rothschild v. Cree, Inc.*, 711 F. Supp. 2d 173, 183–84 (D. Mass. 2010); *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). Since ███████ did not join this suit when it was filed, Volterra has lacked standing to bring suit from before the time this lawsuit was filed. Therefore, this suit must be dismissed. *See STC.UNM.*, 754 F.3d at 946 (dismissing patent infringement suit for lack of standing because co-owner had not voluntarily joined and could not be involuntarily joined). MPS reserves all rights to seek its attorneys' fees, costs and expenses and any other appropriate sanctions.

### B.   Volterra's Indirect Infringement Theory Against MPS Cannot Be Based on NVIDIA's Direct Infringement.

In addition to the standing concerns raised above, Volterra must substantially narrow its indirect infringement claims against MPS. Volterra cannot pursue an indirect infringement theory against MPS based on NVIDIA's direct infringement because Maxim and Volterra covenanted not to sue to NVIDIA. Specifically, back in April 2020, Maxim and Volterra granted NVIDIA a "covenant[] not to sue NVIDIA or NVIDIA's subsidiaries, affiliates or customers for infringement of the Asserted Patents in connection with the use or sale" of the NVIDIA products Volterra now seeks to accuse in its amended infringement contentions.[19] This covenant covers NVIDIA products or derivatives that include an MPS voltage converter with a third-party coupled inductor.

---

[16] SULLIVAN_00000145 at 152 (████████████████); SULLIVAN_00000045 (Li's master's thesis); 8/18/21 Sullivan Tr. at 126:19-127:2.

[17] SULLIVAN_00001778 at 1785.

[18] 9/7/21 Volterra's First Supplemental Responses at pp. 25-27 (Volterra's response to Interrogatory No. 4); 8/18/21 Sullivan Tr. at 58:4-59:8, 25:21-26:9.

[19] MAXIM_00011579.

**RESTRICTED—ATTORNEYS' EYES ONLY**

**LATHAM&WATKINS**LLP

*Id.* ████████████████████████████████████████████████████████
████████████████████████████████████████████████

Volterra alleges that MPS indirectly infringes because this NVIDIA product includes MPS components.[21]  A party cannot be liable for indirect infringement if the underlying act of direct infringement has been authorized by a license, such as a covenant not to sue.  *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986) ("Because of our affirmance of the district court's holding that [the] customers enjoyed an implied license to practice the inventions claimed . . . there can be no direct infringement under the facts of this case.  Absent direct infringement of the patent claims, there can be neither contributory infringement,[22] nor inducement of infringement.") (internal citations omitted).  NVIDIA's acts have been authorized under the covenant not to sue and cannot directly infringe the Asserted Patents.  Therefore, MPS cannot be held liable for indirect infringement based on NVIDIA's direct infringement.

Volterra previously argued the covenant not to sue includes language reserving the right to "sue [or] otherwise challenge and seek damages from MPS based on its sales or other business transactions with NVIDIA that are found to infringe the Asserted Patents."[23]  This assertion ignores that, in order to maintain an indirect infringement allegation, there must be an underlying claim for direct infringement, and here there can be no direct infringement by NVIDIA regardless of this reservation of rights.  The courts recognize that a covenant not to sue has the same legal implications as a nonexclusive license.  *See, e.g.,TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) ("[A] nonexclusive license is equivalent to a covenant not to sue.").  The language in the letter purporting to reserve the right to sue MPS has no effect here, because NVIDIA is authorized to perform the allegedly infringing acts that Volterra accuses MPS of inducing.  This authorization has the same effect as a license, and thus NVIDIA's actions cannot directly infringe the Asserted Patents.  As stated above, absent direct infringement of the Asserted Patents, there can be no indirect infringement.  *See Met-Coil*, 803 F.2d at 687; *see also Glob. Commc'ns, Inc. v. Directv, Inc.*, No. 4:12CV651-RH/CAS, 2015 WL 10906061, at *6 (N.D. Fla. Nov. 16, 2015) (ruling no contributory infringement where party for whom components were manufactured was protected by covenant not to sue); *Robert Bosch LLC v. Alberee Prod., Inc.*, 171 F. Supp. 3d 283, 288-290 (D. Del. 2016) (ruling no indirect infringement in light of indemnification provision protecting alleged direct infringing downstream customers, stating "[t]his indemnification conveys the requisite freedom from suit commensurate with the grant of a

---

[20] *See* D.I. 165, Ex. R at 2 ██████████████████████████████████████
████████████

[21] *See, e.g.,* MPS_DE-00010143, MPS_DE-00010032.

[22] The Court granted MPS's motion to dismiss Volterra's allegations of contributory infringement on September 30, 2021.  D.I. 244.  Though Volterra has not moved for leave to file further amended complaints, we assume for purposes of this letter that its contributory infringement claims are still in this case.

[23] D.I. 180 at 6-7 (citing MAXIM_00011579).

**RESTRICTED—ATTORNEYS' EYES ONLY**

**October 11, 2021**
**Page 6**

LATHAM&WATKINS LLP

license").  Therefore, even with the attempted reservation of rights, MPS cannot be held liable for indirect infringement based on NVIDIA's authorized direct infringement.

████████████████████████████████████████.  Volterra and Maxim have known that NVIDIA cannot be sued for direct infringement since at least January 2020, as evidenced by the negotiation and execution of the covenant not to sue.[24]

If Volterra continues to pursue this case and cannot establish standing or its indirect infringement claims based on NVIDIA's direct infringement, MPS reserves all rights to seek its attorneys' fees, costs and expenses and any other appropriate sanctions.

Respectfully,

/s/ Bob Steinberg

Bob Steinberg
of LATHAM & WATKINS LLP

---

[24] *See, e.g.,* MAXIM_00012143, MAXIM_00012113, MAXIM_00011579.

**RESTRICTED—ATTORNEYS' EYES ONLY**

# EXHIBIT 13



Fish & Richardson P.C.
222 Delaware Avenue
17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114

302 652 5070 main
302 652 0607 fax

**VIA EMAIL**

November 1, 2021

Robert M. Oakes
oakes@fr.com
302 778 8477  direct

Bob Steinberg, Esquire
Latham & Watkins LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067

**Re: "Rule 11 Letter re CNS Standing"**
***Volterra Semiconductor LLC v. Monolithic Power Systems, Inc.***,
**C.A. No. 19-2240-CFC (D. Del.)**

Dear Mr. Steinberg:

I write in response to your letter dated October 11, 2021.

At the outset, you appear to have improperly, or at the very least mistakenly, invoked Rule 11.  As you are aware, a Rule 11 "motion must be served under Rule 5, but must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."  I note that your letter did not even include the words Rule 11, much less attach a Rule 11 motion.  Thus, the title of your letter appears to be in error.

I further note that this is not the first time MPS has invoked Rule 11 without basis.  A letter from your co-counsel for MPS on June 1, 2020 was titled as a "Rule 11 Letter" and accused Volterra of "insufficient investigation and implausible infringement claims."  Yet in denying MPS's subsequent Motion to Dismiss, the Court found that "Monolithic mischaracterize[d] Volterra's allegations" and that Volterra's direct and induced infringement allegations were sufficiently pled.  D.I. 244.  As the Federal Rules themselves make clear, letters purportedly invoking Rule 11 should not be sent for purposes of posturing or sabre rattling.  *See, e.g.*, FRCP 11, Notes of Advisory Committee on Rules—1993 Amendment ("Rule 11 motions . . . should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; . . . [n]or should Rule 11 motions be prepared to emphasize the merits of a party's position, to exact an unjust settlement, to intimidate an adversary into withdrawing contentions that are fairly debatable, [or] to increase the costs of litigation . . . .").



Bob Steinberg, Esquire
Page 2

Turning to the substance of your letter, you are incorrect as to both the facts and the law. ████████████ has no ownership or claim to ownership in the Asserted Patents.  You first cite to the ████████████████████████████████ but as Dr. Sullivan repeatedly testified, ████ ████████████████████████████████████████████████████, which occurred after the conception of the '986 Patent and concluded prior to the conception of the '408 and '955 Patents.  *See, e.g.*, Sullivan Depo at 184:14-209:7; SULLIVAN_00000165.  And even if any of the relevant inventions were found to fall under the Agreement, ████████████ does not currently possess any rights or ownership of the Asserted Patents.  *See* SULLIVAN_00000145.

You next cite to ████████████████████, but you once again ignore Dr. Sullivan's unequivocal testimony.  As you are well aware, ████████████████████████████████ ████████████████████  *See, e.g.*, Sullivan Depo at 29:5-20; 134:21-25; 139:16-140:6; 157:20-158:15; 264:11-266:5.  Volterra thus had, and continues to have, proper standing to bring this suit.

Turning to your arguments regarding indirect infringement, you once again ignore relevant facts and distort the applicable case law.  The language of the Nvidia CNS allows it to identify Nvidia and Nvidia's customers as direct infringers for purposes of an indirect infringement claim against MPS, and the case law you cite does not say otherwise.  Moreover, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  *See, e.g.*, Volterra's Amended Infringement Contentions.  These acts of direct infringement support Volterra's inducement claim independent of whether Nvidia is considered a direct infringer for purposes of inducement.  Volterra's assertion of indirect infringement is thus proper and warranted.

Sincerely,

*/s/ Robert M. Oakes*

Robert M. Oakes

# EXHIBITS 14 - 15
# Redacted in their Entirety

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VOLTERRA SEMICONDUCTOR LLC, | C.A. No. 19-2240-CFC |
| Plaintiff, | |
| v. | **CONTAINS RESTRICTED -** |
| MONOLITHIC POWER SYSTEMS, INC., | **ATTORNEYS' EYES ONLY** |
| Defendant. | **INFORMATION** |

**PLAINTIFF'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF (NOS. 1–6)**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Volterra Semiconductor LLC ("Volterra") hereby serves their Second Supplemental Objections and Responses to Defendant Monolithic Power Systems, Inc. ("Monolithic")'s First Set of Interrogatories (Nos. 1-6).

**GENERAL OBJECTIONS**

1.      Volterra objects to the Interrogatories, "Instructions," and "Definitions," to the extent that they are inconsistent with, enlarge upon, or exceed the scope of discovery authorized by the Federal Rules of Civil Procedure, the Local Rules of the District of Delaware, any applicable Court Order, or any stipulation or agreement between the parties. Volterra will abide by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Delaware, any applicable Court Order, and any stipulation or agreement between the parties in responding to Monolithic's Interrogatories.

2.      By identifying a document in response to an Interrogatory, Volterra does not admit that the document is free of information that is privileged or immune from discovery, nor does Volterra waive its right to withhold any portion of the document that is privileged or immune from discovery.

RESTRICTED - ATTORNEYS' EYES ONLY

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Volterra will identify and produce documents under Rule 33(d) that contain relevant and non-privileged information relevant to this Interrogatory. Volterra further states that its response will be based in part on, but not limited to, yet to be produced information from Monolithic. Discovery is ongoing, and Volterra reserves its right to supplement its response based on information to be produced by Monolithic and in accordance with the Federal and Local Rules.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1 (9/7/2021):**

Subject to and without waiving the foregoing objections, Volterra supplements its response as follows:

Volterra identifies the deposition transcripts of Dawson Huang, Bernie Blegen, Roland Tso and Jinghai Zhou as having information relevant to this Interrogatory. Volterra further identifies the upcoming deposition of Ahmed Abou-Alfotouh as having information relevant to this Interrogatory.

**INTERROGATORY NO. 2:**

For each Accused Product and Volterra Asserted Claim, describe in detail and identify the factual and legal bases for Your claim for damages to which You contend You are entitled as a result of Defendant's alleged infringement, including without limitation, whether Your damages claims are based on lost profits, a reasonably royalty, or other damages theory, any royalty rate, royalty base, lost profits, disgorgements, enhanced damages, attorney's fees, or costs that You contend are appropriate, Your products that you contend compete with the Accused Products, noninfringing alternatives, the date You contend the hypothetical negotiation would have commenced with respect to each Volterra Asserted Patent, the time period for which You contend You are entitled to collect damages from Defendant due to any alleged infringement of each Volterra Asserted Patent, and whether the royalty base is based on the value of the entire product

18

RESTRICTED - ATTORNEYS' EYES ONLY

or a portion thereof (if so, identify the portion); identify all Documents and things supporting, contradicting, or otherwise relating to Your contentions; and identify the three (3) most knowledgeable Persons concerning the facts described in Your response and all Persons on which you intend to rely to support Your contentions.

## RESPONSE TO INTERROGATORY NO. 2:

In addition to the General Objections and Definition Objections, which are incorporated by reference as though fully set forth herein, Volterra objects to this Interrogatory as compound in that it contains multiple, discrete subparts in a single interrogatory and will consider each subpart to be a separate interrogatory for purposes of calculating the number of interrogatories utilized by Monolithic. Volterra also objects to this Interrogatory as vague, ambiguous, overbroad, and unduly burdensome with respect to the terms "without limitation," "any royalty rate, royalty base, lost profits, disgorgements, enhanced damages, attorney's fees, or costs," "all Documents and things," and "all Persons" and the requirement that Volterra "identify the three (3) most knowledgeable Persons." Volterra further objects to this Interrogatory to the extent it seeks expert opinion or analysis or calls for a legal conclusion. Subject to and without waiving the foregoing objections, Volterra responds as follows:

19

**RESTRICTED - ATTORNEYS' EYES ONLY**

Volterra's coupled inductor technology is essential in meeting the increasing power demands that accompany modern technologies. The importance of this technology is evidenced by the technical publications authored by Monolithic's engineers. As discussed in response to Interrogatory No. 1, multiple Monolithic senior engineers have written technical papers in which they discussed the '986 patent and the Volterra patented designs at length. In Mr. Zhou's April 22, 2005 Dissertation, entitled "High Frequency, High Current Density Voltage Regulators," he recognized that "the transistors per die in microprocessors have increased steadily in the past decade" and "[t]he increases in the microprocessors' speed and transistor number have resulted in an increase in power demands." (Zhou Dissertation at 1). Mr. Zhou went on to analyze what he called the "scalable multi-phase surface mount coupling inductor structure proposed by Volterra," and to illustrate what he meant by the structure proposed by Volterra, Mr. Zhou cited the '986 patent as well as multiple related papers by the inventors of the '986 patent. (*Id.* at 130).

Similarly, in Mr. Dong's Dissertation, entitled "Investigation of Multiphase Coupled-Inductor Buck Converters in Point-of-Load Applications," he recognized that "the number of transistors per die has increased steadily in the last 50 years" and "[t]he increases in the integrated circuit's speed and number of transistors have resulted in an increase in power demand." (Dong Dissertation at 1-2). "To meet these requirements, multiphase interleaving buck converters are adopted for today's microprocessor." (*Id.* at 2). Mr. Dong went on to analyze Volterra's coupled inductor technology and cited papers written by the inventors of the '986 patent. (*Id.* at 21-23).

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

**RESTRICTED - ATTORNEYS' EYES ONLY**

████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

Volterra identifies employees Rizwan Khalid, Andrea Pizzutelli, and Thuerin Paing as having knowledge concerning the facts described in response to this Interrogatory.

Volterra further responds that the calculation of any reasonable royalty damages will be based in part on, but not limited to, relevant ████████████████████, the importance of the patented technology, as well as yet to be produced information from Monolithic.  Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Volterra will identify and produce documents under Rule 33(d) that contain relevant and non-privileged information relevant to this Interrogatory.  Discovery is ongoing, and Volterra reserves its right to supplement its response based on information to be produced by Monolithic and in accordance with the Federal and Local Rules.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2 (10/26/2020):**

Subject to and without waiving the foregoing objections, Volterra supplements its response as follows:

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2 (9/7/2021):**

Subject to and without waiving the foregoing objections, Volterra supplements its response as follows:

Volterra identifies the deposition transcripts of Dawson Huang, Bernie Blegen, Roland Tso, Jinghai Zhou, Stan Bochenek, John Weidman, Alberto Viviani, Rizwan Khalid, Andrea Pizzutelli, Thurein Paing, and Alexandr Ikriannikov as having information relevant to this Interrogatory.  Volterra further identifies the upcoming deposition transcript of Ahmed Abou-Alfotouh as having information relevant to this Interrogatory. Volterra also identifies the following production documents as having information relevant to this Interrogatory: MAXIM_00013927; MAXIM_00014123, MAXIM_00014151, MPS_DE-00011029 and MPS_DE-00011034.

**INTERROGATORY NO. 3:**

Describe the complete factual and legal basis for Your contention that You are entitled to any injunctive relief, including any irreparable injury You have allegedly suffered, and why such injury is irreparable, why remedies available at law, such as monetary damages, are inadequate to compensate for that injury, why, considering the balance of hardships between You and Defendant, a remedy in equity is warranted, why the public interest would not be disserved by a permanent injunction, and identify the three (3) Individuals most knowledgeable of the foregoing, and all Documents and things (by Bates number) You intend to rely on to support Your contention.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the General Objections and Definition Objections, which are incorporated by reference as though fully set forth herein, Volterra objects to this Interrogatory as vague, ambiguous, overbroad, and unduly burdensome with respect to the terms "any injunctive relief" and "any irreparable injury." Volterra further objects to this Interrogatory to the extent it seeks expert opinion or analysis or calls for a legal conclusion. Subject to and without waiving the

RESTRICTED - ATTORNEYS' EYES ONLY

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6 (9/7/2021):**

Subject to and without waiving the foregoing objections, Volterra supplements its response as follows:

Volterra identifies the deposition transcripts of Stan Bochenek, John Weidman, Alberto Viviani, Rizwan Khalid, Andrea Pizzutelli, Thurein Paing, and Alexandr Ikriannikov as having information relevant to this Interrogatory.

Dated:  September 7, 2021                FISH & RICHARDSON P.C.

                                        By: */s/ Robert M. Oakes*
                                            Robert M. Oakes (#5217)
                                            222 Delaware Avenue, 17th Floor
                                            Wilmington, DE 19801
                                            (302) 652-5070 (Telephone)
                                            (302) 652-0607 (Facsimile)
                                            oakes@fr.com

                                            David M. Barkan
                                            500 Arguello Street, Suite 500
                                            Redwood City, CA 94063
                                            (650) 839-5070
                                            barkan@fr.com

                                        **COUNSEL FOR PLAINTIFF**
                                        **VOLTERRA SEMICONDUCTOR LLC**

# EXHIBIT 17

| From: | Aaron Pirouznia <pirouznia@fr.com> |
|---|---|
| Sent: | Thursday, October 14, 2021 1:45 PM |
| To: | Lavenue, Lionel; David Barkan; Steinberg, Bob (CC) |
| Cc: | Jones, Forrest; Ecklund, Steve; arussell@shawkeller.com; Hines, Lisa; Cremer, John (DC); Moore, Matthew (DC); Cassady, R. Benjamin; Schulz, Bradford; Ravula, Kumar (CH); Yeh, Thomas (LA); Blaylock, Yvette; SKMPS@shawkeller.com; Jones, Forrest; nhoeschen@shawkeller.com; SKStaff@shawkeller.com; kkeller@shawkeller.com; Lin, Leon; Robert Oakes; Noel Chakkalakal |
| Subject: | RE: [Volterra v. MPS] |

Lionel,

We disagree that 12 hours is warranted for Dr. Dickens and that Mr. Viviani's interview warrants a second deposition. MPS already questioned Mr. Viviani regarding the factual bases that Dr. McDuff relied upon.

Nevertheless, in yet another attempt to compromise, Volterra is willing to put Dr. Dickens up for 12 hours, but as I previously noted, Dr. Dickens must teach on Tuesdays. Therefore, Dr. Dickens can begin at 8:30 CT on Tuesday, but he would need to take a break from 11:30-3 CT.

Volterra will also agree to put Mr. Viviani up for an additional hour of deposition testimony, limited to the meeting he had with Dr. McDuff. Mr. Viviani is available 10/15, 10/18 from 1-5 PT, or 10/19 after 3 PT.

As for MPS's experts, we accept your proposed deposition dates.

Best regards,
Aaron

---

**From:** Lavenue, Lionel <lionel.lavenue@finnegan.com>
**Sent:** Wednesday, October 13, 2021 5:50 PM
**To:** Aaron Pirouznia <pirouznia@fr.com>; David Barkan <Barkan@fr.com>; Steinberg, Bob (CC) <bob.steinberg@lw.com>
**Cc:** Jones, Forrest <Forrest.Jones@finnegan.com>; Ecklund, Steve <steve.ecklund@finnegan.com>; arussell@shawkeller.com; Hines, Lisa <Lisa.Hines@finnegan.com>; Cremer, John (DC) <john.cremer@lw.com>; matthew.moore@lw.com; Cassady, R. Benjamin <R.Benjamin.Cassady@finnegan.com>; Schulz, Bradford <Bradford.Schulz@finnegan.com>; Ravula, Kumar (CH) <surendrakumar.ravula@lw.com>; Thomas.Yeh@lw.com; Blaylock, Yvette <Yvette.Blaylock@finnegan.com>; SKMPS@shawkeller.com; Jones, Forrest <Forrest.Jones@finnegan.com>; nhoeschen@shawkeller.com; SKStaff@shawkeller.com; kkeller@shawkeller.com; Lin, Leon <Yunzhi.Lin@finnegan.com>; Robert Oakes <RMO@FR.com>; Noel Chakkalakal <chakkalakal@fr.com>
**Subject:** [Volterra v. MPS]

Aaron,

MPS's expert witnesses can be available on the following dates:

- Jansen - October 20
- Hopkins - October 21
- Phinney - October 22*

- Zane - October 25
- Dean - October 28

*Please note that, while Dr. Phinney is available, he will need to take a short break between 2:50-3:20 pm ET for a preexisting commitment.

Further, contingent on the rest of the schedule, we can take Dr. McDuff's deposition on October 21, provided that Alberto Viviani's deposition takes place beforehand, preferably on October 19. We can also accept Dr. Dickens's dates of October 25-26, provided that he is offered for 12 hours total.

Regards,

Lionel

---

**From:** Lavenue, Lionel <lionel.lavenue@finnegan.com>
**Sent:** Wednesday, October 13, 2021 11:09 AM
**To:** Aaron Pirouznia <pirouznia@fr.com>; David Barkan <Barkan@fr.com>; Steinberg, Bob (CC) <bob.steinberg@lw.com>
**Cc:** Jones, Forrest <Forrest.Jones@finnegan.com>; Ecklund, Steve <steve.ecklund@finnegan.com>; arussell@shawkeller.com; Hines, Lisa <Lisa.Hines@finnegan.com>; Cremer, John (DC) <john.cremer@lw.com>; matthew.moore@lw.com; Cassady, R. Benjamin <R.Benjamin.Cassady@finnegan.com>; Schulz, Bradford <Bradford.Schulz@finnegan.com>; Ravula, Kumar (CH) <surendrakumar.ravula@lw.com>; Thomas.Yeh@lw.com; Blaylock, Yvette <Yvette.Blaylock@finnegan.com>; SKMPS@shawkeller.com; Jones, Forrest <Forrest.Jones@finnegan.com>; nhoeschen@shawkeller.com; SKStaff@shawkeller.com; EXT- kkeller@shawkeller.com <kkeller@shawkeller.com>; Lin, Leon <Yunzhi.Lin@finnegan.com>; Robert Oakes <RMO@FR.com>; Noel Chakkalakal <chakkalakal@fr.com>
**Subject:** RE: [Volterra v. MPS]

Aaron,

We disagree that 10.5 hours is enough. You state that Dr. Dickens does not need to be deposed for additional time because "there are only three asserted patents." However, we note that both cases, that we provided to you, concerned a single patent, not three. *Novartis Pharmaceuticals Corp. v. Accord Healthcare Inc.*, C.A. No. 18-1043-LPS, D.I. 216 (D. Del. Oct. 25, 2018); *The Gillette Company LLC v. Dollar Shave Club, Inc.*, C.A. No. 15-1158-LPS, D.I. 648 (D. Del. Jan. 3, 2019). Further, in *The Gillette Company LLC v. Dollar Shave Club, Inc.*, C.A. No. 15-1158-LPS, D.I. 648 (D. Del. Jan. 3, 2019), the expert at issue was only one of two experts who were offering an opinion on invalidity of the same, single asserted patent. As a compromise, we can agree to 12 hours total.

Additionally, we ask that you provide dates for a second deposition of Alberto Viviani. Dr. McDuff relies multiple times on undisclosed "interviews" with Mr. Viviani as the basis of his opinion, and MPS has a right to examine him about these interviews.

We will consider the dates and respond soon.

Regards,
Lionel

---

**From:** Aaron Pirouznia <pirouznia@fr.com>
**Sent:** Tuesday, October 12, 2021 5:38 PM
**To:** Lavenue, Lionel <lionel.lavenue@finnegan.com>; David Barkan <Barkan@fr.com>; Steinberg, Bob (CC) <bob.steinberg@lw.com>
**Cc:** Jones, Forrest <Forrest.Jones@finnegan.com>; Ecklund, Steve <steve.ecklund@finnegan.com>; arussell@shawkeller.com; Hines, Lisa <Lisa.Hines@finnegan.com>; Cremer, John (DC) <john.cremer@lw.com>;

# EXHIBITS 18 - 19
# Redacted in their Entirety

# EXHIBIT 20

10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel: +1.424.653.5500  Fax: +1.424.653.5501
www.lw.com

LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

January 14, 2022

**VIA EMAIL**

Robert M. Oakes, Esq.
Fish & Richardson, P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899-1114

Re:   *Volterra Semiconductor LLC v. Monolithic Power Systems Inc.,*
No. 1:19-cv-02240-CFC (Del. 2019)

Counsel:

We write in response to your last letter dated November 1, 2021 regarding our request that Volterra withdraw its indirect infringement claims against MPS that are premised on the alleged direct infringement acts by NVIDIA that are authorized by your April 2020 covenant not to sue ("CNS").[1] These allegations continue to be legally baseless, and must be withdrawn.

As explained in our October 11, 2021 letter, Volterra's CNS authorized NVIDIA and its customers to practice the Asserted Patents in connection with the "use" and "sale" of the NVIDIA products accused in this above-captioned case, and the CNS's reservation language does not impact that authorization.  *See* pp. 4-6.  Your one-paragraph response does not address this explicit authorization—indeed, it fails to raise any new facts or contrary law to undermine MPS's argument, and does not even attempt to distinguish any of the supportive cases cited in our letter. *See* p. 2.  Instead, your only substantive response was to point to the alleged direct infringement by potential ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.*  But those parties are irrelevant to the claim that MPS raised in its letter, which is directed to MPS's alleged inducement of ***NVIDIA***.

Shortly after your last letter, MPS moved for summary judgment of no indirect infringement because the CNS authorized NVIDIA and its customers to use and sell the NVIDIA products accused in this case—the same issue raised in our letter.  D.I. 276.  You responded in an opposition brief filed on December 30, 2021.  D.I. 301.  But again, you failed to raise any material dispute of fact or law undermining the explicit authorization the CNS provides to NVIDIA and its

---

[1] With regard to the issue of standing, MPS understands that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Nonetheless, MPS reserves its rights regarding any further standing issues, including but not limited to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮.

**LATHAM&WATKINS**LLP

customers, as discussed in detail in our Reply filed on January 7, 2022 (D.I. 327), which is enclosed and incorporated herein by reference.

Volterra's repeated refusal to explain how, contrary to settled law, it can maintain induced infringement allegations based on an explicitly authorized direct infringer, reaffirms that Volterra has no basis to accuse MPS of induced infringement.  As such, MPS again requests that Volterra withdraw these meritless claims and reserves all rights to seek attorneys' fees, costs and expenses and any other appropriate sanctions should Volterra refuse.

Respectfully,

*/s/ Bob Steinberg*

Bob Steinberg
of LATHAM & WATKINS LLP

Enclosure:
- [SEALED] MPS's Reply Brief in support of its Motion for Summary Judgment of No Infringement Based on Volterra's Covenant Not to Sue filed in the above-captioned case on January 7, 2022 (D.I. 327).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOLTERRA SEMICONDUCTOR LLC, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 19-2240-CFC-SRF |
| v. | ) ) | **CONFIDENTIAL —** |
| MONOLITHIC POWER SYSTEMS, INC., | ) ) ) | **FILED UNDER SEAL** |
| Defendant. | ) ) | |

## NO. #1: DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF NO INDIRECT INFRINGEMENT BASED ON VOLTERRA'S COVENANT NOT TO SUE

OF COUNSEL:
Bob Steinberg
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA  90067
(424) 653-5500

Matthew J. Moore
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

Lionel M. Lavenue
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
Two Freedom Square
Reston, VA 20190-5675
(571) 203-2750

Surendra K. Ravula
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-6555

R. Benjamin Cassady
Forrest A. Jones
Chen Zang
Bradford C. Schulz
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: January 7, 2022

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................1

II.   ARGUMENT..................................................................................1

    A.    The CNS Authorizes NVIDIA and Its Customers to Use, Sell, and Offer For Sale the NVIDIA Accused Products..............................1

    B.    MPS Cannot Be Liable for Indirect Infringement Based on Authorized Acts of Alleged Direct Infringement. ...............................4

    C.    Volterra's Parol Evidence is Immaterial. ...............................................6

    D.    The CNS Expressly Includes Retroactive Application. ........................6

III.  CONCLUSION...............................................................................7

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Cty. of San Diego v. Ace Prop. & Cas. Ins. Co.*,
   37 Cal. 4th 406 (2005) ............................................................................... 5

*Evolved Wireless, LLC v. HTC Corp.*,
   840 F. App'x 586 (Fed. Cir. 2021**)** ......................................................... 6

*Glob. Commc'ns, Inc. v. Directv, Inc.*,
   No. 4:12CV651-RH/CAS, 2015 WL 10906061 (N.D. Fla. Nov. 16, 2015) ........ 4

*JVC Kenwood Corp. v. Nero, Inc.*,
   797 F.3d 1039 (Fed. Cir. 2015) ................................................................. 4

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
   572 U.S. 915 (2014) ................................................................................... 4

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
   946 F.3d 1354 (Fed. Cir. 2020) ................................................................. 3

*Novartis Corp. v. Ben Venue Lab'ys, Inc.*,
   271 F.3d 1043 (Fed. Cir. 2001) ................................................................. 3

*Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pennsylvania*,
   745 F.2d 248 (3d Cir. 1984) ...................................................................... 3

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
   849 F.3d 1360 (Fed. Cir. 2017) ................................................................. 3

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
   563 F.3d 1271 (Fed. Cir. 2009) .............................................................. 3, 6

## STATUTES

35 U.S.C. §271(a) ...................................................................................... 2

ii

## I.   INTRODUCTION

MPS's motion (D.I. 276, "Br.") is based on the well-settled legal principle that an indirect infringement claim cannot be maintained without an underlying act of direct infringement.  Since Volterra does not dispute that its CNS expressly authorized NVIDIA and its customers to use, sell, and offer for sale the NVIDIA Accused Products, these acts cannot directly infringe.  Thus, as a matter of law, there can be no indirect infringement premised on these authorized acts.

Volterra offers no response to this legal argument.  D.I. 301 ("Opp.").  Nor does it raise any material fact dispute.  D.I. 302 ("PSOF").  Instead, Volterra's opposition resorts to obfuscation, attacking irrelevant arguments that MPS never makes.  Contrary to Volterra's mischaracterizations, MPS's theory of no indirect infringement is not, and need not, be premised on any license granted to MPS or patent exhaustion defense.  Because Volterra is unable to meaningfully respond to any of MPS's arguments, summary judgment should be granted.

## II.   ARGUMENT

### A.   The CNS Authorizes NVIDIA and Its Customers to Use, Sell, and Offer For Sale the NVIDIA Accused Products.

Volterra does not dispute that the CNS authorizes NVIDIA and its customers to use, sell, and offer for sale the NVIDIA Accused Products.  Volterra fails to identify any unauthorized acts of direct infringement by NVIDIA and its customers.  █████████████████████████████████████████  the

1

CNS authorizes—using, selling, and offering for sale the NVIDIA Accused Products, ***not*** making or importing, the NVIDIA Accused Products.  *See* PSOF ¶5; D.I. 277 ("DSOF") ¶5.  Because the CNS authorizes the very acts that Volterra accuses, ███████████████████████████████████.  Thus, there can be no indirect infringement based on these acts.  Br. 6-8.

Volterra's argument that the CNS excludes acts of ████████████ ███████████████████████████████ is irrelevant to the alleged acts of direct infringement subject to this motion.  Opp. 3-4.  ████████████████ ████████████████████████████████, and cannot be newly raised.  *Cf.* DSOF ¶5.  Even if Volterra were not precluded, such allegations have no evidentiary support.  Volterra cites no evidence that ████████████ █████████████████████████████████ PSOF ¶¶11-13.  ██ ██████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████ Ultimately, even those acts are not material because Volterra cites no evidence that they occur ***in the United States***, a requirement for infringement.  35 U.S.C. §271(a).

---

[1] Volterra also fails to show that these other third parties directly infringe.  But MPS will address that theory in a separate motion to exclude.

2

█████████████████████████████

████████████████████████████

███████████████████████████

█████████████████████████████

████████  Such conclusory allegations cannot preclude summary judgment.  *See Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pennsylvania*, 745 F.2d 248, 262 (3d Cir. 1984) (no "issue of material fact" raised where "expert's opinion" failed to "find some support in the record"); *Novartis Corp. v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1050-51 (Fed. Cir. 2001).

Volterra relies on the CNS's statement that it is not "a license" (Opp. 7), but that does not undermine the effect of the authorization it provides.  Br. 9.  The difference between a CNS and a license is "only one of form, not substance—both are properly viewed as 'authorizations.'" *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1276 (Fed. Cir. 2009);[2] *see also Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1370 (Fed. Cir. 2017); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 946 F.3d 1354, 1360-61 (Fed. Cir. 2020).

---

[2] *TransCore*'s CNS authorized acts ("making, using, offering for sale, selling, or importing") without limitation, as here.  *Id.* at 1276.  Volterra's narrow reading that limits its authorization to the patent exhaustion context conflicts with the broad language of the CNS and is unsupported by case law.  *Cf.* Opp. 4-8.

**B.     MPS Cannot Be Liable for Indirect Infringement Based on Authorized Acts of Alleged Direct Infringement.**

Volterra does not dispute MPS's legal basis—MPS cannot be liable for indirect infringement if the underlying alleged directly infringing act was authorized. Br. 6-8.   This is well-settled law, which Volterra does not even attempt to distinguish.  *Id.*; *e.g.*, *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 922 (2014) ("where there has been no direct infringement, there can be no inducement of infringement"); *JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1045–46, 1048 (Fed. Cir. 2015) (summary judgment of no indirect infringement because the alleged direct infringement was authorized); *Glob. Commc'ns, Inc. v. Directv, Inc.*, No. 4:12CV651-RH/CAS, 2015 WL 10906061, at *6 (N.D. Fla. Nov. 16, 2015) ("summary judgment" of no indirect infringement by upstream defendants because the alleged direct infringer was "authorized" by a covenant not to sue).

Unable to refute the settled law, Volterra's opposition focuses on attacking strawman arguments that MPS never makes, mischaracterizing MPS's motion as arguing that: 1) the CNS authorizes ***MPS*** to practice the Asserted Patents through an explicit or implied license (Opp. 6-8), 2) patent exhaustion bars Volterra's indirect infringement claims (Opp. 5), and 3) the CNS's reservation language has no effect (Opp. 5-8).

MPS does not rely on these theories, and none of them undermine the undisputed legal conclusion that there can be no indirect infringement without direct

4

infringement.  The first two arguments mischaracterize MPS's legal theory, which does not require MPS *itself* to be authorized by Volterra (e.g., through any explicit or implied license), or rely on patent exhaustion.[3]  Rather, MPS's theory is one of logical consequence recognized by well-settled law—since the underlying acts (by NVIDIA and its customers) are authorized by the CNS, they are no longer "infringing" acts that MPS can induce.  Br. 6-8.

Contrary to Volterra's third argument, the relief sought in this motion (i.e., no indirect infringement based on acts authorized by the CNS) does not contradict the reservation language of the CNS.  The scope of Volterra's reservation is limited: it only reserves the right to "seek damages from MPS based upon its sales or other business transactions with NVIDIA that *are found to infringe* the Asserted Patents." Br., Ex. 1 (emphasis added).  Under the CNS, Volterra is not precluded from suing MPS based on other theories of infringement, as long as they do not contravene the express authorization the CNS provides.  *Cty. of San Diego v. Ace Prop. & Cas. Ins. Co.*, 37 Cal. 4th 406, 415, 118 P.3d 607, 612 (2005) (Under California law, "[i]f contractual language is clear and explicit, it governs.").  Because the CNS expressly authorizes NVIDIA and its customers to use, sell, and offer for sale the NVIDIA

---

[3] *Exelis* is inapposite.  *Cf.* Opp. 7-8.  There, the Court rejected defendants' arguments that a covenant not to sue precluded infringement based on *patent exhaustion* and *implied license*, *not* MPS's legal theory—no indirect infringement if the underlying alleged direct infringement is authorized.

Accused Products, MPS cannot be "found to [indirectly] infringe" for inducing those acts or be liable for any corresponding damages.

### C.    Volterra's Parol Evidence is Immaterial.

Volterra seeks to admit parol evidence to create a factual dispute about whether the CNS is characterized as a license or a covenant not to sue.  Opp. 8-9. This argument leads nowhere.

MPS disputes that parol evidence is appropriate or would even create a dispute of fact.  Regardless, the parol evidence is immaterial—what matters is that both a covenant not to sue and a license are "properly viewed as authorizations." *TransCore*, 563 F.3d at 1276; *id.* (affirming exclusion of parol evidence because parties' "intent" regarding covenant not to sue was "irrelevant" to whether the sales were "authorized"); *see also Evolved Wireless*, *LLC v. HTC Corp.*, 840 F. App'x 586, 588 n.2 (Fed. Cir. 2021).

### D.    The CNS Expressly Includes Retroactive Application.

Volterra argues that summary judgment should not be granted at least as to indirect infringement claims based on "direct infringement" by NVIDIA and its customers occurring ***before*** the date of the CNS.  Opp. 9-11.  But the CNS expressly contradicts Volterra's interpretation.

Volterra agrees that the CNS encompasses "NVIDIA products in which the MPS Accused Products ***have already been*** designed into the NVIDIA product ***prior***

*to the date of this [CNS] letter.*"  PSOF ¶¶2, 7 (emphases added); DSOF ¶2.  Thus, this language makes clear that any pre-CNS use, sale, or offer for sale of the accused NVIDIA product (which the CNS defines as including the MPS Accused Products) must fall under the scope of the CNS.  DSOF ¶2.  Volterra fails to address this explicit retroactive language, instead relying on inapposite cases that are silent on retroactivity.  Opp. 9-11.

## III.    CONCLUSION

In light of the above, the Court should grant summary judgment of no indirect infringement premised on the authorized acts of NVIDIA and its customers.

<table>
<tr><td>

OF COUNSEL:
Bob Steinberg
LATHAM & WATKINS LLP
10250 Constellation Blvd., Suite 1100
Los Angeles, CA  90067
(424) 653-5500

Matthew J. Moore
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

</td><td>

*/s/ Nathan R. Hoeschen*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

</td></tr>
</table>

Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Two Freedom Square
Reston, VA 20190-5675
(571) 203-2750

Surendra K. Ravula
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-6555

R. Benjamin Cassady
Forrest A. Jones
Chen Zang
Bradford C. Schulz
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Dated: January 7, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the Court's November 6, 2019 Standing Order, I hereby confirm that this brief complies with the type and number limitations set forth in the Standing Order. I certify that this document contains 1,503 words, which were counted using the word count feature in Microsoft Word, in 14-point Times New Roman font. The word count does not include the cover page, tables, or the counsel blocks.

/s/ Nathan R. Hoeschen
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on January 7, 2022, this

document was served on the persons listed below in the manner indicated:

**BY EMAIL**

Robert M. Oakes
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19899
(302) 652-5070
rmo@fr.com

David M. Barkan
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
(650) 839-5070
barkan@fr.com

Aaron P. Pirouznia
Noel F. Chakkalakal
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070
pirouznia@fr.com
chakkalakal@fr.com

*/s/ Nathan R. Hoeschen*
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawekeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

# EXHIBIT 21

```
1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3    VOLTERRA SEMICONDUCTOR,   )
     LLC                       )
4             Plaintiff,       )
                               )   C.A. No. 19-2240-CFC
5      v.                      )
                               )
6    MONOLITHIC POWER SYSTEMS, )
     INC.,                     )
7                              )
              Defendant.       )

8

9

10

11                     Tuesday, August 2, 2022
                             9:00 a.m.
12                         Motion Hearing

13

14                        844 King Street
                       Wilmington, Delaware
15

16    BEFORE: THE HONORABLE COLM F. CONNOLLY
      United States District Court Judge
17

18

19    APPEARANCES:

20
                   FISH & RICHARDSON, P.C.
21                 BY:  ROBERT OAKES, ESQ.
                   BY:  DAVID M. BARKAN, ESQ.
22                 BY:  AARON PIROUZNIA, ESQ.

23                        Counsel for the Plaintiff

24

25
```

 1     time somebody in the Federal Circuit stated it explicitly.

 2     But I think it's very clear from *TransCore* that that

 3     statement, that a covenant not to sue is a license, just

 4     follows necessarily from what the nature of a patent right

 5     is.  It's the right to exclude.  And therefore, if you say

 6     to somebody, I'm not going to sue you for infringement,

 7     then you've effectively granted them a license.  That's

 8     all that *TransCore* says.

 9            What do they add that's new to the mix?  Was

10     there a case before it that said, oh, a covenant not to

11     sue is not a license?

12            **MR. BARKAN:**  No, Your Honor.

13            **THE COURT:**  Yeah.

14            **MR. BARKAN:**  The balance of the parties, and

15     the parties -- when I refer to the "parties" here, I mean

16     the patent owner Volterra and Nvidia were trying to

17     balance here was, Volterra was entitled to protect its

18     patent rights, including seeking damages against the

19     components suppliers like MPS, but doing it in a way that

20     did not disrupt Nvidia's business, which is why the

21     covenant talks about we won't sue Nvidia, and we also

22     won't seek an injunction that would disrupt their supply.

23            **THE COURT:**  I know.  I get what they were

24     trying to do.  But the problem is, once they relinquish

25     the right to exclude Nvidia, and therefore relinquish any

1    claim they could have for direct infringement against

2    Nvidia, they've relinquished their right to go after third

3    parties for inducing those exact conduct or those exact

4    activities, rather, that would otherwise have formed the

5    basis of a direct infringement claim.

6        Like I said, you can't -- you just can't have

7    it both ways, it seems to me.  I understand what their

8    purpose was, but the law doesn't allow it.

9        **MR. BARKAN:**  Your Honor, should I move on to

10   the --

11       **THE COURT:**  Well, I just think -- let's just be

12   clear.  I mean, I think you have an argument about

13   importation.

14       **MR. BARKAN:**  Yes.

15       **THE COURT:**  Okay?  And I'll hear from -- but I

16   don't think there's even disagreement about it.

17       But it seems to me that, you know, whether we

18   want to call this a summary judgment motion or a motion in

19   limine or, you know, like you are precluded from basing

20   direct -- from basing indirect claims of infringement to

21   the extent they are based on direct infringement by Nvidia

22   that is authorized under the covenant not to sue.  That

23   seems to me kind of a succinct way of stating what should

24   be allowed.

25       Now, why don't we just discuss how this should

 1    be entered.

 2            **MR. BARKAN:**  There is one other issue --

 3            **THE COURT:**  Oh, I'm sorry.  Okay.

 4            **MR. BARKAN:**  -- in terms of retroactivity.

 5            **THE COURT:**  Well, see, that goes to the date

 6    and the products.  And I agree with you, that there could

 7    be some issue about that.  I totally agree with you on

 8    that.

 9            So how do you want to address it?

10            **MR. BARKAN:**  In terms of summary judgment

11    versus motion in limine or --

12            **THE COURT:**  Yeah.  I mean, in other words -- I

13    think -- in other words, I think we all know what the

14    issue is, and so I don't know that I can enter this

15    summary judgment motion as it's been offered to me.

16            **MR. BARKAN:**  Right.

17            **THE COURT:**  Right?  I don't think I can.  But I

18    think the rules of the road going forward are very clear

19    to me, except when it comes to identifying the specific

20    products and the specific time frame.

21            So do you want to address that or do you all

22    discuss that?

23            **MR. BARKAN:**  I'll address it just very briefly,

24    Your Honor.

25            The products, I don't think, are going to be an

1    issue in the sense that all of the accused products fall

2    within the definition in the letter.

3              **THE COURT:**  Okay.

4              **MR. BARKAN:**  But I do think that the time frame

5    is an issue.  We don't think there is retroactive

6    application and defendants do.

7              **THE COURT:**  You think there is retroactive?

8              **MR. BARKAN:**  No, that CNS does not apply

9    retroactively.

10             **THE COURT:**  Correct.  Right.  Right.

11             All right.  You want to pull up the language,

12   maybe we can walk through that?

13             **MR. BARKAN:**  Go to Slide 22.

14             **THE COURT:**  Incidentally, who signed this

15   letter?  Is it a lawyer?

16             **MR. BARKAN:**  No, Your Honor.  It's a business

17   person.

18             **THE COURT:**  If you can say, I mean, who drafted

19   the letter?  Was it a lawyer who drafted it?

20             **MR. BARKAN:**  I don't think we can say,

21   Your Honor.

22             The language of the letter all refers to future

23   activities, the discussion and description of the product

24   and being already designed in, is a way of defining the

25   product.  You know, these products take typically, you

89

1    know, years to go from design phase to actual

2    commercialization.

3             And so it was way of saying, anything you've

4    designed in up to X date, is going to be part on the

5    defined product universe.  That's all that language was

6    doing.

7             **THE COURT:**  All right.

8             **MR. BARKAN:**  But otherwise, there's nothing

9    retroactive in the language.  It's all future looking.

10            **THE COURT:**  That's weird language.  I mean, it

11   almost sounds like -- I mean, I've got to tell you, you

12   know, my first read of it was that it only applies

13   retroactively, you know?  It's like, what's frozen in time

14   right now, what's in the design or has been produced is

15   covered.

16            **MR. BARKAN:**  That was just a way of defining

17   the product.  The idea here was, we don't want to disrupt

18   your business going forward.  We obviously -- it's not

19   going to deal with disruption in the past, because the

20   past has already happened.  And so going forward, we don't

21   want to interrupt your business.

22            As the Court can imagine, this was a common

23   customer of both the plaintiff and the defendant, so...

24            **THE COURT:**  Well, you know, let me just press

25   you.  Let's look at the first highlighted language.

1    Quote, "Maxim and its subsidiaries do not intend to

2    disrupt Nvidia's usage or commercialization of Nvidia

3    products in which the MPS accused products have already

4    been designed into the Nvidia product prior to the date of

5    this letter."

6            So that, I think in plain English, says, we

7    don't want to disrupt your usage of or sale or

8    commercialization of these products to the extent they

9    have already been incorporating the MPS accused products.

10           **MR. BARKAN:**  I think that's correct.

11           **THE COURT:**  All right.

12           **MR. BARKAN:**  But, again, to disrupt someone's

13   commercialization, you can't disrupt what they already

14   sold.  That's out the door.

15           **THE COURT:**  No, no, agreed.  But what I'm

16   getting at is, what it's saying is, then -- it is looking

17   to the future.  But if there's any change in the design,

18   or if there's a new MPS product incorporated into the

19   future Nvidia product, it would not be covered by this.

20           Would you agree with that?

21           **MR. BARKAN:**  Yes.  There are some exceptions

22   about -- there's language here, if it's past Nvidia

23   standard X release product milestone prior to May 31,

24   2022.  There was some allowance for modifications going

25   forward to that same product.

1      **THE COURT:**  I mean, you know, I think what

2   hurts you is the next sentence, right, where we really

3   have the covenant not to sue.  It's just not limited

4   temporally.

5           I mean, to your point, that the sentence I

6   read, which I told you when I first read it, I thought,

7   well, we're only talking retroactive in a way, right?

8   These products are already frozen in time, at least.

9      **MR. BARKAN:**  Yes.

10      **THE COURT:**  Okay.  But it's the next sentence.

11   And it doesn't -- where's the qualification or any

12   language that would suggest that it doesn't apply

13   retroactively?

14      **MR. BARKAN:**  I think it has to be read in

15   context of the overall letter, including the last

16   paragraph, which is really talking about, we're not trying

17   to disrupt your supply of components.  It has to be read

18   as an overall package that way.

19      **THE COURT:**  Yeah.  I mean, I read that last

20   sentence that you're referring to, which, for the record

21   is, quote, "to further avoid disruption to Nvidia, Maxim

22   and its subsidiaries will not seek to use the asserted

23   patents to enjoin or otherwise prevent MPS from providing

24   MPS accused products to Nvidia for use in the above

25   described Nvidia products," unquote.

1          That, just to me, just says, we're not going to

2    ever seek to enjoin MPS from being a supplier to Nvidia.

3    That's all it is.

4          And I would even agree with you that that

5    sentence by itself does not preclude or would not preclude

6    Volterra from seeking damages.  I would agree with that,

7    incidentally.  That's in your briefing, and I don't

8    dispute that.

9          And I think that's trying to make clear to

10   Nvidia that, don't worry, we're not going to seek to

11   enjoin.

12         I just don't think that's enough to cure or to

13   serve as a caveat or qualification or to render ambiguous

14   the statement that Maxim covenants not to sue Nvidia or

15   Nvidia subs, affiliates, or customers for the infringement

16   of the asserted claims in connection with the use or sale

17   of the above described products or their derivatives.  It

18   doesn't say future sale use.  You know, it's unambiguous.

19         Now, neither of you, I don't -- well, maybe you

20   have, but is -- what law applies to the interpretation of

21   this covenant not to sue?

22         **MR. BARKAN:**  California law, Your Honor.

23         **THE COURT:**  All right.  Is it different from

24   Delaware law, that an unambiguous contract can be -- does

25   not require, in fact, does not permit resort to extrinsic

1    evidence to interpret; is that right?

2            **MR. BARKAN:**  Yes.  I mean, if there an

3    ambiguity, then parol evidence is permitted.  But if there

4    is no ambiguity, then it's not.

5            **THE COURT:**  Yeah, and I just don't see an

6    ambiguity.  Thank you for pointing that out.

7            Anything else you want to --

8            **MR. BARKAN:**  No, Your Honor.

9            **THE COURT:**  All right.  So maybe -- let's hear

10   from the defendant to figure out, like, really how do we,

11   essentially, implement this.

12           All right.  Thank you.

13           **MR. STEINBERG:**  Your Honor, there were a couple

14   of things that you talked about that I wanted to address,

15   but since this is on the screen, maybe I can hit that

16   first.

17           **THE COURT:**  Sure.

18           **MR. STEINBERG:**  I understand the issue that

19   you're raising.  It's important to understand the history

20   a little bit of where this letter came from as background.

21           And the letter -- well, the lawsuit was filed

22   in December 2019.  Lawsuit was filed against MPS, not

23   Nvidia, right.

24           Right after the lawsuit was filed in January,

25   the parties started talking to one another.  Nvidia

1    started talking to Maxim Volterra immediately.  Okay.  And

2    then there was a negotiation over this letter, which

3    resulted in the April letter.

4              THE COURT:  Well, just to be clear, not with

5    you involved, just between those guys?

6              MR. STEINBERG:  Those guys.

7              THE COURT:  Okay.  All right.

8              MR. STEINBERG:  Right.  Well, not these guys,

9    but other guys.

10             THE COURT:  Okay.  I cannot imagine what

11   somebody reading this transcript, "not these guys, those

12   guys."

13             But I think I understand what you're saying is

14   that, Volterra's lawyers, but not the ones sitting at this

15   table or somebody --

16             MR. STEINBERG:  Somebody.

17             THE COURT:  -- was talking with --

18             MR. STEINBERG:  We don't know.

19             THE COURT:  -- with Nvidia's lawyers or their

20   people.

21             MR. STEINBERG:  They may have been, but we

22   don't know.

23             THE COURT:  We don't know.  Okay.  Good.

24             MR. STEINBERG:  Right.  So the point is that

25   Nvidia was concerned about this lawsuit affecting them,

 1    obviously.

 2              **THE COURT:**  Sure.

 3              **MR. STEINBERG:**  And so they wanted a covenant

 4    not to sue to absolve them of any concerns about their

 5    use, if there was any, and then the commercialization.

 6    Commercialization of the product comes after this letter.

 7    The products don't get shipped for sometime after.

 8              **THE COURT:**  Okay.  But they want protection for

 9    it when they start selling them.

10              **MR. STEINBERG:**  They do, and they also want

11    protection if they were doing testing or valuation.

12              **THE COURT:**  That's what a use is.  I get that.

13              **MR. STEINBERG:**  Yeah.  And so that covenant not

14    to sue would protect them with regard to the use prior to

15    the letter, because they were going to get evaluation

16    boards and other things to use.

17              **THE COURT:**  I've already ruled your way on that

18    I'm with you.

19              **MR. STEINBERG:**  Okay.

20              **THE COURT:**  I think it's unambiguous.  I mean,

21    in other words, I just -- and I appreciate counsel's

22    attempts.  But I don't think this limits the covenant not

23    to sue at all.  I think it's very --

24              **MR. STEINBERG:**  Well, from a time frame

25    perspective, I would say this:  The parties were talking

1   about commercialization that was going to happen in the

2   future because the products were -- but I want to make

3   sure that Nvidia's use that it made, prior to the letter,

4   was covered by that covenant not to sue, because that was

5   the --

6            **THE COURT:**  I already said that.  I think I've

7   said it three times.

8            **MR. STEINBERG:**  I don't know if counsel wants

9   to -- because the way I heard it was that I -- and the way

10   I've read it in their brief is, everything that happened

11   after that letter is covered by the covenant.

12            **THE COURT:**  I think we just had a very, very

13   respectful discussion about this or argument, and Volterra

14   made their best argument, and I don't find it persuasive.

15            **MR. STEINBERG:**  Okay.  Well, then you and I are

16   on the same page.  I just wanted to make clear.

17            **THE COURT:**  Right.  And, you know, I think it's

18   pretty clear, if you go back and read the transcript, that

19   what I'm saying is that the sentence that -- is it

20   Mr. Barkan?

21            **MR. BARKAN:**  Yes, Your Honor.

22            **THE COURT:**  Okay.

23            -- that Mr. Barkan was pointing me to, or the

24   two sentences, one precedes and then the other follows

25   what seems to me the dispositive sentence, which is an

1  unambiguous covenant not to sue.  And I don't think that

2  the sentence that precedes or follows renders any

3  ambiguity to the covenant not to sue sentence, which is

4  not temporally limited.

5          **MR. STEINBERG:**  Yeah.

6          **THE COURT:**  So we're on the same page.

7          **MR. STEINBERG:**  Okay.  While this is up, I'm

8  going to address another issue having to do with the

9  "make" and "importation."  Okay.

10         **THE COURT:**  Yep.  Well, he's already said

11  "make" is not on the table.

12         **MR. STEINBERG:**  Not on the table.  Okay.

13         **THE COURT:**  It's "importation."

14         **MR. STEINBERG:**  So you and I are on the same

15  page with that.

16         **THE COURT:**  Well, I think all three of us are

17  on the same page.  Mr. Barkan is nodding his head

18  affirmatively.

19         **MR. BARKAN:**  Yes, just with a caveat,

20  Your Honor, that for purposes of the appellate record.

21         **THE COURT:**  Oh, listen, for purposes of the

22  appellate record, you're off to the races.  You're going

23  to tell the Federal Circuit I got it wrong and that you

24  are -- you don't -- you can somehow promise a third party

25  that, you know, you're letting them off the hook and at

1    the same time, you're going to sue another party for

2    induced infringement based on what you're letting the

3    Nvidia off the hook.

4              Yeah, I get it.  And I don't think you can do

5    that.

6              **MR. BARKAN:**  We just want to be clear we're not

7    stipulating the --

8              **THE COURT:**  I fully hear you.  And I'm sure

9    we're going to trial as a result.

10             **MR. STEINBERG:**  On the importation issue,

11   Your Honor, just a couple thoughts about that.

12             Number 1, the infringement contentions, I just

13   want to make a distinction.  Perhaps, you have already

14   identified this.

15             The plaintiff is pointing to the expert report,

16   not the infringement contentions with regard to importing.

17   So that allegation --

18             **THE COURT:**  Well, wait.  They're going to have

19   to have -- see, this goes to what is the relief you really

20   want here, right?

21             **MR. STEINBERG:**  Right.

22             **THE COURT:**  They're not going to be able to get

23   a -- to avoid JMOL if all they have on importation is

24   their expert said "Nvidia's importing it."

25             **MR. STEINBERG:**  That's what they're saying.

1          THE COURT:  Okay.  Well, that's not going to

2     survive JMOL.  They need a fact witness to come in and say

3     "Nvidia is importing it."

4          MR. STEINBERG:  Yeah.  And they -- that has not

5     happened.

6          THE COURT:  Well, but that's not before me.

7          MR. STEINBERG:  Right.

8          THE COURT:  I don't think.

9          MR. STEINBERG:  No, and I'll tell you why.

10    This is what concerns me.  Because that only came up in

11    their opposition briefs.  Since it wasn't in their

12    infringement contentions, we were looking at the four

13    corners of the covenant not to sue and the infringement

14    contentions.  All the words in the covenant not to sue

15    that you're familiar with were in the infringement

16    contentions, the amended infringement contentions one year

17    ago, their amended.

18          But not "make" or "importation."  Not

19    "importation."  That's not in the infringement

20    contentions.

21          Then later, Dickens, their expert, has a couple

22    sentences that are in their statement of facts.  And

23    that's all they have.

24          THE COURT:  Well, let's walk through -- so that

25    seems to be a Rule 26 issue or a motion in limine issue

1    that they haven't -- that they didn't allege in their

2    infringement contentions, at any point, "importation,"

3    therefore --

4            **MR. STEINBERG:**  We're going to move to exclude

5    it under in limine, Your Honor, yes.  I just want to point

6    that out.

7            **THE COURT:**  That's fine.

8            **MR. STEINBERG:**  And, yeah, you're absolutely

9    right.  This is a motion, from the very beginning, that

10   was only about the four corners of that letter.  We were

11   not going to go any further than that.  That's all we

12   needed to do and then this came up.  I just wanted to have

13   the context.

14           **THE COURT:**  All right.  But here's -- and

15   that's fair.  And that's helpful in terms of -- you know,

16   here's what your proposed order says, you know, "That the

17   Court having considered your motion, it's hereby ordered

18   that the motion is granted."  I mean, I am not sure.

19           So what I'm just trying to work out here is, I

20   mean, I think it would be fair to say "Right now, I'm

21   granting, in part, the motion."  And I don't know that I

22   need to say anything else.

23           I mean, and, you know, I think you need to work

24   this out.  I mean, do you -- like I don't know how you

25   have judgment that -- I mean, maybe what you ought to do

1     is put before me some proposed order.  And it would be

2     something like, you know, "Judgment is granted in your

3     favor insofar as any claims of induced infringement are

4     based on alleged direct infringement by Nvidia, its

5     subsidiaries, affiliates, and customers' use and sale of

6     the accused products."  But we still -- period.

7                 I mean, I think that would probably fairly

8     summarize this.

9                 **MR. STEINBERG:**  That's pretty much what we're

10    doing up there.  I wrote that because after that

11    presentation, post having their opposition brief,

12    recognizing they're trying to bring in "importation."

13    Really, this is what we're asking for.  And it's split

14    between the '986 patent, which is just a method claim.

15    It's just a method claim that's being asserted, Claim 17.

16    And that method claim is just "use."  That's all it would

17    ever cover.  So that one we think you can dismiss

18    entirely.

19                 **THE COURT:**  All right.  Well, let me ask.

20                 Is that true, Mr. Barkan?

21                 **MR. BARKAN:**  No, Your Honor, because there are

22    other third parties who were using the invention.

23                 **THE COURT:**  Yeah.  Delta?  I don't know if

24    Delta --

25                 **MR. STEINBERG:**  I mean, for inducement with

1     regard to the four corners of the letter.  So with regard

2     to Nvidia and the covenant not to sue.

3                   I'm not talking about that.  I know what he's

4     saying.  So, yes, there are --

5                   **THE COURT:**  Well, Mr. Barkan, I mean, this

6     slide that's up there, it does say "because they're solely

7     premised on direct infringement by Nvidia's."

8                   So here's what I would suggest is, I would

9     rephrase it.  I think it's probably better to say, you

10    know, "Having considered the briefing and studied the

11    papers and heard oral argument, the Court is going to

12    grant and deny in part the summary judgment motion.  It's

13    going to grant it to the extent" -- or "It's going to

14    grant judgment in defendant's favor insofar as Volterra's

15    induced infringement claims of the '986 patent are based

16    on alleged direct infringement by Nvidia and its

17    customers' use or sale of the Nvidia products."

18                  And you have to define Nvidia products.  All

19    right.

20                  Why don't you work on that.  And then the same

21    would apply to the second.  And just send me something,

22    and I can sign it.

23                  And, Mr. Barkan, what I would say to you is,

24    your rights are preserved.  Okay.  And I think you've done

25    a really nice job, frankly, even though I'm ruling against

1    you.  But if you could kind of work collaboratively on

2    this, you know, and get it to me no later than Monday.

3            And I really think this should be able to be

4    worked out, that I'm not going to have to fight on this

5    and choose, but all right.

6            **MR. BARKAN:**  I think we should be able to work

7    out language, Your Honor.

8            **THE COURT:**  Okay.

9            **MR. STEINBERG:**  The only other thing I was

10   going to point out, Your Honor, and I will ask you if you

11   want to indulge in my conversation here with you, and that

12   is, with regard to this reservation issue, which we agree

13   with what you're saying.

14           I wanted to point your attention to two cases

15   that you might look at later, or maybe you already have.

16   And the first one is this one.  This is a Supreme Court

17   case, 1964.  And I think this one applies.

18           This is having to do with contributory

19   infringement, but we're not -- you know, the U.S. Supreme

20   Court has said that they're the same for this issue.

21           We're not arguing that MPS is protected by

22   exhaustion or implied license.  We don't need to make that

23   argument because --

24           **THE COURT:**  No.

25           **MR. STEINBERG:**  -- we're not a direct

 1    infringer.  That's where that comes up.

 2            Our argument is simple.  We just provide

 3    components.  Okay.  And that was what the Ford -- this

 4    case was about.

 5            And Ford, they got a license to make these

 6    convertible top structures.  And the question was, who

 7    gets to provide --

 8            THE COURT:  Right.  I think -- you know, I kind

 9    of stayed away from *ARO*, because my recollection of *ARO* is

10    there's another case in the Supreme Court that dealt with

11    *ARO*, right?  There was *ARO1* and *ARO2*?

12            MR. STEINBERG:  This is *ARO2*.

13            THE COURT:  This is *ARO2*?  Okay.

14            MR. STEINBERG:  That's ARO2.

15            THE COURT:  Right?

16            MR. STEINBERG:  You're right.

17            So *ARO1* made a determination that the users

18    were covered by a license, and the customers, the Ford car

19    owner.

20            And the question was:  Could the company,

21    convertible top replacement, sue *ARO* that was just

22    providing the fabric for replacement.

23            And since Ford had a license, even though its

24    license and in the settlement agreement had a reservation,

25    that the patent owner expressly reserved the right

1    prohibiting the fabric replacement unless purchased from

2    Ford.  The Supreme Court said that clause was invalid as

3    it relates to *ARO's* sale of just the fabric, a component,

4    not patented, to the customer, the Ford car owner.

5              **THE COURT:**  Whose opinion said that?

6              **MR. STEINBERG:**  Brennan.

7              So then there's another opinion --

8              **THE COURT:**  There's subsequent case law, just

9    so you'll know, because this just came up in another

10   context recently.  But I think there's a question of

11   whether the entirety of Brennan's opinion is actually the

12   majority opinion in that case.

13             **MR. STEINBERG:**  Whose opinion?

14             **THE COURT:**  *Global-Tech,* it's either

15   *Global-Tech* or *Halo*, this comes out.  Anyway, I don't need

16   it for the record.  Look, you can make all this to the

17   Federal Circuit.

18             The case law, I mean, and, again, I think

19   Mr. Barkan did a nice job.  Because as he pointed out, you

20   know, it's not like *TransCor*e has coming along and

21   correcting some lower court's opinion about whether a

22   covenant not to sue is a license.

23             It's not like it's adding gloss on anything.  I

24   mean, all it's doing is recognizing what I think is very

25   clear in the patent law, that a covenant not to sue is a

1        license.  And there was no case before it.  It wasn't like

2        *TransCore* said, we need to correct the case law that's out

3        there or clarify it.  No, you know.

4                So anyway, all this is good, but we've got to

5        watch time.  We're in the District Court.  We're not in

6        the Federal Circuit where they have a lot of time to write

7        a treatise on this.

8                I think it's the right result.  It's very clear

9        to me under the case law.  And I might be wrong, you know.

10       If I am, I think it's a shame, because I think it is the

11       right result.

12               **MR. STEINBERG:**  Okay.  Your Honor, that's all I

13       had to say.

14               **THE COURT:**  All right.  So that motion you're

15       going to submit no later than Monday, a form order for me

16       to sign, and, hopefully, you'll work it out.  If not, I'll

17       go back and spend the time.  I think it's really clear

18       where we are.  All right?

19               **MR. STEINBERG:**  Can I hand up to you the

20       slides?

21               **THE COURT:**  Sure.

22               All right.  Let's deal with the second motion.

23               And we didn't address the importation.  And

24       that's why I think it's probably fair to say, at least at

25       this point, "Granted in part, denied in part."  Or

1    analysis.  And, frankly, there's not even a conclusory

2    assertion in the opening report.

3         But go ahead.  You can show me what you want

4    from the reply brief.  But what you're really going to

5    have to show me is that in his deposition, he offered an

6    analysis of why the Nvidia evaluation board, made by MPS,

7    infringes the patents.

8         All right.  Go ahead.  Show me what you want in

9    the reply brief.

10        **MR. PIROUZNIA:**  So Your Honor, taking one step

11   back.  Last time I was up here, I talked all about the

12   opening report and about why the Nvidia Power Solution

13   umbrella included the evaluation --

14        **THE COURT:**  Right.  And I don't think it does.

15   I think that is a stretch.  And I, frankly, don't think

16   it's a credible reading of the report.  And I think that's

17   why we get this statement that we do on Page 149 or

18   Paragraph 149 of the reply brief.

19        And then when we get to the deposition

20   testimony, specifically to Pages 216 to 217, we get a

21   confirmation that there's not a direct correlation between

22   the MPS-made evaluation board and the evaluation board,

23   ultimately, that is included in the accused products.

24        Go ahead and show me what you want.  We've got

25   to watch the time.  Show me what you want in the reply

1   brief, and then let's turn to the deposition.  Go ahead.

2          **MR. PIROUZNIA:**  I just want to make sure we

3   frame the issue correctly.

4          But what I didn't show you from the opening

5   report was all the numerous paragraphs analyzing the

6   inductor in the Nvidia Power Solution.  That's all in

7   there.  They're not debating that.  There is

8   claim-by-claim element for the Nvidia Power Solution

9   coupled inductor.

10          The sole issue is, is that coupled inductor

11   identified as the same in both production and evaluation.

12          **THE COURT:**  Correct.

13          **MR. PIROUZNIA:**  Right?  So we don't need

14   Dr. Dickens' depo to walk through each element of the

15   patent.  He's already done that.  We just need to make

16   sure his opinion is that evaluation board coupled inductor

17   equals production board coupled inductor.

18          **THE COURT:**  Okay.

19          **MR. PIROUZNIA:**  Okay?  And so when the question

20   came up in their rebuttal reports, that's when we get the

21   reply report.

22          **THE COURT:**  And you know, I will accept that

23   for right now.  But I, frankly, am kind of bothered by it,

24   the whole premise here.  It seems gamesmanship.  It really

25   does.  You can be very, very forthright.  If you're an

1    expert -- he should have just said in his opening report,

2    "Hey, this evaluation board, it infringes."  He doesn't

3    say that.  And that's very, very clear.  He doesn't say

4    it.

5              And they reasonably interpreted the report not

6    to say it.  And then he comes back, and he says that he

7    disagrees that he didn't say it.

8              But at the end of Paragraph 14, he gives this,

9    what I would say is, less than clear conclusory sentence

10   that, "Thus, when my report identifies the Nvidia Power

11   Solution as infringing the '986 patent, that includes the

12   evaluation board that MPS designed and created."

13             And then we get to Paragraph 149 where he's

14   very, very explicitly that he did accuse the evaluation

15   board.  But, of course, I don't see any language where he

16   does accuse the evaluation board.

17             Go ahead.

18             **MR. PIROUZNIA:**  Your Honor, there's one

19   paragraph we haven't looked at yet, that I'd like to point

20   the Court to.  That's Paragraph 12, right before 14,

21   right.

22             "By way of further example, my opening report

23   referenced several instances where MPS used the Nvidia

24   Power Solutions.  For example, my report described how

25   MPS' employee, Dawson Huang, traveled to Nvidia's U.S.

1    this in another case in regards to res judicata.  And it's

2    very common you get infringement on one product, you go to

3    the next trial, if it's substantially similar in all

4    aspects that infringed, that's all you need.  You don't

5    need to put on a whole other infringement case.

6           So under the law, you don't need an expert

7    opinion on something that's substantially identical with

8    respect to infringement.  All we need to do is the issue I

9    pointed out before, show these are the same.  We can do

10   that through Dr. Huang's testimony, the data sheet and

11   MPS' manual, as I indicated earlier, Your Honor.

12          **MR. JONES:**  Your Honor, I mean, it would be our

13   position that even if they -- if they want to specifically

14   identify that the coupled inductor is the exact same,

15   there's an evaluation for that coupled inductor, but not

16   as used in the evaluation board.  So there is a question

17   of that.

18          But, the -- ultimately, however you want to

19   resolve this.  The ultimate thing that we move for and are

20   asking for, is that Dr. Dickens be restricted to the

21   opinions that he offered in his report, which there, he

22   did not offer direct infringement opinion for the

23   evaluation board.

24          **THE COURT:**  Okay.  Here's where I am on the

25   motion.  I do believe that there was not anything other

1     than, at best, a wholly conclusory opinion about whether

2     the MPS-made evaluation board infringes the asserted

3     claims.

4              I'm not even sure -- I actually don't think

5     there was an opinion made, that it infringes except as

6     stated in the reply brief.  And it is absolutely -- it's

7     in Paragraph 14 and 149, and it is absolutely conclusory.

8     And it's reference to Paragraph 78 and 4 --

9              **MR. JONES:**  I believe it's 487, Your Honor.

10             **THE COURT:**  -- 487 in the opening brief.

11    Actually, you know, reveals disingenuousness on the part

12    of the expert.  Those paragraphs are in the context of

13    induced infringement.  And there's not any kind of

14    analysis there about direct infringement of the MPS-made

15    evaluation board.

16             Now, I'm not ruling, though.  I'm not barring

17    at this point.  You can file, I guess, a motion in limine.

18    I'm not precluding argument by the plaintiff that you can

19    basically just apply the transitive property, though,

20    through factual witnesses that establish the identical

21    nature of some other evaluation board to this MPS -- well,

22    no, to the evaluation board that was analyzed in the

23    opening report.

24             And then they can argue that those evaluation

25    boards also infringe.

# EXHIBITS 22 - 23
# Redacted in their Entirety